IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In Re Enron Corporation Securities, Derivative & "ERISA" Litigation | § § § § | MDL-1446 |
| MARK NEWBY, ET AL.,<br><br>            Plaintiffs<br><br>VS.<br><br>ENRON CORPORATION, ET AL.,<br><br>            Defendants. | § § § § § § § § § § | CIVIL ACTION NO. H-01-3624<br>CONSOLIDATED CASES |
| AMERICAN NATIONAL INSURANCE COMPANY, et al.,<br><br><br>            Plaintiffs,<br>VS.<br><br>ARTHUR ANDERSEN, LLP, et al.,<br><br>            Defendants. | § § § § § § § § § | CIVIL ACTION NO. G-03-0967 |

**OPINION AND ORDER OF PARTIAL DISMISSAL**

Pending before the Court in G-03-0967, alleging a giant Ponzi

scheme involving *inter alia* all Defendants sued here,[1] in

---

[1] Claims against most Outside Directors were dismissed on 10/31/06, #45; claims against Outside Director Ken Harrison were dismissed on 4/10/07, #84; claims against Outside Director John Wakeham were dismissed on 7/13/07, #105; and claims against Outside Director Paulo V. Ferraz Pereira were dismissed on 2/8/07, #59. Claims against Director Rebecca Mark-Jusbasche were dismissed on 6/22/07, #101.
    Claims remain pending against Arthur Andersen and its employees, David Duncan and D. Stephen Goddard, Jr.; against former Enron officers and Directors Jeffrey Skilling, Andrew Fastow, Richard Causey, Richard Buy, Michael Kopper, and Kenneth Lay, now deceased.  The Second Amended Complaint, #56 at ¶ 12, the now

violation of (1) the Texas Securities Act ("TSA"), Tex. Rev. Civ.
Stat. art. 581-33, *et seq.*, (2) the Texas Fraud in Real Estate And
Stock Transactions statute, Texas Business & Commerce Code § 27.01
*et seq.*, and (3) Texas common law (fraud, civil conspiracy to
commit fraud, and negligence and professional malpractice),[2] are
motions to dismiss the Second Amended Complaint pursuant to
Federal Rules of Civil Procedure 12(b)(6) and 9(b), filed by the
following Defendants:  (1) Arthur Andersen, LLP and D. Stephen
Goddard, Jr. (collectively, "Andersen")(instrument #62); (2)

---

governing pleading here, states that Plaintiffs intend to
substitute the Estate of Kenneth L. Lay, Deceased, but there is no
indication on the docket sheet that they have done so.

[2] Plaintiffs seek actual damages.  They also seek exemplary
damages based on conduct designated as a felony in §§ 32.43
(commercial bribery), 32.45 (misapplication of fiduciary property
or property of a financial institution), 32.46 (securing execution
of document by deception), and 32.47 (fraudulent destruction,
removal or concealment of writing) of the Texas Penal Code, which
are exempted from the cap on exemplary damages in Texas Civil
Practice & Remedies Code § 41.008(c).  Section 41.008(b) of Texas
Civil Practice and Remedies Code Ann. (Vernon Supp. 2007) provides
for a cap, generally, on exemplary damages:

> (b) Exemplary damages awarded against a defendant may not
> exceed an amount equal to the greater of:
>
> 1. (1)(A) two times the amount of economic
>    damages; plus
>
>    (B) an amount equal to any noneconomic
> damages found by the jury, not to exceed $750,000; or
>
> 2. $200,000.

Section 41.008(c) states that the cap does not apply to specified
felonies described in sections of the Penal Code, including those
alleged by Plaintiffs.

Richard B. Buy (#67), who, alternatively requests a more definite statement under Fed. R. Civ. P. 12(e); and (3) David B. Duncan (#69).  Furthermore, in their response to Richard B. Buy's motion, Plaintiffs include a request for acknowledgment that unanswered admissions served on Richard B. Buy[3] on October 26, 2005 (Ex. A to #76) are deemed admitted (#76).  Finally Plaintiffs have filed a motion for status conference (#111).

The Plaintiffs are American National Insurance Company, American National Investment Accounts, Inc., S.M. & R. Investments, Inc., American National Property and Casualty Company, Standard Life and Accident Insurance Company, Farm Family Life Insurance Company, Farm Family Casualty Insurance Company, and National Western Life Insurance Company.

According to the Second Amended Complaint, Defendants are comprised of three, at times overlapping, groups.  #56 at ¶¶ 48–50.  Arthur Andersen, LLP[4] and two of its accountants, D. Stephen

---

[3] Buy was Executive Vice President and Chief Risk Officer of Enron from June 1999 until Enron's bankruptcy.

[4] "Arthur Andersen was Enron's accountant from the time Enron was created until Enron's bankruptcy filing."  #73 at 2.

Goddard, Jr.[5] and David B. Duncan,[6] are referred to in the complaint as the "AA Defendants."   The Enron "Management Defendants," who are purportedly liable in their individual capacities "because the wrongful conduct was not within the proper scope of employment with Enron," are Kenneth Lay, Jeffrey Skilling, Andrew Fastow, Richard Causey, Richard Buy, and Michael Kopper.   The complaint asserts that they conceived and perpetrated the fraud, which was subsequently rubber-stamped by the Executive Committee and by the Board of Directors, which wantonly

---

[5] "During the years prior to Enron's Collapse, Stephen Goddard managed Arthur Andersen's Houston Office and was one of the primary Arthur Andersen partners working on the Enron account."  #73 at 2. Goddard worked with David Duncan, was an advisory partner to the Enron engagement, and with Duncan attended most of the Enron Audit Committee meetings.  #56, ¶¶ 560-62.

[6] David B. Duncan was a partner in Arthur Andersen, LLP, the lead engagement partner on the Enron account, and the supervisor of the Enron engagement team in Houston.  #73 at 1-2; #56, ¶¶ 560-62. With Goddard, he attended most of the Enron Audit Committee meetings.  #56, ¶ 562.  After Enron's collapse, Arthur Andersen LLP fired Duncan for violating its policies in destroying Enron documents.  On April 9, 2002 Duncan pleaded guilty and entered into a plea agreement with the Department of Justice after it brought obstruction of justice charges against him.  #73 at 2.
The Court would add that Duncan cooperated with the government and testified during the trial against Arthur Andersen LLP for obstruction of justice (H-02-CR-121, from May 6, 2002-June 15, 2002).  After the verdict against Arthur Andersen was overturned by the United States Supreme Court on a jury instruction (*Arthur Andersen, LLP. v. U.S.*, 544 U.S. 696 (2005)), the criminal charge against Duncan was dropped and Duncan, whose sentencing had been postponed continuously, withdrew his guilty plea on December 12, 2005, with the approval of the undersigned judge.  In January 2009, he settled with the SEC which had charged that he had violated securities laws.

disregarded their duties to perform independent oversight of the corporation's activities and to implement and monitor controls, thereby aiding Enron's fraud.    Finally a third group, the "Director Defendants," who were members of Enron's Board of Directors, originally included Robert Jaedicke, Ronnie Chan, Joe Foy, John Wakeham, Wendy Gramm, John Mendelsohn, Paulo Ferraz Pereira, Robert Belfer, Norman Blake, Jr., John H. Duncan, Charles LeMaistre, Frank Savage, Herbert Winokur, Ken L. Harrison, Rebecca Mark-Jusbasche, Jerome Meyer, John Urquhart and Charles Walker. Allegations against the "Director Defendants" are complaints against each individual during the time period that the individual was a member of the Board of Directors, unless otherwise indicated.  As noted earlier, all of the above listed "Director Defendants" have since been dismissed from the suit (#60, 84, 91, 101, 105, 109, 110).    Nevertheless Kenneth Lay and Jeffrey Skilling were also Enron Board members, so each allegation against the "Director Defendants" is also an allegation against the two of them.  As noted, Mr. Lay is deceased, but Plaintiffs' claims against Skilling as a "Director Defendant," as well as a "Management Defendant," remain pending.

The Court will address the Andersen Defendants' two motions, and subsequently, Richard B. Buy's.

### Standard of Review under Rules 12(b)(6) and 9(b)

When a district court reviews a motion to dismiss pursuant

to Fed. R. Civ. P. 12(b)(6), it must construe the complaint in favor of the plaintiff and take all well-pleaded facts as true. *Kane Enterprises v. MacGregor (US), Inc.*, 322 F.3d 371, 374 (5th Cir. 2003), *citing Campbell v. Wells Fargo Bank*, 781 F.2d 440, 442 (5th Cir. 1986).  In addition to the complaint, the court may review documents attached to the complaint[7] and documents attached to the motion to dismiss to which the complaint refers and which are central to the plaintiff's claim(s).   *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000).

Generally, "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, . . . a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause

---

[7] Attached to the Second Amended Complaint (#56) in this action is the expert report and opinions of Professor Daryl Koehn, Executive Director of the Center for Business Ethics of the University of St. Thomas in Houston, Texas, addressing the performance of the Enron Board of Directors and Board Committees. According to the complaint Koehn is "an internationally recognized corporate governance expert, whose review of relevant documents led to his report specifying 'critical material Board of Director failures.'"  #56, ¶ 449.

The Complaint in large part focuses on the failures of Enron's Board of Directors and Committees to provide adequate independent oversight of the activities of the corporation and to implement and monitor internal controls.   Enron directors served on five Committees:   Audit and Compliance; Finance; Compensation and Management Development; Nomination and Corporate Governance; and Executive. #57, § 191. Lay, an Enron Board member from 1985-2002, served on the Executive Committee during 1995-2002. *Id.* at ¶ 244. Skilling served on the Executive Committee from 1997-2001. *Id.* at 245.

-6-

of action will not do . . . ." *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007)(citations omitted). "Factual allegations must be enough to raise a right to relief above the speculative level." *Id.* at 1965, *citing* 5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1216, pp. 235-236 (3d ed. 2004)("[T]he pleading must contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action."). "*Twombly* jettisoned the minimum notice pleading requirement of *Conley v. Gibson*, 355 U.S. 41 . . . (1957)["a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief"], and instead required that a complaint allege enough facts to state a claim that is plausible on its face." *St. Germain v. Howard*, 556 F.3d 261, 263 n.2 (5th Cir. 2009), *citing In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007). "Dismissal is proper if the complaint lacks an allegation regarding a required element necessary to obtain relief . . . ." *Rios v. City of Del Rio, Texas*, 444 F.3d 417, 421 (5th Cir. 2006), *cert. denied*, 549 U.S. 825 (2006).

Recently, in *Ashcroft v. Iqbal*, the Supreme Court, applying the *Twombly* plausibility standard to a *Bivens* claim of unconstitutional discrimination and a defense of qualified immunity for a government official, observed that two principles

inform the *Twombly* opinion: (1) "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." . . . Rule 8 "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions"; and (2) "only a complaint that states a plausible claim for relief survives a motion to dismiss," a determination involving "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 129 S. Ct. 1937, 1940 (2009)(5-4).

Fraud claims must also satisfy the heightened pleading standard set out in Federal Rule of Civil Procedure 9(b): "In allegations alleging fraud . . ., a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." "What constitutes 'particularity' will necessarily differ with the facts of each case . . . ." *Benchmark Electronics, Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 724 (5th Cir. 2003)(*citing Guidry v. Bank of LaPlace*, 954 F.2d 278, 288 (5th Cir. 1992)), *modified on other grounds*, 355 F.3d 356 (5th Cir. 2003).

The Fifth Circuit interprets Rule 9(b) to require at minimum "specificity as to the statements (or omissions) considered to be fraudulent, the speaker, when and why the statements were made, and an explanation of why they were fraudulent." *Plotkin v. IP Axess, Inc.,* 407 F.3d 690, 696 (5th Cir. 2005). *See also Williams*

*v. WMX Technologies, Inc.*, 112 F.3d 175, 179 (5th Cir. 1997)(Rule 9(b) requires "'the who, what, when, where, and how' to be laid out.")(citations omitted), *cert. denied*, 522 U.S. 966 (1997).

Furthermore, although Rule 9(b) expressly states, "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally," the Fifth Circuit has ruled that even though common-law fraud claims are not subject to the strong inference of scienter standard imposed by the Private Securities Litigation Reform Act of 1995 ("PSLRA")[8] on federal securities claims, Rule

---

[8] Under the strict standard of the PSLRA, a plaintiff must "for each act or omission alleged" to be false or misleading, "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). In the context of federal securities fraud, scienter is "defined as 'an intent to deceive, manipulate, or defraud or that severe recklessness in which the danger of misleading buyers or sellers is either known to the defendant or is so obvious that the defendant must have been aware of it.'" *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 207 (5th Cir. 2009)(*citing R2 Invs. LDC v. Phillips*, 401 F. 3d 638, 643 (5th Cir. 2005), *cert. denied*, 130 S. Ct. 199(2009), and *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 697 (5th Cir. 2005)("[A] securities fraud plaintiff must prove that the defendant either consciously misbehaved . . . or was so severely reckless that it demonstrates that the defendant must have been aware of the danger of misleading the investing public."). "'Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from standards of ordinary care.'" *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d at 2073, *quoting R2 Invs.*, 401 F. 3d 643. In *Tellabs Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 127 S. Ct. 2499 (2007), the Supreme Court held that for drafting a complaint under Rule 12(b)(6) to adequately plead scienter, "Congress required plaintiffs to plead with particularity facts that would give rise to a 'strong'--*i.e.*, a powerful or cogent-- inference." *Tellabs*, 127 S. Ct. at 2509-10. Furthermore,

9(b) "incorporates an element of scienter." *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 213 (5th Cir. 2009)(*citing Dorsey v. Portfolio Equities, Inc.*, 540 F. 3d 333, 341 (5th Cir. 2008)), *cert. denied*, 130 S. Ct. 199 (2009). Rule 9(b) applies to state law fraud claims. *Sullivan v. Leor*, __ F.3d ___, No. 06-20867, 2010 WL 909109, *5 (5th Cir. mar. 15, 2010). In order to plead adequately fraudulent intent in the context of a state-law securities fraud claim, a plaintiff must allege specific facts to support an inference of fraud. *Flaherty*, 565 F.3d at 213. "'Alleged facts are sufficient to support such an inference if they either (1) show a defendant's motive to commit securities fraud or (2) identify circumstances that indicate conscious behavior on the part of the defendant.'" *Id.*, quoting *Herrmann Holdings, Ltd. v. Lucent Technologies, Inc.*, 302 F.3d 552, 565 (5th Cir. 2002).

The pleading standards of *Twombly* and Rule 9(b) apply to pleading a state-law claim of conspiracy to commit fraud. *U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 185, 193 (5th Cir.

---

the inquiry is inherently comparative [and] . . . a court must take into account plausible inferences opposing as well as supporting a strong inference of scienter. The inference of scienter must ultimately be "cogent and compelling," not merely "reasonable" or "permissible." A complaint will survive, we hold, only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.

*Tellabs*, 127 S. Ct. at 2510.

-10-

2009)("The *Twombly* standard replaces the lenient and longstanding rule that 'a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. The new reading raises a hurdle in front of what courts had previously seen as a plaintiff's nigh immediate access to discovery--modest in its demands but wide in its scope."; "a plaintiff alleging a conspiracy to commit fraud must 'plead with particularity the conspiracy as well as the overt acts . . . taken in furtherance of the conspiracy'"), *quoting FC Inv. Group LLC v. IFX Markets, Ltd.*, 529 F.3d 1087, 1097 (D.C. Cir. 2008).

Because conspiracy to defraud is a derivative tort that includes an underlying claim of common-law fraud, under Rule 9(b) if the plaintiff fails to adequately plead fraud, the court must dismiss the conspiracy claim, too. *Jag Media Holdings, Inc. v. A.G. Edwards & Sons, Inc.*, 387 F. Supp. 2d 691, 710 (S.D. Tex. 2004); *in accord Allstate Ins. Co. v. Receivable Finance, Inc.*, 501 F.3d 398, 414 (5th Cir. 2007)(If Plaintiffs fail to state a claim for fraud underlying their civil conspiracy claim, the civil conspiracy claim must be dismissed, too.); *American Tobacco Co., Inc. v. Grinnell*, 951 S.W. 2d 420, 438 (Tex. 1997)("Allegations of conspiracy are not actionable absent an underlying [tort]"); *Krames v. Bohannon Holman, LLC*, No. 3:06-CV-2370-0, 2009 WL

762205, *10 (N.D. Tex. Mar. 24, 2009)("Plaintiffs' failure to state a claim for fraud, which is the offense underlying their conspiracy claim, necessitates that Plaintiffs' conspiracy claim should similarly be dismissed.").

Rule 9(b) also applies to statutory fraud claims arising under Tex. Bus. & Comm. Code § 27.01. *7-Eleven Inc. v. Puerto Rico-7 Inc.*, No. 3:08-CV-00140-B, 2008 WL 4951502, *2 (N.D. Tex. Nov. 19, 2008), *citing Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338-39 (5th Cir. 2008).

A dismissal for failure to plead with particularity as required by Rule 9(b) is treated the same as a Rule 12(b)(6) dismissal for failure to state a claim. *Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1017 (5th Cir. 1996).

**Federal Rule of Civil Procedure 36:  Requests for Admission**

Rule 36(a)(1) states in relevant part,

**(1) *Scope.*   A** party may serve on any other party a written request to admit, for purposes of the pending action only, the truth of any matters within the scope of Rule 26(b)(1) relating to:

> **(A)** facts, the application of law to fact, or opinions about either; and

> **(B)** the genuineness of any described documents.

Rule 36(a)(3) provides,

**(3) *Time to Respond:  Effect of Not Responding.***

A matter is admitted unless, within 30 days after being served, the party to whom the request is directed

-12-

serves on the requesting party a written answer or
objection addressed to the matter and signed by the
party or its attorney.  A shorter or longer time for
responding may be stipulated to under Rule 29 or be
ordered by the court.

Finally, Rule 36(b) sets out the procedure to seek to
withdraw or amend a matter admitted:

> **(b) Effect of an Admission; Withdrawing or Amending It.**
> A matter admitted under this rule is conclusively
> established unless the court, on motion, permits the
> admission to be withdrawn or amended.  Subject to Rule
> 16(e), the court may permit withdrawal or amendment if
> it would promote the presentation of the merits of the
> act and if the court is not persuaded that it would
> prejudice the requesting party in maintaining or
> defending the action on the merits.  An admission under
> this rule is not an admission for any other purpose and
> cannot be used against the party in any other
> proceeding.

The Fifth Circuit has opined that "Rule 36 allows litigants
to request admissions as to a broad range of matters, including
ultimate facts, as well as applications of law to fact." *In re
Carney*, 258 F.3d 415, 419 (5th Cir. 2001).  Nevertheless, Rule 36
cannot be used to compel an admission of a conclusion of law.
*Id., citing Playboy Enterprises, Inc. v. Welles*, 60 F. Supp. 2d
1050, 1057 (S.D. Cal. 1999).  The breadth of the scope "allows
litigants to winnow down issues prior to trial and thus focus
their energy and resources on disputed matters." *Id., citing*
Wright, Miller & Marcus, *Federal Practice and Procedure:  Civil
2d* § 2254 (1994).  To insure that parties can rely on matters
admitted, a matter admitted "is conclusively established unless
the court on motion permits withdrawal or amendment of the

admission." *Id.*, quoting Rule 36.

A deemed admission can only be withdrawn or amended by a motion in compliance with Rule 36(b). *Carney*, 258 F. 3d at 419. *See id.* at 420 ("[T]he proper course for a litigant that wishes to avoid the consequences of failing to timely respond to Rule 36 requests for admission is to move the court to amend or withdraw the default admissions in accordance with the standard outlined in Rule 36(b)."). Recognizing the "'potential harshness'" of the Rule in that "'the failure to respond to admissions can effectively deprive a party of the opportunity to contest the merits of a case,'" the Fifth Circuit has opined that this result "'is necessary to insure the orderly disposition of cases; parties to a lawsuit must comply with the rules of civil procedure.  In addition the harshness is tempered by the availability of the motion to withdraw admissions . . . .'"  *Id., quoting United States v. Kasuboksi*, 834 F.2d 1345, 1350 (7th Cir. 1987).

To permit withdrawal or amendment, the district court "must find that withdrawal or amendment: 1) would serve the presentation of the case on its merits, but 2) would not prejudice the party that obtained the admissions in its presentation of the case." *Id. See also Le v. Cheesecake Factory Rest., Inc.*, No. 06-20006, 2007 WL 715260, *2-3 (5th Cir. Mar. 6, 2007).  Even if these two factors are met, the court still has the discretion to deny a request for withdrawal or amendment. *Carney*, 258 F. 3d at 419;

*Cheesecake Factory*, 2007 WL 715260, *3 (in addition to deciding whether denial of the withdrawal would essentially eliminate any presentation of the case, this court and others have considered other factors, such as whether the plaintiff has demonstrated that the merits would be served by advancing evidence showing that 'the admission is contrary to the record of the case,' or that the admission 'is no longer true because of changed circumstances or [that] through an honest error a party has made an improvident admission.'"), *citing N. La. Rehab. Ctr., Inc. v. United States*, 179 F. Supp. 2d 658, 663 (W.D. La, 2001).   *In accord Branch Banking & Trust Co. v. Deutz-Allis Corp.,* 120 F.R.D. 655, 658-59 (E.D.N.C. 1988)(denying withdrawal because movants for withdrawal proffered "no affidavit, verified pleading, or other evidence . . . to suggest the admission, if left standing, would render an unjust result under the law.").   The Fifth Circuit has also held that the court acts within its discretion if it considers the fault of the party seeking withdrawal or its diligence in seeking withdrawal. *Cheesecake Factory*, 2007 WL 715260, at *2.

### Adverse Inferences in Civil Actions

### 1. Invocation of the Fifth Amendment Privilege

The Fifth Amendment states in relevant part, "No person . . . shall be compelled in any criminal case to be a witness against himself . . . ."  U.S. Const. Amend. V.  The Fifth Amendment privilege against compulsory self incrimination "can be asserted

-15-

in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory . . . . ." *Kastigar v. United States*, 406 U.S. 441, 444 (1972); *U.S. v. Ramos*, 537 F.3d 439, 454 (2008).   The privilege against self-incrimination "protects against any disclosures which the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used." *Kastigar* at 445; *Ramos* at 454. The privilege protects a party against self incrimination under both federal and state law. *Murphy v. Waterfront Comm'n of New York Harbor*, 378 U.S. 52, 77-78 (1964).   The privilege covers not only responses that would support the party's criminal conviction, but also "embraces those which would furnish a link in the chain of evidence needed to prosecute." *Malloy v. Hogan*, 378 U.S. 1, 11 (1964), *citing Hoffman v. U.S.*, 341 U.S. 479, 486-87 (1951); *Maness v. Meyers*, 419 U.S. 449, 461 (1975).

"[W]hile a person may refuse to testify during civil proceedings on the ground that his testimony might incriminate him . . . his refusal to testify may be used against him in a civil proceeding." *Farace v. Independent Fire Ins. Co.*, 699 F.2d 204, 210 (5th Cir. 1983), *cited for that proposition, Hinojosa v. Butler*, 547 F.3d 285, 291 (5th Cir. 2008).   While a jury in a criminal case is not permitted to draw adverse inferences when a defendant invokes his Fifth Amendment right and refuses to testify, it is well established that "the Fifth Amendment does not

-16-

forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them." *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976), *cited for that proposition, Hinojosa*, 547 F.3d at 291.

Under Fed. R. Civ. P. 8(b)(6)("An allegation--other than one relating to the amount of damages--is admitted if a responsive pleading is required and the allegation is not denied."), "the failure to deny an allegation in a pleading to which a responsive pleading is required constitutes an admission of that allegation." *North River Ins. Co. v. Stefanou*, 831 F.2d 484, 486 (4th Cir. 1987), *cert. denied*, 486 U.S. 1007 (1988). A proper and timely assertion of the Fifth Amendment privilege against self-incrimination, even at the pleading stage, can preclude the operation of Rule 8(b)(6). *Id.* When served with a request for admissions, "a party is entitled to the same constitutional protection as if the party were called as a witness at trial." *In re Fetla's Trading Post, Inc.*, No. 04 B 12231 *et al.*, 2006 WL 538802, *3 (Bankr. N.D. Ill. Mar. 02, 2006).

Nevertheless, a blanket refusal to answer requests for discovery by invoking the Fifth Amendment privilege is insufficient; an individual must affirmatively assert the privilege "with sufficient particularity to allow an informed ruling on the claim." *North River Ins. Co. v. Stefanou,* 831 F.3d at 486-87. "He is obliged to answer those allegations that he can

-17-

and to make a specific claim of the privilege as to the rest."
*Id.* at 486, *citing* 5 C. Wright & A. Miller, *Federal Practice and
Procedure* § 1280 at 360 (1969).  Then the court must conduct "a
particularized inquiry, deciding in connection with each specific
area that the questioning seeks to explore, whether or not the
privilege is well-founded."  *SEC v. First Financial Group of
Texas, Inc.*, 659 F.2d 660, 668 (5th Cir. 1981).  *See also Stefano*,
831 F.2d at 486 ("Nor does a proper invocation of the privilege
mean that a defendant is excused from the requirement to file a
responsive pleading; he is obliged to answer those allegations
that he can and make a specific claim of privilege as to the
rest."), *citing* 5 C. Wright & A. Miller, *Federal Practice and
Procedure* § 1280, at 360 (1969); *id.* at 487 ("[F]or one to invoke
this privilege the party claiming it must not only affirmatively
assert it, he must do so with sufficient particularity to allow
an informed ruling on the claim.").  "Even where a party has a
legitimate claim of privilege with respect to certain questions
or lines of inquiry, that person may not be entitled to invoke his
privilege to remain totally silent.  Only where the court finds
that he could 'legitimately refuse to answer essentially all
relevant questions,' because of the threat of incrimination from
any relevant question is a person totally excused from responding
to relevant inquiries."  *Id.* at 668-69.  "A party is not entitled
to decide for himself whether he is protected by the fifth

-18-

amendment privilege." *First Financial Group of Texas, Inc.*, 659 F.2d at 668. *See also Hoffman v. U.S.*, 341 U.S. 479, 486 (1951)("The witness is not exonerated from answering merely because he declares that in so doing he would incriminate himself--his say-so does not of itself establish the hazard of incrimination. It is for the court to say whether his silence is justified.").

Moreover a party may waive the Fifth Amendment right if he testifies to certain transactions and then refuses to testify further because the disclosure of a fact waives the privilege as to its details. *Brown v. Walker*, 161 U.S. 591, 597 (1896)("Thus, if the witness himself elects to waive his privilege, as he may doubtless do, since the privilege is for his protection and not for that of other parties, and discloses his criminal connections, he is not permitted to stop, but must go on and make a full disclosure."); *McCarthy v. Arndstein*, 262 U.S. 355, 358-59 (1923)(same), *rehearing granted*, 263 U.S. 676 (19223), *aff'd*, 266 U.S. 34 (1924); *Rogers v. U.S.*, 340 U.S. 367, 373-74 (1951)("Disclosure of a fact waives the privilege as to details"; "[W]here a witness has voluntarily answered as to materially [in]criminating facts . . . he cannot stop short and refuse further explanation, but must disclose fully what he attempted to relate.").

In general, the district court has wide discretion in

deciding whether to admit evidence of a party's invocation of the Fifth Amendment. *Farace*, 699 F.2d at 210. The Fifth Circuit has found that under Federal Rule of Evidence 403 ("[E]vidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . .. ."), a district court may exclude evidence of invocation of the Fifth Amendment privilege, even though it generally allows adverse inferences against parties in civil actions when they refuse to testify in response to probative evidence, e.g., when that party subsequently testifies or cooperates with an investigation. *Burdine v. Johnson*, 262 F.3d 336, 367 (5th Cir. 2001), *cert. denied sub nom. Cockrell v. Burdine*, 535 U.S. 1120 (2002). Moreover the Fifth Circuit has affirmed a district court decision that the adverse inference from a party's refusal to answer questions about collateral matters, by itself, was insufficient to create an issue of material fact to preclude summary judgment without significant probative evidence to bolster the inference. *State Farm Life Ins. v. Gutterman*, 896 F.2d 116, 119 (5th Cir. 1990)(after stating under oath in a deposition and an affidavit that she did not participate in her husband's death, "Diane Gutterman's refusal to testify to collateral matters regarding Dr. Gutterman's shooting is not 'significant probative evidence' to create a genuine issue of material fact" without other evidence to bolster the inference), *citing Avirgan v. Hull*, 691 F. Supp. 1357 (S.D. Fla.

1988)(concluding the adverse inference from the party's refusal to answer questions was insufficient to create a material issue of fact). *See also Federal Deposit Ins. Corp.*, 45 F.3d at 977-78 (invocation of Fifth Amendment by a non-party against a party is barred where not relevant but used only to discredit a party). "The assertion of the [fifth amendment] privilege, particularly on the advice of counsel, is an ambiguous response." *Farace*, 699 F.2d at 210-11 (holding that the district court did not err in excluding as unfairly prejudicial evidence of a party's assertion of his fifth amendment right). The Fifth Circuit has "limited the value of the negative inference by recognizing that a party seeking summary judgment cannot rely solely on the other party's exercise of his fifth amendment rights. *Gutterman*, 896 F.2d at 119 n.3, *citing United States v. White*, 589 F.2d 1283, 1287 (5th Cir. 1979)("[A] grant of summary judgment merely because of the invocation of the fifth amendment would unduly penalize the employment of the privilege.").

The entry of a guilty plea does not waive or extinguish the privilege, which remains in effect through sentencing because the party's response to questions might have an adverse impact on his sentence or his prosecution for other crimes. *Mitchell v. United States*, 526 U.S. 314, 324-27 (1999). "[A] guilty plea is more like an offer to stipulate than a decision to take the stand" and the "purpose of Rule 11 is to inform the defendant of what he

loses by forgoing the trial, not to elicit a waiver of the privilege for proceedings still to follow." *Id.* at 323.

Moreover, Federal Rule of Evidence 410 generally mandates that where a defendant who entered a plea of guilty is later permitted to withdraw it under Federal Rule of Criminal Procedure 32(d), evidence of that plea is not admissible in any criminal or civil proceeding against the defendant who made it. The same is true of any statements made by the defendant during the negotiations with the prosecutor or statements made in court to establish the factual basis for the plea for the court. Fed. R. Evid. 410(4).

## 2. Spoliation of Evidence

"Spoliation" is "the destruction of evidence . . . . The significant and meaningful alteration of a document or instrument." *Andrade Garcia v. Columbia Med. Ctr.*, 996 F. Supp. 605, 615 (E.D. Tex. 1998)(citations omitted). "If a party with a duty to preserve evidence fails to do so and acts with culpability, a court may impose appropriate sanctions. . . . The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation.'" *Smith v. American Founders Financial Corp.*, 365 B.R. 647, 681 (S.D. Tex. 2007)(and cases quoted and cited therein). "A court may . . . assume facts against a party that

destroys or loses evidence subject to a preservation obligation." *Id., citing FDIC v. Hurwitz*, 384 F. Supp. 2d 1039, 1099 (S.D. Tex. 2005). Under the doctrine of spoliation, a jury may draw an adverse inference "'that a party who intentionally destroys important evidence in bad faith did so because the contents of those documents were unfavorable to that party.'" *Whit v. Stephens County*, 529 F.3d 278, 284-85 (5th Cir. 2008), *quoting and citing Russell v. Univ. of Texas*, 234 Fed. Appx. 195, 207 (5th Cir. 2007); *Vick v. Texas Employment Commission*, 514 F.2d 734, 737 (5th Cir. 1975)("The adverse inference to be drawn from the destruction of records is predicated on bad conduct of the defendant. . . . The circumstances of the act must manifest bad faith."); *in accord, Wal-Mart Sores, Inc. v. Johnson*, 106 S.W.3d 718, 721 (Tex. 2003)("a party who has deliberately destroyed evidence is presumed to have done so because the evidence was unfavorable to its case").[9]

The Fifth Circuit has concluded that "[e]videntiary

---

[9] Because the alleged spoliation here occurred before any litigation was filed, Fed. R. Civ. P. 37, which is a procedural rule that governs conduct during the pendency of a lawsuit, does not apply here. *Beil v. Lakewood Engineering and Mfg. Co.*, 15 F.3d 546, 552 (6th Cir. 1994). Nevertheless, the Court may rely on its inherent power to impose sanctions. *Duque v. Werner Enterprises, Inc.*, Civil Action No. L-05-183, 2007 WL 998156, *2 (S.D. Tex. Mar. 30, 2007), *citing Toon v. Wackenhut Corrections Corp.*, 250 F.3d 950, 952 (5th Cir. 2001)(*citing Carroll v. The Jacques Admiralty Law Firm, P.C.*, 110 F.3d 290, 292 (5th Cir. 1997)); *see also Silvestri v. General Motors, Corp.*, 271 F.3d 583, 590 (4th Cir. 2001)(a court's ability to impose sanctions for spoliation is based in the court's inherent power rather than substantive law).

'presumptions' which merely permit an adverse inference based on unproduced evidence are . . . controlled by federal law." *King v. Ill. Cent. R.R.*, 337 F.3d 550, 556 (5th Cir. 2003); *in accord, Adkins v. Wolever*, 554 F.3d 650, 652 (6th Cir. 2009)(joining the Fourth, Second and Ninth Circuit Court of Appeals in holding that federal law controls a federal court's imposition of sanctions as relief for spoliated evidence because "a federal court's inherent powers include broad discretion to craft proper sanctions for spoliated evidence").

Because there are so few Fifth Circuit cases addressing imposition of spoliation sanctions, however, and because this case before the Court involves Texas state law claims, the Court "may supplement its analysis by applying elements from Texas case law" where they are not contrary to established Fifth Circuit law.[10] *In re Advanced Modular Power Systems, Inc.*, No. 07-34646-H4-7, 2009 WL 2762477, *9 (Bkrtcy. S.D. Tex. Aug. 31, 2009), *citing Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001)(recognizing that federal law governs, but nevertheless examining New York law); *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 944 (11th Cir. 2005)(noting that although federal law governs

---

[10] The Court notes that unlike many other jurisdictions, Texas does not recognize spoliation as an independent tort cause of action. *Trevino v. Ortega*, 969 S.W. 2d 950, 952-53 (Tex. 1998); *Adobe Land Corp. v. Griffin*, 236 S.W. 3d 351, 356 (Tex. App.--Fort Worth 2007)(citing *Trevino* and stating, "Rather, spoliation is an evidentiary concept that is best remedied by the trial court within the context of the core lawsuit in which such allegations arise.").

spoliation, the court applied Georgia law); *Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76, 78 (3d Cir. 1994)(noting disagreement on whether spoliation is an issue of substantive state law or federal evidence law, but not reaching the choice of law issue because the panel concluded that the district court's decision exceeded the court's bounds of discretion under both).

In *Trevino v. Ortega*, 969 S.W. 2d 950, 953-561 (Tex. 1998), Justice Baker wrote an influential concurrence describing the procedure and remedies available to Texas courts to protect parties prejudiced by spoliation. Justice Baker first identified the three purposes served by remedies for spoliation (1) to punish the spoliator for destroying relevant evidence; (2) to deter future spoliators; and (3) perhaps most important, to serve an evidentiary function by allowing courts to use sanctions or submit a "presumption that levels the evidentiary playing field and compensates the nonspoliating party." *Id.* at 954 (Baker, J., concurring).

If a party to a lawsuit believes the other party has wrongly destroyed or discarded relevant evidence, that party may move for sanctions or request a spoliation jury instruction.[11] *Offshore Pipelines, Inc. v. Schooley*, 984 S.W. 2d 654, 666 (Tex. App.-

_____

[11] While Plaintiffs raise the issue of spoliation in their motion to dismiss to excuse their inability to obtain Arthur Andersen's records of its Enron engagement, they have not yet filed a motion for sanctions or for a spoliation instruction.

-25-

–Houston [1st Dist.] 1998, no pet.), *citing Trevino*, 969 S.W. 2d at 953 (Baker, J. concurring). Texas courts have followed a procedure set out in Justice Baker's concurrence in *Trevino*. "[T]he inquiry as to whether a spoliation presumption is justified requires a court to consider (1) whether there was a duty to preserve evidence; (2) whether the alleged spoliator breached that duty; and (3) whether the spoliation prejudiced the non-spoliator's ability to present its case or defense." *Adobe Land Corp.*, 236 S.W. 3d at 358, *citing Trevino*, 969 S.W. 2d at 954–55 (Baker, J. concurring); *Offshore Pipelines,* 984 S.W. 2d at 666.

As a threshold matter, before the court determines whether discovery abuse has occurred, the opposing party must demonstrate that the destroying party had a duty to preserve the evidence at issue. *Adobe Land Corp.*, 236 S.W. 3d at 358, *citing Wal-Mart Stores, Inc.*, 106 S.W. 3d at 722. A duty to preserve the evidence arises "only when a party knows or reasonably should know that there is a substantial chance that a claim will be filed and that the evidence in its possession or control will be potentially relevant to that claim." *Id., citing id., citing* 1 Weinstein & Berger, *Weinstein's Federal Evidence* § 302.06[4] at 301-28.3 (2d ed. 2003)("[T]here must be a sufficient foundational showing that the party who destroyed the evidence had notice both of the potential claim and of the evidence's potential relevance" before a duty to preserve arises). Emphasizing that "[a] party should

-26-

not be able to subvert the discovery process and the fair administration of justice simply by destroying evidence before a claim is actually filed," in *Trevino* Justice Baker opined about at what point during prelitigation does the duty [to preserve evidence] arise and what kind of "notice" is required:

> In [*National Tank Co. v. Brotherton*, 851 S.W. 2d 193, 204 (Tex. 1993)] the Court defined "anticipation of litigation" in the context of whether a party should be allowed to assert an investigative privilege. The Court focused on how to determine when a party reasonably foresees or anticipates litigation. Importantly, we did not require actual notice of the potential litigation for a party to anticipate litigation. Instead we recognized that "*common sense* dictates that a party may reasonably anticipate suit being filed . . . before the plaintiff manifests an intent to sue." . . . Consequently, the Court held that to determine when a party reasonably anticipates or foresees litigation, trial courts must look at the totality of the circumstances and decide whether a reasonable person in the party's position would have anticipated litigation and whether the party actually did anticipate litigation. *See National Tank*, 851 S.W. 2d at 207.

*Trevino*, 969 S.W. 2d at 956 (emphasis in original)(Baker, J., concurring).

Once a duty to preserve has been established, the court must determine whether the party breached its duty. *Adobe Land Corp.*, 236 S.W. 3d at 359, *citing Trevino*, 969 S.W. 2d at 957 (Baker, J., concurring).[12] While the possessor of potential evidence need not

---

[12] The Texas Supreme Court departs from the Fifth Circuit's requirement of bad faith by the spoliator in holding parties accountable for negligent as well as intentional destruction of evidence. *Trevino*, 969 S.W. 2d at 957 (Baker, J., concurring); *Adobe Land Corp.*, 236 S.W. 3d at 359. Because that rule is in

retain every document, it must "preserve what it knows, or
reasonably should know is relevant in the action, is reasonably
calculated to lead to the discovery of admissible evidence, is
reasonably likely to be requested during discovery, or is the
subject of a pending discovery sanction." *Adobe Land Corp.*, 236
S.W. 3d at 358-59, *citing Tex. Elec. Coop. v. Dillard*, 171 S.W.
3d 201, 209 (Tex. App.--Tyler 2005, no pet.).  Under Texas law,
while a spoliator may raise a defense of destruction of evidence
pursuant to a corporate retention policy, "when a party's duty to
preserve evidence arises before the destruction or when a policy
is at odds with a duty to maintain records, the policy will not
excuse the obligation to preserve."  *Id.* at 360, *citing id.*

Last, the court must ask whether the other side's ability to
present its case was prejudiced by the spoliation.  *Adobe Land
Corp.*, 236 S.W. 3d at 360, *citing Offshore Pipelines*, 984 S.W.2d
at 66 (*citing Trevino*, 969 S.W.2d at 954-55 (Baker, J.,
concurring)).  To do so, the court considers various factors, such
as the relevancy of the missing evidence and the availability of
other evidence to take the place of the missing information.
*Adobe Land Corp.*, 236 S.W. 3d at 360, *citing Trevino*, 969 S.W.2d
at 958 (Baker, J. concurring).

If the court determines that the spoliating party had a duty
to preserve the evidence, that it breached that duty, and that the

conflict with the Fifth Circuit, the Court will not apply it here.

other side was accordingly prejudiced, the court has broad discretion in choosing an appropriate remedy, such as a suitable sanction or a spoliation instruction. *Offshore Pipelines*, 984 S.W. 2d at 666.

As stated, in the Fifth Circuit, the sanction of an adverse inference instruction may be imposed only after a showing of bad faith by the party being sanctioned, to be determined by an independent investigation by the court to decide whether it has been a victim of fraud.[13] *Smith v. American Founders Financial Corp.*, 365 B.R. 647, 681 (S.D. Tex. 2007), *citing Chambers v. NASCO, Inc.*, 501 U.S. 32, 43-44 (1991)(holding that federal courts have the inherent power to manage their affairs to achieve orderly and expeditious disposition of cases, but this power must be exercised with restraint and discretion, especially in fashioning an appropriate sanction for conduct that abuses the judicial process), and *King v. Illinois Cent. R.R.*, 337 F.3d 550, 556 (5th Cir. 2003), *citing United States v. Wise*, 221 F.3d 140, 156 (5th Cir. 2000). *See also Vick*, 514 F.2d at 737 ("The adverse inference to be drawn from destruction of records is predicated on bad conduct of the defendant"; "[m]oreover the circumstances of the act must manifest bad fath."). The adverse inference is not automatic where documents are destroyed under a routine policy

---

[13] The court may make credibility determinations during this examination to determine whether misconduct has occurred. *Smith v. American Founders Financial Corp.*, 365 B.R. at 681.

or "'simply because documents are destroyed after the initiation of litigation.'"  *St. Tammany Parish Hospital Serv, District No. 1 v. Travelers Property Casualty Co. of America*, 250 F.R.D. 275, 276 (E.D. La. 2008), *quoting Russell v. Univ. of Tex. of Permian Basin*, 234 Fed. Appx. 195, 208 (5th Cir. 2007).  A showing of bad faith or bad conduct is essential.


### Relevant Substantive Law

**1.  Common-Law Fraud**

**a.  Affirmative Misrepresentation**

For common-law fraud a plaintiff must prove that (1) a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the representation was made with the intention that it be acted upon by the other party; (5) the party actually and justifiably acted in reliance upon the representation; and (6) the party suffered injury.  *Ernst Young, LLP v. Pac. Mutual Life Ins. Co.*, 51 S.W. 3d 573, 577 (Tex. 2001); *Johnson & Higgins of Tex., Inc. v. Kenneco Energy , Inc.*, 962 S.W. 2d 507, 524 (Tex. 1998).

Fraudulent intent may be established by direct or circumstantial evidence.  *Spoljaric v. Percival Tours, Inc.*, 708 S.W. 2d 432, 434-35 (Tex. 1986).   "Fraud is usually not

discernible by direct evidence and is usually so covert or attendant with such attempts at concealment as to be incapable of proof other than by circumstantial evidence." *W.L. Lindemann Operating Co. v. Strange*, 256 S.W. 3d 766, 776 (Tex. App.--Fort Worth 1986).

Noting that "our fraud jurisprudence has traditionally focused not on whether a misrepresentation is directly transmitted to a known person alleged to be in privity with the fraudfeasor, but on whether the misrepresentation was intended to reach a third person and induce reliance," and that the Texas Supreme Court had previously held "that a misrepresentation made through an intermediary is actionable if it is intended to influence a third person's conduct," the Texas Supreme Court has concluded that "Texas jurisprudence is entirely consistent with section 531's [of the *Restatement (Second) Torts*] reason-to-expect standard, which requires a degree of certainty that goes beyond mere foreseeability." *Ernst & Young, L.L.P. v. Pacific Mutual Life Insurance Co. (hereinafter, "Pacific Mutual")*, 51 S.W. 3d 573, 578-80 (Tex. 2001). *Restatement (Second) of Torts* § 531 (1977) provides,

> One who makes a fraudulent misrepresentation is subject to liability to the persons or class of persons whom he **intends or has reason to expect** to act or to refrain from action in reliance upon the misrepresentation, for pecuniary loss suffered by them through their justifiable reliance in the type of transaction in which he intends or has reason to expect either conduct to be influenced.

*Id.* (emphasis added).

"Texas does not require that there be privity between the alleged target of the fraud and the fraudfeasor." *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Company*, 313 F.3d 305, 323 (5th Cir. 2002).   "[T]he alleged fraudfeasor must 'have information that would lead a reasonable man to conclude that there is *an especial likelihood* that it will reach those persons and *will influence their conduct*." *Pacific Mutual*, 51 S.W. 3d at 580, citing *Restatement (Second) of Torts* § 531 cmt. d (1977)(which does not require privity and recognizes liability when the alleged fraudfeasor has "reason to expect" a person's or class of persons' reliance on the fraudfeasor's representations). Moreover, the information must "reach" the third party and "influence its conduct." *Id.*  Furthermore, "even an obvious risk that a third person will rely on a representation is not enough to impose liability. . . . General industry practice or knowledge may establish a basis for foreseeability to show negligence, but it is not probative of fraudulent intent." *Id.* at 581.   Thus a plaintiff must demonstrate that the defendant *intended* that the plaintiff receive and rely upon the defendant's representation and that the plaintiff *actually received and relied* upon that representation. *Admiral Ins. Co. v. Heath Holdings USA, Inc.*, No. Civ. A. 3:03-CV-1634G, 2004 WL 1144062, *4 (N.D. Tex. May 21, 2004).   Furthermore, "the plaintiff must have incurred pecuniary

-32-

loss 'in the type of transaction in which [the maker of the representation] intends or has reason to expect [his or her] conduct to be influenced.'" *Pacific Mutual*, 51 S.W. 3d at 580, *quoting Restatement (Second) of Torts* § 531 (1977).

To prevail on a fraud claim, a plaintiff must show that it actually and justifiably relied on the defendant's representation and thereby suffered damages. *Pacific Mutual*, 51 S.W. 3d at 577. "Texas courts require a showing of actual reliance and do not recognize a fraud-on-the-market theory of reliance for common law claims." *In re Enron Corp. Securities, Derivative & "ERISA" Litig.*, 490 F. Supp. 2d 784, 814 (S.D. Tex. 2007), *citing Griffen v. GK Intelligent Sys., Inc.*, 87 F. Supp. 2d 684, 690 (S.D. Tex. 1999), and *Steiner v. Southmark Corp.*, 734 F. Supp. 269, 270 (N.D. Tex. 1990). *See also Rubalcaba v. Pacific/Atlantic Crop Exchange, Inc.*, 952 S.W. 2d 552, 556 (Tex. App.--El Paso 1997, no writ)(under Texas law "fraud is never presumed," but actual reliance is required).

**b.   Common-Law Fraudulent Concealment**

A subcategory of fraud is fraud by nondisclosure or fraudulent concealment. *Schlumberger Tech. Corp. v. Swanson*, 959 S.W. 2d 171, 181 (Tex. 1997). For common-law fraud based on nondisclosure, a plaintiff must allege that (1) defendants concealed or failed to disclose a material fact that they knew the plaintiff was ignorant of or did not have the opportunity to

-33-

discover, (2) they intended to induce plaintiff to take some action by concealing or failing to disclose the material fact, and (3) he suffered as a result of acting on the Defendants' nondisclosure. *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 341 (5th Cir. 2008), *citing Bradford v. Vento*, 48 S.W. 3d 749, 754-55 (Tex. 2001); *see also 7979 Airport Garage, L.L.C. v. Dollar Rent a Car Syst., Inc.*, 245 S.W. 3d 488, 507 n.27 (Tex. App.--Houston [14th Dist.] 2007, pet. denied); *see also Celanese Corp. v. Coastal Water* Authority, 475 F. Supp. 2d 623, 637 (S.D. Tex. 2007)("Elements of fraud by nondisclosure are: (1) the defendant failed to disclose facts to the plaintiff; (2) the defendant had a duty to disclose those facts; (3) the facts were material; (4) the defendant knew the plaintiff was ignorant of the facts and the plaintiff did not have an equal opportunity to discover the facts; (5) the defendant was deliberately silent when it had a duty to speak; (6) by failing to disclose the facts, the defendant intended to induce the plaintiff to take some action or refrain from acting; (7) the plaintiff relied on the defendant's nondisclosure; (8) the defendant was injured as a result of acting without that knowledge."). It is essential that the defendant have a duty to disclose this information to the plaintiff. *Id.*

Under Texas law, an affirmative duty to disclose may arise under four circumstances: (1) where there is a fiduciary or confidential relationship between the parties, the defendant must

disclose; (2) where a person voluntarily discloses new information, he must disclose the whole truth; (3) when a person makes a representation and new information makes the earlier misrepresentation misleading or untrue; and (4) when a person makes a partial disclosure and conveys a false impression. *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 490 F. Supp. 2d 784, 794 (S.D. Tex. 2007)(and cases cited therein).

## 2.  Statutory Fraud

Texas also has a cause of action for statutory fraud.  Tex. Bus. & Comm. Code § 27.01, encompassing both a primary and a secondary violation.  The Court quotes the statute in relevant part:

> § 27.01 Fraud in Real Estate and Stock Transactions
>
> (a)  Fraud in a transaction involving real estate or stock in a corporation or joint stock company consists of a
>
> (1) false representation of a past or existing material fact, when the false representation is
>
> (A) made to a person for the purpose of inducing that person to enter into a contract; and
>
> (B) relied on by that person in entering into that contract; . . . .
>
> (b) a person who makes a false representation  . . . commits the fraud described in Subsection (a) of this section and is liable to the person defrauded for actual damages.
>
> (c) A person who makes a false representation or false promise with actual awareness of the falsity thereof commits the fraud described in Subsection (a) of this section and is liable to the person defrauded for

exemplary damages.  Actual awareness may be inferred where objective manifestations indicate that a person acted with actual awareness.

(d) A person who (1) has actual awareness of the falsity of a representation . . . made by another person and (2) fails to disclose the falsity of the representation . . . to the person defrauded, and (3) benefits from the false representation . . . commits the fraud described in Subsection (a) of this section and is liable to the person defrauded for exemplary damages.   Actual awareness may be inferred where objective manifestations indicate that a person acted with actual awareness.

(e) Any person who violates the provisions of this section shall be liable to the person defrauded for reasonable and necessary attorney's fees, expert witness fees, costs for copies of depositions, and costs of court.

Section 27.01(d) addresses secondary liability, here allegedly incurred by Andersen Defendants and Richard B. Buy, for being actually aware of the primary violation by Enron, remaining silent about it, and benefitting from that false representation, under Section 27.01(a) and (b).

Section 27.01 and its predecessor, article 4004, V.T.C.S., are penal in nature and must be strictly construed by the courts. *Ratcliff v. Trenholm*, 596 S.W. 2d 645, 650 (Tex. Civ. App.--Tyler 1980, writ ref'd n.r.e.); *Bykowicz v. Pulte Home Corp.*, 950 F.2d 1046, 1050-51 (5th Cir. 1992), *cert. denied*, 506 U.S. 822 (1992).

Recent briefing has caused this Court to reconsider and examine again whether under Section 27.01(d), a secondary violator must have an independent duty to disclose.   There is sparse case law dealing with Section 27.01(d), and most of that merely quotes

the statute, without applying it to the facts in the case.  After careful review of the statute and case law examining a duty to disclose fraud generally, the Court concludes that it has wrongly imposed as a pleading requirement the elements of common-law fraud by nondisclosure on Section 27.01(d), perhaps having been led to that result by the failure of other courts to distinguish the two in contemporaneously addressing Section 27.01 as a whole and common-law fraudulent concealment.

Statutory construction questions are legal issues for the court. *Johnson v. City of Fort Worth*, 774 S.W. 2d 653, 656 (Tex. 1989).  In construing a statute, the objective of the court is to determine and give effect to the Legislature's intent. *City of Rockwell v. Hughes*, 246 S.W. 3d 621, 625-26 (Tex. 2008); *National Liab. & Fire Ins. v. Allen*, 15 S.W. 3d 525, 527 (Tex. 2000).  The Court presumes that the Legislature intended the plain meaning of its words.  *Allen*, 15 S.W. 3d at 570.  To give effect to the legislature's intent, "we look first and foremost to the words of the statute." *Lexington Ins. Co. v. Strayhorn*, 209 S.W. 3d 83, 85 (Tex. 2006).  A court should construe the statute's words according to their plain and common meaning unless a contrary intention is apparent from the context or unless such a construction leads to absurd results. *City of Rockwell v. Hughes*, 246 S.W. 3d 621, 625-26 (Tex. 2008); *see also Texas Dept. of Protective and Regulatory Services v. Mega Child Care, Inc.*, 145

-37-

S.W. 3d 170, 177 (Tex. 2004)(Where the text of a statute is unambiguous, the court must first examine and follow the clear, plain language and common meaning); *Allen*, 15 S.W. 3d at 527. Every word of a statute is presumed to have been used for a purpose, and every word excluded is presumed to have been excluded for a purpose. *City of Rockwell*, 246 S.W. 3d at 628.

Reading the plain and unambiguous language of Section 27.01(d), the Court notes that an alleged violation of the statute must be based on "the falsity of a representation or promise made by **another** person [emphasis added by the Court]," i.e., made by the alleged primary violator, in this case Enron. There is no mention of a duty to disclose under § 27.01(d). To be liable, under the clear language of the statute, the alleged aider and abettor (here Buy, Duncan, Goddard, and/or Arthur Andersen) need only to "(1) [have] actual awareness of the falsity of a representation . . . made by another person and (2) fail[] to disclose the falsity of the representation . . . to the person defrauded, and (3) benefit[] from the false representation." Section 27.01(d). *See Dentler v. Perry*, No. 04-02-00034-CV, 2002 WL 31557302, *8 (Tex. App.--San Antonio 2002, no pet.); *Rodriguez v. Elizabeth Lusk*, No. 08-03-00385-CV, 2004 WL 2307443, *3 (Tex. App.--El Paso, Oct. 14, 2004)("The plaintiff must . . . prove that the defendant had actual awareness of the falsity of the representation if the plaintiff is seeking exemplary damages based

-38-

on a misrepresentation made by someone other than the defendant."), *citing Woodlands Land Development Co. L.P. v. Jenkins*, 48 S.W. 3d 415, 426 n.4 (Tex. App.--Beaumont 2001).

"Actual awareness may be inferred where objective manifestations indicate that a person acted with actual awareness." § 27.01(d). Two appellate courts have concluded that the Texas Supreme Court's definition of "actual awareness" in a DTPA case[14] "'would be similar, if not identical'" to that for section 27.01 of the Texas Business & Commerce clause:

> actual awareness 'does not mean merely that a person knows what he is doing; rather, it means that a person knows what he is doing is false, deceptive, or unfair. In other words, a person must think to himself at some point, "Yes, I know this is false, deceptive, or unfair to him, but I'm going to do it anyway.'"

*Woodlands Land Development Co. v. Jenkins*, 48 S.W. 3d 415, 426 (Tex. App.--Beaumont 2001), and *Scott v. Sebree*, 986 S.W. 2d 364, 371 (Tex. App.--Austin 1999, pet. denied), *citing   St. Paul Surplus Lines Ins. Co. v. Dal-Worth Tank Co.,* 974 S.W. 2d 51, 53-54 (Tex. 1998).

Reliance is a necessary element of statutory fraud under § 27.01, just as it is of common law fraud. *Schlumberger Tech. Corp. v. Swanson*, 959 S.W. 2d 171, 182 (Tex. 1997). "Texas law does not require a plaintiff to show the reasonableness of its reliance on a misrepresentation to prove fraud. Rather Texas

---

[14] *St. Paul Surplus Lines Ins. Co. v. Dal-Worth Tank Co.*, 973 S.W. 2d 51, 53-54 (Tex. 1998).

courts simply demand proof that the 'party acted in reliance upon the [false] representation.'" *Martin v. MBank El Paso, N.A.*, 947 F.2d 1278, 1280 (5th Cir. 1991). *See also In re Webber*, 350 B.R. 344, 372-73 (Bankr. S.D. Tex. 2006)("The 'justifiable reliance' element of common law fraud [and statutory fraud] does not require [the plaintiff] to demonstrate 'reasonableness. However . . . [the plaintiff] cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he utilized his opportunity to make a cursory investigation.'").

## 3.  Common-Law Civil Conspiracy to Defraud

A civil conspiracy is composed of two or more persons combining to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means. *Massey v. Armco Steel Co.*, 652 S.W. 2d 932, 934 (Tex. 1983). The elements of a cause of action for civil conspiracy in Texas are (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result. *Juhl v. Airington*, 936 S.W.2d 640, 644 (Tex. 1990); *Tri v. J.T.T.*, 162 S. W. 3d 552, 556 (Tex. 2005). To impose liability on a defendant for civil conspiracy to defraud, plaintiff must establish (1) that there was such a conspiracy and (2) that the particular defendant, here Buy, Duncan, Goddard, and/or Arthur Andersen, with Enron, agreed with one or more of the conspirators about the claimed illegal object

-40-

or purpose of the conspiracy and intended to effectuate it. *Goldstein v. Mortenson*, 113 S.W. 3d 777, 779 (Tex. App.--Austin 2003, writ ref'd), *citing Ward v. Sinclair*, 804 S.W. 2d 929, 931 (Tex. App.--Dallas 1990), *citing Zervas v. Faulkner*, 861 F.2d 823, 836 (5th Cir. 1988).[15]

A conspiracy to defraud must have a common purpose, supported by a concerted action to defraud, and each member must have the understanding that the other has that purpose. *Goldstein v. Mortenson*, 113 S.W. 3d at 779. "'There must be an agreement or understanding between the conspirators to inflict a wrong against, or injury on, another, a meeting of the minds on the object or course of action, and some mutual mental action coupled with an intent to commit the act which results in injury; in short, there must be a preconceived plan and unity of design and purpose, for the common design is of the essence of the conspiracy.'" *Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.*, 435 S.W. 2d 854, 857 (Tex. 1969). *See also Laxson v. Giddens,* 48 S.W. 3d 408, 410 (Tex. App.--Waco 2001)("One without knowledge of a conspiratorial plan or scheme to injure another by the commission of a particular wrong cannot share the intent to injure such other. [emphasis in original]").    "For a civil

---

[15] The "meeting of the minds" element means that a "defendant agreed with one or more of the conspirators on the claimed illegal object of the conspiracy and intended to have it brought about." *Goldstein*, 113 S.W. 3d at 779, *citing Zervas*, 861 F. 2d at 836.

conspiracy to arise, the parties must be aware of the harm or the wrongful conduct at the beginning of the combination or agreement [or when the party joins the conspiracy]. . . . One cannot agree, expressly or tacitly, to commit a wrong about which he has no knowledge." *Firestone Steel Products Co. v. Barajas*, 927 S.W. 2d 608, 614 (Tex. 1996), *citing Triplex Communications, Inc. v. Riley*, 900 S.W. 2d 716, 719 (Tex. 1995)("[C]ivil conspiracy requires specific intent.  For a civil conspiracy to arise, the parties must be aware of the harmful or wrongful conduct at the inception of the combination or agreement."); *Schlumberger Well Surveying Corp. v. Nortex Oil & Gas*, 435 S.W. 2d 854, 857 (Tex. 1969)("[O]ne without knowledge of a conspiratorial plan or scheme to injure another by commission of a particular wrong cannot share the intent to injure the other.").

Nevertheless, "[t]he agreement need not be formal; rather, the understanding may be tacit; and it is not essential that each conspirator have knowledge of the details [of the conspiracy]; inferences of concerted action may be drawn from participation in the transactions." *J.T.T. v. Chon Tri*, 111 S.W. 3d 680, 684 (Tex. App.--Houston [1st Dist.] 2003)(*citing Bourland v. State*, 528 S.W. 2d 350, 354 (Tex. Civ. App.--Austin 1975, writ ref'd n.r.e.)), *reversed on other grounds*, 162 S.W. 3d 552 (Tex. 2005).

On the other hand, "[t]he fact that a conspirator is not present at, or does not participate in, all of the conspiratorial

activities does not, by itself, exonerate him." *United States v. Ashley*, 555 F.2d 462, 467 (5th Cir. 1977), *cert. denied sub nom. Leveriette v. United States*, 434 U.S. 869 (1977); *see also United States v. Thomas*, 686 F. Supp. 1078, 1087-88 (M.D. Pa. 1988)(quoting *Ashley*).   "[I]t is axiomatic that it is not necessary for each conspirator to have entered into the unlawful agreement at its inception." *Id.* at 468.   A person may participate in a conspiracy without knowing the identities of all the other co-conspirators." *Id., citing United States v. Capo*, 791 F.2d 1054, 1066 (2d Cir. 1986).   "[A] changing cast of characters does nothing to lessen the fact of one conspiracy. Once the existence of a common scheme of conspiracy is shown, 'slight evidence is all that is required to connect a particular defendant with the conspiracy.'" *Id.* at 467.   The district court in *Ashley* opined, "Further, even if this case does present circumstances of changing and overlapping membership and activities, they were all directed toward a common goal.   In such circumstances, 'most courts have found, as we do here, sufficient evidence to uphold a jury verdict reflecting a single conspiracy.'" 155 F.2d at 468, *citing United States v. Beasley*, 519 F.2d 233, 246 (5th Cir. 1975).

In addition, "a co-conspirator is bound by the overt acts of other conspirators taken in furtherance of the conspiracy, whether or not said co-conspirator was a member of the conspiracy at the

time . . . ."  *Thomas*, 686 F. Supp. at 1088.

Conspiracy is a derivative tort because recovery is not based on the conspiracy, i.e., the agreement, but on the injury from the underlying tort, here allegedly fraud.  *Tilton v. Marshall*, 925 S.W. 2d 672, 681 (Tex. 1996).  "The gist of a civil conspiracy is the damage resulting from commission of a wrong which injures another, and not the conspiracy itself"; in other words, it is the injury resulting from an act done pursuant to the conspiracy's common purpose that gives rise to the cause of action, not the existence of the conspiracy itself.[16]  *Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.*, 435 S.W. 2d 854, 856 (Tex. 1968); *see also Alford Chevrolet-Geo v. Jones*, 91 S.W. 3d 396, 403 (Tex. App.--Texarkana 2002, pet. denied)(It is not the agreement, but the injury to the plaintiff from an act done pursuant to the common purpose that gives rise to a cause of action for civil conspiracy), *citing Carroll v. Timmers Chevrolet*, 592 S.W. 2d 922, 925 (Tex. 1979).  Thus to be liable for conspiracy, a defendant must also participate to some degree in the underlying fraud.

---

[16] A key distinction between criminal and civil conspiracy is that unlike for a criminal conspiracy, for civil conspiracy the mere existence of a conspiracy is insufficient to constitute a claim; there must also be damages resulting from the commission of a wrong which injures another.  *See, e.g., Belz v. Belz*, 667 S.W. 2d 240, 243 (Tex. App.–Dallas 1984), *citing Schlumberger*, 435 S.W. 2d at 856; *Starling v. Hill*, 121 S.W. 2d 648, 650 (Tex. Civ. App.–Waco, 1938, no writ).

*Id.*[17]   Furthermore, to establish a conspiracy to defraud, the plaintiff must prove both a civil conspiracy and the underlying fraud.  *Conger v. Danek Med., Inc.*, 27 F. Supp. 2d 717, 721-22 (N.D. Tex. 1998), *citing American Tobacco Co. V. Grinnell*, 951 S.W. 2d 420, 438 (Tex. 1997).

Typically a conspiracy is proved by circumstantial evidence. *Schlumberger*, 435 S.W. 2d at 858, *citing Jernigan v. Wainer*, 12 Tex. 189 (1854).[18]   "Circumstantial evidence may be used to establish any material fact, but it must constitute more than mere suspicion."  *Transport*, 898 S.W. 2d at 278*, citing Browning-Ferris, Inc. v. Reyna*, 865 S.W. 2d 925, 927-28 (Tex. 1993)("some suspicion linked to other suspicion produces only more suspicion, which is not the same as evidence."); *Schlumberger*, 435 S.W. 2d at 858 ("vital facts may not be proved by unreasonable inferences from other facts and circumstances"; any vital fact must be proved "by evidence amounting to something more than a mere scintilla").

---

[17] Furthermore, if a plaintiff cannot adequately allege with particularity or ultimately prove an element of the underlying fraud, the conspiracy claim also fails.  *Hernandez v. Ciba-Geigy Corporation USA*, 200 F.R.D. 285, 292 (S.D. Tex. 2001); *United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 380 (5th Cir. 2004).  Under Rule 9(b), conspiracy to commit fraud must be pleaded with particularity as to time, place, and contents of false representations and the identity of the person making them and what he obtained thereby.  *Castillo v. First City Bancorporation of Texas, Inc.*, 43 F.3d 953, 961 (5th Cir. 1994).

[18] Intent to defraud, however, must be established by "full, clear, satisfactory and convincing testimony." *Riquelme Valdes v. Leisure Res. Group, Inc.*, 810 F. 2d 1345, 1351 (5th Cir. 1987).

Where the circumstantial evidence is meager, "if 'circumstances are consistent with either of two facts and nothing shows that one is more probable than the other, neither fact can be inferred.'" *Transport Ins. Co. v. Faircloth*, 898 S.W. 2d 269, 278 (Tex. 1995), *quoting $56,700 in U.S. Currency v. State*, 730 S.W. 2d 659, 662 (Tex. 1987). Circumstantial evidence can include acts by or statements of the alleged conspirators. *International Bankers Life Ins. Co. v. Holloway*, 368 S.W. 2d 567, 581-82 (Tex. 1963)("The general rule is that conspiracy liability is sufficiently established by proof showing concert of action or other facts and circumstances from which the natural inference arises that the unlawful overt acts were committed in furtherance of common design, intention, or purpose of the alleged conspirators. . . . It is not required that each and every act of a conspirator be shown to have been in concert with the others or that it be established by direct evidence that all combined at a given time prior to each transaction. Inferences of concerted action may be drawn from joint participation in the transactions and from enjoyment of the fruits of the transactions.").

"[C]ivil conspiracy 'came to be used to extend liability in tort . . . beyond the active wrongdoer to those who have merely planned, assisted, or encouraged his acts.' Once a conspiracy is proven, each co-conspirator 'is responsible for all acts done by any of the conspirators in furtherance of the unlawful

-46-

combination.'" *Carroll v. Timmers Chevrolet*, 592 S.W. 2d 922, 925-26 (Tex. 1979), *quoting* W. Prosser, *Handbook of the Law of Torts* § 46 at 293 (1971), and *State v. Standard Oil Co.*, 130 Tex. 313, 107 S.W. 2d 550, 559 (1937).   A finding of civil conspiracy imposes joint and several liability on all conspirators for actual damages resulting from acts in furtherance of the conspiracy. *Carroll*, 592 S.W. 2d at 925.

Proximate cause is composed of two elements, cause-in-fact and foreseeability. *City of Gladewater v. Pike*, 727 S.W. 2d 514, 517 (Tex. 1987), *citing Williams v. Steves Industries, Inc.*, 699 S.W. 2d 570, 575 (Tex. 1985); *McClure v. Allied Stores of Texas, Inc.*, 608 S.W. 2d 901, 903 (Tex. 1980); and *Missouri Pac. R. Co. v. American Statesman*, 552 S.W. 2d 546, 549-50 (Tex. 1977).

"Cause in fact means that the omission or act involved was a substantial factor in bringing about the injury and without which no harm would have occurred." *Gladewater*, 727 S.W. 2d at 517, citing *McClure*, 608 S.W. 2d at 903; *Ford Motor Co. v. Ledesma*, 242 S.W. 3d 32, 46 (Tex. 2007). "The word 'substantial' is used to denote the fact that the defendant's conduct has such an effect in producing the harm as to lead reasonable men to regard it as a cause, using that word in the popular sense, in which there always lurks the idea of responsibility, rather than in the so-called 'philosophic sense,' which includes every one of the great number of events without which any happening would not

have occurred." *Union Pump Co. v. Allbritton*, 898 S.W. 2d 773, 776 (Tex. 1995), *abrogated on other grounds*, *Ford Motor Co. v. Ledesma*, 242 S.W. 3d 32 (Tex. 2007).

"Even if the injury would not have happened but for the defendant's conduct, the connection between the defendant and the plaintiff's injuries may be too attenuated to constitute legal cause." *Hunt*, 1999 WL 1201689, at *3 *(citing Union Pump Co. v. Allbritton*, 898 S.W. 2d at 775 ("At some point in the causal chain the defendant's conduct may be too remotely connected with the plaintiff's injury to constitute legal causation," a determination that "'mandates weighing of policy considerations [citations omitted].'")).

"Foreseeability requires that the actor, as a person of ordinary intelligence, would have anticipated the danger that his . . . act created for others." *City of Gladewater,* 727 S.W. 2d at 517*, citing Nixon v. Mr. Property Management Co., Inc.*, 690 S.W. 2d 546, 549-50 (Tex. 1985). "Foreseeability does not require the actor to anticipate the manner in which injury will occur." *Univ. Preparatory School v. Huitt*, 941 S.W. 2d 177, 180 (Tex. App.--Corpus Christi 1996, writ denied). "All that is required is that the injury be of such a general character as might reasonably have been anticipated, and the injury should be so situated with relation to the wrongful act that the injury to him or to one similarly situated might reasonably have been foreseen."

-48-

*Id.* "Proximate cause cannot be satisfied by mere conjecture, guess, or speculation." *IHS Cedars Treatment Center of DeSoto Texas, Inc. v. Mason*, 143 S.W. 3d 794, 798-99 (Tex. 2003); *Doe v. Boys Club of Greater Dallas, Inc.*, 907 S.W. 2d 472, 477 (Tex. 1995).

"There can be more than one proximate cause of an event." *Olson*, 980 S.W. 2d at 893; *see also Travis v. City of Mesquite*, 830 S.W. 2d 94, 98 (Tex. 1995). Under Texas law, a plaintiff does not need direct evidence to satisfy causation. *Tomkins v. Cyr*, 202 F. 3d 770, 782 (5th Cir. 2000). "Circumstantial evidence and reasonable inferences therefrom are a sufficient basis for a finding of causation." *Id., citing Texas Dept. of Transportation v. Olson*, 980 S.W. 2d 890, 893 (Tex. App.--Fort Worth 1998), *citing Havner v. E-Z Mart Stores, Inc.*, 825 S.W. 2d 456, 459 (Tex. 1992). "Establishing causation requires facts sufficient for the fact-finder reasonably to infer that the defendants' acts were a substantial factor in bringing about the injury." *Id., citing Purina Mills, Inc. v. Odell*, 948 S.W. 2d 927, 936 (Tex. App.--Texarkana 1997).

Whether something constitutes a proximate cause of an event is a question "of fact particularly within the province of a jury." *Olson*, 980 S.W. 2d at 893; *see also El Chico Corp. v. Poole*, 732 S.W. 2d 306, 314 (Tex. 1987); *Strakos v. Gehring*, 360 S.W. 2d 787, 792 (Tex. 1962). It can be a question of law for the

court where there is no material dispute about the evidence and the circumstances are such that reasonable minds could not come to a different conclusion. *Hunt v. Killeen Imports, Inc.*, No. 03-99-00093-CV, 1999 WL 1201689, *3 (Tex. App.--Austin Dec. 16, 1999, pet. denied), *citing Missouri Pac. R.R. Co. v. American Statesman*, 552 S.W. 2d 99, 104 (Tex. 1977). It may also be a question of law for the court when the relationship between the defendant's acts or omissions and the plaintiff's injuries is attenuated or remote. *Id., citing Lear v. Siegler*, 819 S.W. 2d 470, 472 (Tex. 1991).

**4. The Texas Securities Act ("TSA")**

**a. Primary Liability**

The TSA "creates causes of action for securities fraud against various parties, including sellers of securities and aiders and abettors." *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 343 (5th Cir. 2008).

A prerequisite for establishing liability for aiding and abetting under the TSA is a primary violation under the statute. *Sterling Trust Co. v. Adderley*, 168 S.W. 3d 835, 845 (Tex. 2005)("a secondary violator's liability depends upon the primary violator's culpability"). Two provisions, Articles 581-33A(2) and 581-33C, define a primary violator.

Under Article 581-33A(2),[19] a primary violator is a person who

---

[19] Section 33(A)(2), addressing the liability of sellers, states in full,

"offers or sells a security . . . by means of an untrue statement of material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made not misleading."[20]  Under

_____

Untruth or Omission.  A person who offers or sells a security (whether or not the security or transaction is exempt under Section 5 or 6 of this Act) by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, is liable to the person buying the security from him, who may sue either at law or in equity for rescission, or for damages if the buyer no longer owns the security.  However, a person is not liable if he sustains the burden of proof that either (a) the buyer knew of the untruth or omission or (b) he (the offeror or seller) did not know, and in the exercise of reasonable care could not have known, of the untruth or omission.  The issuer of the security (other than a government issuer identified in Section 5M) is not entitled to the defense in clause (b) with respect to an untruth or omission (i) in a prospectus required in connection with a registration statement under Section 7A, 7B, or 7C, or (ii) in a writing prepared and delivered by the issuer in the sale of a security.

[20] Texas Rev. Civ. Stat. Ann. article 581-4(E)(effective Sept. 3, 2003) states in relevant part,

The terms "sale" or "offer for sale" or "sell" shall include every disposition, or attempt to dispose of a security for value.  The term "sale" means and includes contracts and agreements whereby securities are sold, traded or exchanged for money, property or other things of value, or any transfer or agreement to transfer, in trust or otherwise.  Any security given or delivered with or as a bonus on account of any purchase of securities or other thing of value, shall be presumed to constitute a part of the subject of such purchase and to have been sold for value.  The term "sell" means any act by which a sale is made, and the term "sale" or "offer for sale" shall include a subscription, an option for sale, a solicitation of an offer to buy, an attempt to sell, or

the TSA a statutory "seller" is the person who sold the security
directly to the purchaser or who acted as the vendor's agent and
solicited the sale. *In re Enron Corp. Sec. Derivative & ERISA
Litig.*, 540 F. Supp. 2d 759, 767 (S.D. Tex. 2007). Thus the
plaintiff must have bought his securities from the party he is
suing as the primary violator. *Frank v. Bear*, 11 S.W. 3d 380, 383
(Tex. App.--Houston [14[th] Dist.] 2000, rev. denied), *citing* Hal M.
Bateman, *Securities Litigation: The 1977 Modernization of Section
33 of the Texas Securities Act*, 15 Houston L. Rev. 839, 847
(1978). *See also In re Enron Corp. Sec. Derivative & ERISA
Litig.*, 258 F. Supp. 2d 576, 601-08 (S.D. Tex. 2003). Unlike
common law fraud, an article 581-33 claim for seller liability
does not require scienter, i.e., "'proof that the speaker knew

---

an offer to sell, directly or by an agent, by a circular,
letter, or advertisement or otherwise, including the
deposit in a United States Post Office or mail box or in
any manner in the United States mails within this State
of a letter, circular, or other advertising matter.
Nothing herein shall limit or diminish the full meaning
of the terms "sale," "sell" or "offer for sale" as used
by or accepted in courts of law or equity. . . .

*See, e.g., Lutheran Broth. v. Kidder Peabody & Co., Inc.*, 829 S.W.
2d 300, 306-07 (Tex. App.--Texarkana 1992)(placement agent who
acted as seller's agent in making misrepresentations in a private
placement memorandum and in the placement and offering of bonds,
and who dealt directly with plaintiffs in doing so, was a "seller"
within the meaning of the TSA; "one who 'offers or sells' a
security is not limited to those who pass title," and "sell" is
defined by the statute "as any act by which a sale is made,
including a solicitation to sell, an offer to sell, or an attempt
to sell"), *judgment set aside and case remanded for entry of
judgment in accordance with settlement*, 840 S.W. 2d 384 (Tex.
1992).

that the representation was false, or made without regard to its truth or falsity.'"[21] *Dorsey*, 540 F.3d at 343-33, *quoting Herrmann Holdings Ltd. v. Lucent Technologies, Inc.*, 302 F.3d 552, 563 (5th Cir. 2002).

Under Article 581-33C, strict primary liability is imposed on issuers of registered securities purchased on a secondary market for misleading statements in the prospectus under which those securities were issued.  Section 33C provides,

Liability of Nonselling Issuers Which Register.

(1) This Section 33C applies only to an issuer which registers under Section 7A, 7B, or 7C of this Act, or under Section 6 of the U.S. Securities Act of 1933, its outstanding securities for offer and sale by or for the owner of the securities.

(2) If the prospectus required in connection with the registration contains, as of its effective date, an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading, the issuer is liable to a person buying the registered security who may sue either at law or in equity for rescission or for damages if the buyer no longer owns the securities. However, an issuer is not liable if it sustains the burden of proof that the buyer knew of the untruth or omission.

Hal Bateman,15 Houston L. Rev. at 849, explains,

Section 33C applies only to issuers which register

---

[21] One exception recognized by the Fifth Circuit to the rule that scienter is not an element of a 581-33 claim is a claim for an untrue promise of future performance. *Dorsey*, 540 F.3d at 344 n.5, *citing Hermann Holdings Ltd.*, 302 F.3d at 563.  There is no such claim here.

> outstanding securities for sale by owners under either
> section 7 of the Texas Securities Act or section 6 of
> the Securities Act of 1933.   This means that Section
> 33C will apply only to registered secondary offerings
> by persons other than the issuer and will not apply in
> primary offerings by the issuer itself, although the
> liability created is a special liability of the issuer.
> With respect to registered secondary offerings, section
> 33C provides that the issuer of the security is liable
> to any person who buys the registered security if, as
> of the effective day, the prospectus required in
> connection with the registration contains a material
> misstatement of fact or fails to state any material
> fact necessary to make what is stated not misleading.
> Liability clearly will extend to any buyer of the
> registered security and no privity limitation or
> requirement is included.   Nor is it necessary for the
> plaintiff to prove reliance on the misstatement or
> omission in the prospectus, and the only defense
> available under section 33C is proof that the plaintiff
> actually knew of the untruth or omission.   [footnotes
> omitted]

Furthermore, liability under this provision "only extends to the

prospectus, not to the entire registration statement." *Id*.

The Second Amended Complaint, #56 at ¶ 42, alleges, "Enron

was publicly traded on the New York Stock Exchange under the

symbol ENE and was an 'issuer' and/or 'seller' of securities for

purposes of Texas securities laws." It does not, however, plead

with particularity any specific material misstatements or

omissions necessary in order to make the statements made, in light

of the circumstances under which they are made, not misleading,

in any of the prospectuses identified in ¶ 290 of the complaint

as those under which Plaintiffs purchased their Enron securities.

Article 581-33F addresses secondary "Liability of Control

Persons and Aiders":

(1) A person who directly or indirectly controls a seller, buyer, or issuer of a security is liable under Section 33A, 33B, or 33C jointly and severally with the seller, buyer, or issuer, and to the same extent as if he were the seller, buyer, or issuer, unless the controlling person sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist.

(2) A person who directly or indirectly with intent to deceive or defraud or with reckless disregard for the truth or the law materially aids a seller, buyer, or issuer of a security is liable under Section 33A, 33B, or 33C jointly and severally with the seller, buyer, or issuer, and to the same extent as if he were the seller, buyer, or issuer.

(3) There is contribution as in cases of contract among the several persons so liable.

Plaintiffs allege aider and abettor liability against Arthur Andersen, Duncan, Goddard, and Buy under section 33F(2). They must therefore plead and prove that (1) Enron committed a primary violation of the securities laws, (2) Defendants had "general awareness" of their role in this violation, (3) Defendants rendered "substantial assistance" in this violation, and (4) Defendants either intended to deceive Plaintiffs or acted with reckless disregard in the truth of the representations made by primary violator Enron. *Frank v. Bear Stearns & Co.*, 11 S.W. 3d at 384; *Goldstein v. Mortenson*, 113 S.W. 3d 769, 776 (Tex. App.--Austin 2003). *See also Sterling Trust Co. v. Adderley*, 168 S.W. 3d 835, 842 (Tex. 2005)(holding that as the statute's scienter requirement for aiding and abetting, "the TSA's 'reckless disregard for the truth or the law' standard means that an alleged

aider can only be held liable if it rendered assistance 'in the face of a perceived risk' that its assistance would facilitate untruthful or illegal activity by the primary violator. . . . In order to perceive such a risk, the alleged aider must possess a 'general awareness that his role was part of an overall activity that was improper.'").  In contrast to a claim for primary seller liability under the TSA, a claim for aider and abettor liability requires the plaintiff to plead and prove scienter. *Dorsey*, 540 F.3d at 344.  Furthermore, "the TSA does not require the aider to have had direct dealing with the defrauded party; indeed a person who 'materially aids a seller' may have no contact at all with the investors." *Sterling Trust,* 168 S.W. 3d at 843.  The TSA also does not require an investor to prove he relied on the alleged misrepresentations or omissions.  *In re Westcap Enterprises*, 230 F. 3d 717, 726 (5th Cir. 2000).

**5.  Professional Negligence/Negligent Misrepresentation**

Because Plaintiffs were not in privity with Andersen, their claim based on Andersen's auditing must be for negligent misrepresentation, not professional malpractice or professional negligence. *Prospect High Income Fund, ML CBO IV(Cayman), Ltd. v. Grant Thornton, LLP*, 203 S.W. 3d 602, (Tex. App.--Dallas 2006), *citing McCamish, Martin, Brown & Loeffler v. F.E. Appling Interests*, 991 S.W. 2d 787, 791-92 (Tex. 1999), and *Abrahms Centre Nat'l Bank v. Farmer, Fuqua & Huff*, 225 S.W. 3d 171, 177 (Texas

-56-

App.--El Paso 2005, no pet.)(applying *McCamish* to accountants).

Texas has adopted the approach of the *Restatement (Second) of Torts* § 552 (1977) with respect to a professional's liability to non-client third parties for negligent misrepresentation. *Scottish Heritable Trust, PLC v. Peat Marwick Main & Co.*, 81 F.3d 606 (5th Cir. 1996),[22] *cert. denied*, 519 U.S. 869 (1996); *McCamish,*

_____

[22] *Scottish Heritage* cites as authority *Federal Land Bank Ass'n v. Sloane*, 825 S.W. 2d 439, 442 (Tex. 1991), and *Blue Bell, Inc. v. Peat, Marwick, Mitchell & Co.*, 715 S.W. 2d 408, 411 (Tex. App.--Dallas, 1986, writ ref'd n.r.e.).  Although the *McCamish* court dealt with attorney liability under § 552, it cited *Blue Bell* for the proposition that § 552 should also apply to accountants. *McCamish*, 991 S.W. 2d at 791.

*Blue Bell* is significant because it upheld a wider "foreseeability" standard for negligent misrepresentation for accountant liability than the "actual knowledge" test of *McCamish,* which has been recognized as the law in Texas by the Fifth Circuit. The Dallas appellate court in *Blue Bell* held that under § 552 "if, under current business practices and circumstances of that case, an accountant preparing audited financial statements, knows *or should know* that such statements will be relied upon by a limited class of person, the accountant may be liable for injuries to members of that class relying on his certification of the audited reports." 715 S.W. 2d at 412.  The appellate panel found that a current trade creditor of the party whose financial statements the accountant had audited was "one of a limited number of existing trade creditors who would, in all probability, be receiving copies of the financial statements." *Id.* at 413.  Thus in deciding whether the audited company had a duty to Blue Bell, a fact finder must determine whether the company knew or should have known that members of such a limited class would receive copies of the audited financial statements it prepared." *Id.*  The *Blue Bell* appellate court expressly limited its "holding to apply section 552 of the Restatement to accountant liability to third parties whom the accountant intends to receive the information, or whom the accountant knows, or should know, will receive the information, or parties who are members of such a class of person." *Id.*

Meanwhile, although the Fifth Circuit has concluded that *McCamish* implicitly overruled *Blue Bell*, not all Texas courts are certain.  *See, e.g., Prospect High Income Fund*, 203 S.W.2d at 616 ("Without deciding whether *McCamish* overturns *Blue Bell*, we

*Martin, Brown & Loeffler v. F.E. Appling Interests*, 991 S.W. 2d

787, 791 (1999).  Section 552 provides,

> (1) One who, in the course of his business, profession,
> or employment, or in any other transaction in which he
> has a pecuniary interest, supplies false information
> for the guidance of others in their business
> transactions, is subject to liability for pecuniary
> loss caused to them by their justifiable reliance upon
> the information, if he fails to exercise reasonable
> care or competence in obtaining or communicating the
> information.
>
> (2) Except as stated in Subsection (3), the liability
> stated in Subsection (1) is limited to loss suffered
>
> (a) by the person or one of a limited group of persons
> for whose benefit and guidance he intends to supply the
> information or knows that the recipient intends to
> supply it; and

---

conclude there is sufficient evidence for jurors to disagree and a
genuine issue of material fact whether appellants qualify for
inclusion within the limited class entitled to sue."). *Prospect
High Income Fund* cites several Texas cases it believes suggest that
Texas might allow existing investors to qualify for a limited class
of potential claimants for negligent misrepresentation under § 552.
In addition to *Scottish Heritable Trust*, 81 F.3d at 614 (in an
"*Erie*" guess, "we simply assume without deciding that [an existing
minority-interest shareholder] could be a member of a 'limited
group' with respect to its subsequent stock purchases" [under the
*Restatement (Second) of Torts* § 552 as applied to accountant's
liability to third parties for negligent misrepresentation in
audit]), the *Prospect High Income Fund* court cites *Tara Capital
Partners, LLP, et al. v. Deloitte & Touche, LLP*, No. 05-03-00746-
CV, 2004 WL 1119947, *3 (Tex. App.--Dallas May 20, 2004, no
pet.)("assuming, without deciding, that existing shareholders might
constitute a limited group"); and *Abrams*, 225 S.W. 2d 171 (Tex.
App.--El Paso 2005)("stating in dicta that auditor undoubtedly owed
a duty to client's existing lender when auditor knew opinion
furnished for benefit of government agency would be passed on to
existing lender as requirement of credit line").  Nevertheless,
until and unless the Texas Supreme Court comes out with a different
holding, this Court is bound by the Fifth Circuit's construction of
Texas law.

(b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

(3) The liability of one who is under a public duty to give the information extends to loss suffered by any of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them.

Comment h (*Persons for whose guidance the information is supplied*) and illustrations 4 and 10 to Section 552(2)(a) are relevant to the instant action.  Comment h distinguishes knowledge from foreseeability and makes clear that the defendant must have actually intended or known that the plaintiff would rely on the misinformation; it is not enough to confer standing that the plaintiff's reliance on the defendant's misinformation was foreseeable by the defendant.  Comment h provides in pertinent part,

> The rule stated in this Section subjects the negligent supplier of misinformation to liability only to those persons for whose benefit and guidance it is supplied. In this particular[,] his liability is somewhat more narrowly restricted than that of the maker of a fraudulent misrepresentation (see § 531), which extends to any person whom the maker of the representation has reason to expect to act in reliance upon it.
> Under this Section . . . [i]t is enough that the maker of the representation intends to reach and influence either a particular person or persons, known to him, or a group or class of persons, distinct from the much larger class who might reasonably be expected sooner or later to have access to the information and foreseeably to take some action in reliance upon it. It is enough, likewise, that the maker of the representations knows that his recipient intends to transmit the information to a similar person, persons or group. It is sufficient, in other words, insofar as

the plaintiff's identity is concerned, that the maker
supplies the information for repetition to a certain
group or class of persons and that the plaintiff proves
to be one of them, even though the maker never had
heard of him by name when the information was given.
It is not enough that the maker merely knows of the
ever-present possibility of repetition to anyone, and
the possibility of action in reliance upon it, on the
part of anyone to whom it may be repeated. . . .

Illustration 4 recites,

A, having lots for sale, negligently supplies
misinformation concerning the lots to a real estate
board, for the purpose of having the information
incorporated in the board's multiple listing of
available lots, which is distributed by the board to
approximately 1,000 prospective purchasers of land each
month. The listing is sent by the Board to B, and in
reliance upon the misinformation B purchases one of A's
lots and in consequence suffers pecuniary loss. A is
subject to liability to B.

Illustration 10 to comment h states,

A, an independent public accountant, is retained by B
Company to conduct an annual audit of the customary
scope for the corporation and to furnish his opinion on
the corporation's financial statements. A is not
informed of any intended use of the financial
statements; but A knows that the financial statements,
accompanied by an auditor's opinion, are customarily
used in a wide variety of financial transactions by the
corporation and that they may be relied upon lenders,
investors, shareholders, creditors, purchasers and the
like, in numerous kinds of transactions. In fact
Company B used the financial statements and
accompanying auditor's opinion to obtain a loan from X
Bank. Because of A's negligence, he issues an
unqualifiedly favorable opinion upon a balance sheet
that materially misstates the financial position of B
Company, and through reliance upon it X Bank suffers
pecuniary loss. A is not liable to X Bank.

Reflecting concern that professionals might be threatened by

"almost unlimited liability," the *McCamish* court concluded that

§ 552(2) appropriately narrows the class of potential claimants and requires justifiable reliance on the alleged negligent misrepresentation of a material fact.  991 S.W. 2d at 793-94. Under *McCamish*, an auditor's liability to third parties for negligent misrepresentation under § 552 would be limited to (1) those plaintiffs specifically identified as recipients of the representations and (2) those plaintiffs who, although not specifically named, belong to a group or class the auditor knew would receive the information.

The Fifth Circuit has concluded that *McCamish* "overruled by implication the portion of the *Blue Bell* opinion extending accountant liability to those parties the accountants should know would rely on their opinions," because it is inconsistent with the ruling of the Texas Supreme Court for professional negligent misrepresentation in *McCamish*.  *Compass Bank v. King Griffin & Adamson, P.C.*, No. CIV. A. 3:01-CV-2028-N, 2003 WL 22077721, *4 (N.D. Tex. Sept. 03, 2003), *aff'd*, 388 F.3d 504 (5th Cir. 2004)(2-1)(refusing to certify the question, "whether Texas uses an actual knowledge test or a foreseeability requirement for negligent misrepresentations claims against accountants," to the Texas Supreme Court).  The district court's interpretation in *Compass Bank*, sustained by the Fifth Circuit, of § 552(a) and (b) is as follows:

> This formulation limits liability to situations in
> which the attorney who provides the information is

-61-

aware of the nonclient and intends that the nonclient
rely on the information.  In other words, a section 552
cause of action is available only when the information
is transferred by an attorney [or accountant] to a
known party and for a known purpose.  A lawyer may also
avoid or minimize the risk of liability to a nonclient
by setting forth (1) limitations as to whom the
representation is directed and who should rely on it,
or (2) disclaimers as to the scope and accuracy of the
factual investigation or assumptions forming the basis
of the representation or the representation itself.

In sum, the elements of a negligent misrepresentation claim
are (1) defendant provides information in the course of his
business, or in a transaction in which he has a pecuniary
interest; (2) the information provided for the guidance of others
in their business is false; (3) the defendant did not exercise
reasonable care or competence in obtaining or communicating the
information; (4) the plaintiff justifiably relied on the
information; and (5) the plaintiff suffered pecuniary loss by
justifiably relying on the information.  *Federal Land Bank Ass'n
of Tyler v. Sloane*, 825 S.W. 2d 439, 442 (Tex. 1991), *citing
Restatement (Second) of Torts* § 552.  Liability is limited to the
person or one of a limited group of persons for whose benefit and
guidance the defendant intends to supply the information or knows
that the recipient intends to supply it.  *Restatement (Second) of
Torts* § 552(2)(a).  "[L]iability is not based on the breach of
duty a professional owes his or her clients or others in privity,
but on an independent duty to the nonclient based on the
professional's manifest awareness of the nonclient's reliance on

-62-

the misrepresentation and the professional's intention that the nonclient so rely." *McCamish*, 991 S.W. 2d at 792.

## Complaint's Factual Allegations

The Court will summarize only those factual allegations in the Second Amended Complaint that relate in some way to claims against the Defendants who filed the pending motions to dismiss. As will be noted, most statements in the complaint are conclusory, general, and lack the specificity required by Rule 9(b).

The complaint asserts generally that Enron's fraud has been well established (1) by the numerous guilty pleas and criminal cooperation agreements, entered into and sworn by Enron judicial admissions[23] that demonstrated that special purpose entities

---

[23] The complaint recites portions of such pleas or cooperation agreements by Enron's former Chief Financial Officer Andrew Fastow, Vice President and Director of Investor Relations Mark Koenig, employee Kevin P. Hannon, and former Assistant Treasurer Timothy Despain, testifying to Enron's fraudulent intent, manipulation of accounting, and the resulting falsification of financial statements. # 56, ¶¶ 58, 69-77.

This Court observes that while a plea agreement or cooperation agreement offered for the truth of the information contained in it is hearsay, the Ninth Circuit has found such instruments admissible under Federal Rule of Evidence 807: "A statement not specifically covered by Rule 803 or 804 but having equivalent circumstantial guarantees of trustworthiness, is not excluded by the hearsay rule if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purpose of these rules and the interests of justice will best be served by admission of the statement into evidence." *In re Slatkin*, 525 F.3d 805, 812 (9th Cir. 2008). The Ninth Circuit found that Slatkin's plea agreement met these requirements: (A) it was offered as evidence of a material fact, i.e., that he operated a Ponzi scheme for fifteen years and his actual fraudulent intent in

("SPEs") and related-party transactions were used to manipulate Enron's financial statements; and (2) by investigations by the U.S. Department of Justice ("DOJ"), the Securities and Exchange Commission ("SEC"), and by investigations and reports by William C. Powers, Jr., Enron Bankruptcy Examiner Neal Batson, and various Congressional committees.  Lay and Skilling were tried and found guilty in May 2006 by a jury on numerous counts of securities fraud and conspiracy in a criminal proceeding, while a federal judge also convicted Lay on four counts of bank fraud.[24]  Moreover,

---

doing so; (B) that as direct proof, it was more probative on these issues than any other evidence the plaintiff bankruptcy trustee could obtain; and (C) admission of the plea agreement furthers the general purposes of the Rules of Evidence and "the interests of justice."  *Id.*  The appellate court noted that the plea agreement has equivalent circumstantial guarantees of trustworthiness, including that it was made under oath with the advice of counsel, it subjected Slatkin to severe criminal penalties, it was made after Slatkin was advised of his constitutional rights, and it was accepted by the court in a criminal matter only after the court determined that Slatkin's plea was knowing and voluntary.  *Id.  See also In re AFI Holding, Inc.*, 525 F. 3d 700, 704 (9th Cir. 2008); *Scholes v. Lehmann*, 56 F. 3d 750, 762 (7th Cir. 1995)(plea agreement admissible as exception to hearsay rule under Fed. R. Evid. 803(22); admissions in a guilty plea bind the party and "the veracity safeguards surrounding a plea agreement that is accepted as the basis for a guilty plea and resulting conviction actually exceed those surrounding a deposition"); *Miller v. Holzmann*, 563 F. Supp. 2d 54, 84-85 & n.24 (D.D.C. 2008); *Newby v. Enron Corp.*, 491 F. Supp. 2d 690, 703-04 (S.D. Tex. 2007); *In re Bayou Group, LLC*, 393 B.R. 810, 835 (S.D.N.Y. 2008)("Courts have consistently found that criminal proceeding admissions of a fraudulent scheme to defraud investors made in guilty pleas and plea allocutions are admissible as evidence of 'actual intent' to defraud creditors.").

[24] The Second Amended Complaint was filed on March 30, 2007 and thus does not cover what has happened since to the parties that is key to arguments before this Court.

   Jeffrey K. Skilling's appeal of his conviction was affirmed by

on November 8, 2001 Enron issued a press release announcing that

Enron would "restate its financial statements for the years ended

---

the Fifth Circuit, but resentencing was ordered because the district court had misapplied federal guidelines in enhancing Skilling's sentence on the grounds that Skilling's conduct had endangered a "financial institution" by damaging Enron's retirement plans.  The Fifth Circuit concluded that retirement plans did not qualify as "financial institutions."  Skilling then appealed to the United States Supreme Court. *U.S. v. Skilling*, 554 F.3d 529 (5th Cir. 2009), *cert. granted*, 130 S. Ct. 393 (2009).  In *Skilling v. United States*, 130 S. Ct. 2896, 2926-34 (2010), the Supreme Court reversed that part of Skilling's conviction under 18 U.S.C. § 1364, proscribing fraudulent deprivation of "the intangible right of honest services," on the grounds that the statute was unconstitutionally vague and reaches only bribery and kickback schemes; it could not apply to an alleged conspiracy to defraud a corporation's shareholders by misrepresenting the company's financial status to inflate its stock price where there was no bribery or kickback involved.  Because the indictment alleged conspiracy based on the honest services fraud, money-or-property wire fraud and securities fraud, the Supreme Court remanded the case for a determination whether his conviction for conspiracy was harmless error and whether reversal of his conspiracy conviction would affect any other of his convictions.  The Fifth Circuit is now considering these issues.

Other events not mentioned in the complaint occurred before it was filed.  After Kenneth Lay died on July 5, 2006, his conviction was vacated and his indictment dismissed on October 17, 2006 because he had not exhausted the appeal of his conviction. *U.S. v. Lay*, 456 F. Supp. 2d 869 (S.D. Tex. 2006), *mandamus denied by 5th Cir. Ct. App.* (06-20848)(Nov. 1, 2006).

Although David Duncan initially invoked his Fifth Amendment rights, on April 9, 2002 he entered into a cooperation agreement with the government (H-02-CR-209, instrument #6) and testified for the government at the criminal trial of Arthur Andersen, LLP (H-02-CR-121, #101, 102, 110, 111, and 112), from May 13-17, 2002.  As noted earlier, after that conviction of the accounting firm was reversed by the United States Supreme Court, the criminal charge against Duncan was dropped and Duncan, whose sentencing had been postponed continuously, withdrew his guilty plea on December 12, 2005, with the approval of the undersigned judge.  H-02-CR-209, instrument #36.  Long after the complaint was filed, in January 2009, Duncan settled with the SEC over charges that he had violated securities laws.

-65-

December 31, 1997 through 2000 and the quarters ended March 31 and June 30, 2001," and warned that "previously-issued financial statements for these periods and audit reports covering the year-end financial statements for 1997 to 2000 should not be relied upon." #56, ¶¶ 62-68.[25] The complaint claims that restatements filed that month were only the "tip of the iceberg" of the fraud that was uncovered by investigations after Enron filed for bankruptcy. Moreover numerous lawsuits filed by investors uncovered more fraud.

Plaintiffs assert that the judicial admissions made by former Enron officers and employers in guilty pleas and cooperation agreements provide factual support for their allegations of fraud against Enron. In his Plea Agreement, Andrew Fastow reveals his

---

[25] A few courts have concluded that the issuance of a restatement alone adequately pleads securities fraud. *See, e.g., In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 486-87 (S.D.N.Y. 2004)("[a]lthough a restatement is not an admission of wrongdoing, the mere fact that financial results were restated is sufficient basis for pleading that those statements were false when made."), *citing In re Cylink Sec. Litig.*, 178 F. Supp. 2d 1077, 1084 (N.D. Cal. 2001)("'the mere fact that . . . statements were restated at all' is sufficient to establish falsity at the pleading stage" under the PSLRA). *See also in accord In re Huffy Corp. Sec. Litig.*, 577 F. Supp. 2d 968, 1017-18 (S.D. Ohio 2008); *In re H&R Block Sec. Litig.*, 527 F. Supp. 2d 922, 978 (W.D. Mo. 2007); *Caiafa v. Sea Containers, Ltd.*, 525 F. Supp. 2d 398, 410 (S.D.N.Y. 2007); *In re OCA, Inc. Sec. and Derivative Litig.*, No. 05-2165, 2006 WL 3747560, *12 (E.D. La. Dec. 14, 2006); *Payne v. DeLuca*, 433 F. Supp. 2d 547, 577 (W.D. Pa. 2006). *But see In re The Goodyear Tire & Rubber Co. Sec. Litig.*, 465 F. Supp. 2d 873,893-94 (N.D. Ohio 2006)(merely because there was a restatement to correct an error or false statement in a financial statement does not mean there was fraud; plaintiff must show scienter)(and cases cited therein).

and others' wrongdoing in very general statements,

> I was the Chief Financial Officer ("CFO") of Enron
> Corporation ("Enron") from March 1998 until October 24,
> 2001.  While CFO, I and other members of Enron's senior
> management fraudulently manipulated Enron's publicly
> reported financial results.  Our purpose was to mislead
> investors and others about the true financial position
> of Enron and, consequently, to inflate artificially the
> price of Enron's stock and maintain fraudulently
> Enron's credit rating.

> I also engaged in schemes to enrich myself and others
> at the expense of Enron's shareholders and in violation
> of my duty of honest services to those shareholders.

#56, ¶ 98.  The "other members of Enron's senior management" are
not identified in the submitted portion of Fastow's plea
agreement.  Fastow further testified, "I understood these schemes
would have a material effect on Enron's financial statements
(which Enron shareholders and potential shareholders relied upon
in making investment decisions) or would have an otherwise
deleterious impact on the company."  #56, ¶¶ 70, 96.  In his Plea
Agreement, Fastow admitted that he used off-balance sheet entities
and SPE transactions, in particular LJM1, LJM2, and the Raptors,
to manipulate Enron's financial statements.  #56, ¶ 93.  Andrew
Fastow explained how SPEs LJM2 and the Raptors were used to
deceive Plaintiffs:

> Among the improper Enron-LJM transactions were four
> special purpose entities (SPEs) know[n] as the
> "Raptors."  The Raptors purported to be independent,
> unconsolidated entities with which Enron would hedge
> the value of certain assets.  I and others knew that
> the Raptors were not sufficiently independent from
> Enron and should not have been deconsolidated.  As a
> result, Enron overstated its earnings.  I and other

> members of Enron's senior management knew the impact of the Raptors on Enron's financial statements.
>
> The first Raptor vehicle, Talon, was created in April 2000 to protect Enron's balance sheet from decreases in the value of certain investments.  Talon was capitalized mainly by Enron through a promissory note and Enron's own stock.  The remainder of Talon's capitalization came from LJM2's payment of $30 million.  The purpose of this $30 million payment was to provide Talon the "outside equity at risk" required for accounting purposes, to qualify Talon as an independent third party entity.  The structure of Talon was used as a model for two of the remaining three Raptor entities.
>
> I and others at Enron, including Enron's Chief Accounting Officer, had an unwritten agreement that LJM2 would be paid the return on its investment, plus a profit, prior to Talon engaging in any hedging, in exchange for my agreement to allow Enron to flexibly determine what assets would be hedged by Talon and the values at which they were hedged.

#56 at ¶ 71.  Again this portion of Fastow's Plea Agreement fails to identify the "others," except for Causey, involved in the scheme nor provides specificity about transactions beyond a general mention of deceptive accounting for the Raptors' financing.  In the portion of his plea quoted and/or discussed in the complaint, Fastow admitted without stating specific supporting facts, "Enron exercised control over Talon and used it fraudulently to meet Wall Street expectations regarding Enron's financial performance."  *Id.*, ¶ 72.  Without details, he explained, "I understood Talon was set up in a way to conceal the poor performance of certain Enron assets, and that by hedging of these assets at values set by Enron misled investors by fraudulently improving the appearance of Enron's financial

statements." *Id.* Fastow generalizes, with respect to the deception accomplished by means of the Raptors, that LJM2 was employed to falsify Enron's reported financial results by (1) generating improper earnings and funds flow, (2) enabling Enron to set inflated "market" prices for undesirable assets, and (3) improperly shielding Enron's balance sheet from poorly performing and volatile assets. *Id.*, ¶ 69. No specific examples are delineated.

On August 25, 2004 Mark Koenig entered into a cooperation agreement with the DOJ in which he judicially admitted,

> By early 2001, I was aware that the presentation to the public of Enron's finances and business success by Enron senior management, including myself, intentionally concealed the true state of Enron. Enron's publicly reported financial results and filings with the Securities and Exchange Commission, including its public descriptions of itself and statements made by myself and members of senior management, did not truthfully present Enron's financial positions, results from operations, and cash flow of the company and omitted facts necessary to make the disclosures and statements that were made truthful and not misleading.

#56, ¶ 73. The portion of Koenig's agreement discussed in the complaint, too, does not name the individuals referred to in "senior management" nor allege specific examples, but confesses to the intent to mislead about Enron's financial status.

Timothy Despain, in the portion of his sworn cooperation agreement with the DOJ on October 5, 2004 discussed in the complaint, stated that he

> [a]mong other things . . . falsely represented to

-69-

> credit agencies that Enron's cash flows from its non-
> regulated business were stable and predictable.   In
> fact, the annual cash flow targets that Enron set for
> itself and reported to the rating agencies were
> arbitrarily based on what I and others believed was
> necessary to maintain Enron's investment-grade credit
> rating, rather than on the amount of cash flow Enron's
> non-regulated businesses were expected to achieve.

#56, ¶ 77.[26]   No particular examples are cited, nor are the

"others" identified.

Richard Causey pleaded guilty to federal securities fraud on

December 28, 2005.   In that portion of his plea agreement

addressed in the complaint Causey admitted,

> I was the Chief Accounting Officer ("CAO") of Enron
> Corporation ("Enron") from 1998 through Enron's
> bankruptcy in December 2001.   While CAO, I and other
> members of Enron's senior management fraudulently
> misled investors and others about the true financial
> position of Enron in order to inflate artificially the
> price of Enron's stock.
>
> More specifically, I conspired with members of Enron's
> senior management to make false and misleading
> statements, in Enron's filings with the Securities and
> Exchange Commission ("SEC") and in analyst calls, about
> the financial condition of Enron, which did not fairly
> and accurately reflect Enron's actual financial
> condition and performance as I knew it.

#56, ¶ 83.[27]  He continued,

> I, along with others in senior management, was
> responsible for ensuring that the financial statements
> contained in Enron's public filings fairly represented
> Enron's true financial condition.   The financial

---

[26] Despain, too, does not identify with particularity examples
of the fraud he generally describes.

[27] Causey's summary also fails to provide the details necessary
to satisfy Rules 12(b)(6) and 9(b).

-70-

statements were required to include a section entitled
Management, Discussion and Analysis ("MD&A"), which
required, among other things, that management disclose
information necessary to an understanding of Enron's
financial condition and results of operations. I
reviewed drafts of Enron's quarterly and annual
reports, and I signed these reports attesting to their
accuracy. . . . I participated along with others in
Enron's senior management in efforts to use Enron's
public filings and public statements to mislead the
investing public about the true nature of Enron's
financial performance by making false and misleading
statements, and omitting facts necessary to make
certain statements not misleading.

#56, ¶ 84.  Causey, too, does not identify the "others" involved

nor cite with particularity specific examples of his wrongdoing.

None of the quoted portions of plea agreements and

cooperation agreements specifically names Arthur Andersen, LLP,

its employees Duncan and Goddard, nor Richard Buy, the Defendants

in this action.  The only senior management people in the scheme

that are identified are those who made the judicial admissions.

Nor do Plaintiffs describe particular facts of specific Special

Purpose Entities ("SPEs"), their transactions, and the deceptive

accounting for each.  In other words, they do not plead the who,

what, when where and why required by the Fifth Circuit for fraud

claims under Rule 9(b).

Plaintiffs state that they purchased and continued to hold

Enron and Enron-related securities in reliance upon Enron's SEC-

filed financial statements, which the Andersen Defendants made

false or aided Enron in making false.  American National Property

and Casualty Company, American National Investment Accounts, Inc.,

SM&R Investments, Inc., and Standard Life and Accident Insurance Company purchased Enron common stock from 1997 to 2001. Farm Family Casualty Insurance Company and Farm Family Life Insurance Company purchased Enron Capital, L.L.C. preferred shares in 1993. Farm Family Life Insurance also bought an Enron bond in 1992. American National Insurance Company purchased Enron commercial paper and an Enron bond in 2001. National Western Life Insurance Company purchased Enron bonds in 1992 and 1993. Plaintiffs assert that they also considered other false information, not identified, created by Defendants and disseminated through the media, not identified, to Plaintiffs and other investors.

With regard to Management Defendant[28] Richard B. Buy,

---

[28] The complaint conclusorily asserts that the Management Defendants are liable to Plaintiffs for damages, without providing the required specific facts and examples to support their contentions:

171. Each Management Defendant committed fraud, conspired to commit fraud, aided Enron to commit fraud, and wholly disregarded his legal duties and ethical obligations to Enron's stakeholders. The conduct of each Management Defendant evinces an astounding disregard for the duty of care required of managers. The conduct of each Management Defendant was not within the scope of the managers' employment.
172. The secretive, fraudulent conduct of each Management Defendant aided and/or resulted in falsification of Enron's reported financial results in SEC filings--reports that Plaintiffs reasonably relied upon in their decisions to buy, hold, or sell Enron securities.
173. The Management Defendants' wrongful conduct was motivated by greed.
174. In public pronouncements, throughout the time they were stealing from Enron and helping create false and

Executive Vice President and Chief Risk Officer of Enron from June
1999 through Enron's bankruptcy, the complaint asserts that he
worked for Arthur Andersen, LLP before he joined Enron in 1991.
#56, ¶ 128.   The complaint does not place Buy on the Board of
Directors or any of its five committees.   The complaint states
that the Board of Directors charged Buy and Causey with monitoring
and reviewing all Enron transactions with the LJM SPEs and with
overseeing the conflicting obligations of Fastow in his dual roles
as Enron CFO and general partner of the LJM SPEs to ensure that
Enron shareholders suffered no harm.   #56, ¶ 129.   Both Buy and
Causey purportedly recklessly disregarded this obligation and
conspired with each other and others, including Fastow, to falsely
report Enron's true financial condition.[29]   #56, ¶¶ 129-31.   The
complaint conclusorily claims that because of Buy's accounting
background and his knowledge in risk assessment, he knew that the
Raptors could not properly be treated as off-balance sheet

---

deceptive financial reports, each Management Defendant
touted Enron as a financial[ly] strong, creditworthy, and
well-managed company.
175.   Plaintiffs, believing the fraudulent SEC-filed
statements (which were bolstered by the knowingly-false,
optimistic pronouncements by the Management Defendants),
bought and held rather than sold, Enron securities.
176.   Plaintiffs suffered losses as a result of each
Management Defendant's conduct.

[29] No facts of a conspiracy involving Buy specifically are
provided, such as a meeting of the minds with Causey or anyone
else, nor particular overt acts in furtherance of the conspiracy
pleaded with specificity.

entities because they were funded and backed only by a loan from
Enron and Enron stock; no risk was transferred, as is required for
off-balance sheet treatment.  #56, ¶ 132-34.  The complaint fails
to detail with specific facts how the Raptors contributed to or
were utilized in the alleged fraudulent scheme and how that
activity was concealed or misrepresented to the public.  The
complaint also claims vaguely that Buy knew the Nigerian Barge
transaction was improperly treated as an off-balance sheet event
because there was a secret "handshake" deal between Fastow and
Merrill Lynch assuring Merrill Lynch that no risk would be
transferred from Enron to Merrill Lynch.[30]  #56, ¶ 135.  The
complaint does not explain how Buy knew about the secret deal, no
less what the Nigerian Barge transaction was, when it occurred,
who was involved, or how was it fraudulent.  Buy is charged with
failing to use the power vested in him by the Board to stop Fastow
from engaging in other fraudulent transactions, but the complaint
does not state with factual particularity which transactions, when
and how Buy knew, if he did, about each, and what he did or did
not do about each.  #56, ¶ 136.[31]  The complaint also generally
alleges that Buy knew Enron was in trouble and that he sold

---

[30] The complaint does not explain what the Nigerian barge
transaction was, when it (and the handshake agreement) took place,
and why it was fraudulent, or how Buy knew about it or participated
in the transaction.

[31] The complaint fails to identify any other transactions.

approximately 140,000 shares of Enron stock for $10,656,000, but fails to assert the facts necessary to adequately plead insider trading. He also received bonus payments of about $1,600,000 for his unspecified help in falsifying Enron's financial statements that permitted Enron to meet certain vaguely described "performance targets."[32]  #56, ¶ 137.  The complaint reports generally that Buy has repeatedly refused to testify before unnamed governmental investigative bodies and depositions, invoking his Fifth Amendment right against self-incrimination. #56, ¶ 138.[33]

With conclusory allegations the complaint paints a picture of a rapidly growing Enron whose Board of Directors and Committees shirked their duties, were uninformed, and basically rubber-stamped management's requests and representations.  Outside director John Mendelsohn testified that the Board saw itself as merely "the last ratifying stop in the chain."  #56, ¶ 269. Arthur Andersen admonished the Audit Committee on December 11,

---

[32] The complaint does not allege how, when, and from what Buy knew that Enron was in trouble, when he sold his Enron shares, and who paid him the bonus payments and how he knew they were connected with his help in falsifying the financial statements and specifically where or what he falsified in those statements for what performance targets.  Again, no details are provided to satisfy Rule 9(b).

[33] This Court observes that these vague and conclusory allegations are inadequate to state any kind of fraud claim against Buy under Rule 9(b).

2000 that Enron faced a "control gap,"[34] but the complaint claims that the Committee recklessly ignored the warning.  #56, ¶ 267. The failure to question management, to make informed outside investigations, and to implement and monitor controls was pervasive.  The most blatant example was Fastow's dual roles at Enron and in LJM1 and LJM2, fraught with potential conflict of interest in violation of Enron's Code of Conduct (see discussion *infra*).  *Id.* at ¶ 270.

Plaintiffs insist that Enron's Code of Conduct required a waiver by the Board of Directors of Fastow's two-hat role because the Code states in relevant part,

> The employer is entitled to expect of [each full-time regular . . . officer and employee] . . . complete loyalty to the best interests of the Company and the maximum application of skill, talent, education, etc., to the discharge of his or her job responsibilities, without any reservations.  Therefore, it follows that no full-time officer or employee should: . . . .
>
> > Subcategory B:  Make investments or perform services for his or her own interest in any enterprise under any circumstances where, by reason of the nature of the business conducted by such enterprise, there is, or could be, a disparity or conflict of interest between the office or the employee and the Company.
> >
> > Subcategory C:  Own an interest in or participate, directly or indirectly, in the profits of any other entity which does business with or is a competitor of the Company, unless such ownership or

---

[34] The complaint does not explain what Arthur Andersen meant by "control gap," what it knew, and how it knew.

-76-

> participation has been previously disclosed
> in writing to the Chairman of the Board and
> Chief Executive Officer of Enron Corp., and
> such officer has determined that such
> interest or participation does not adversely
> affect the best interests of the Company.

#56, ¶ 351. Ken Harrison testified that the Board did not actually review the Code of Conduct, and some directors admitted to never having read it prior to approving Fastow's dual roles. #56, ¶ 356.

The complaint at ¶¶ 342–46, asserts that in allowing Fastow to wear two hats,

> 342. The Director Defendants waived Enron's Code of
> Conduct three times (on June 28, 1999, October 11-12,
> 1999, and again on October 6, 2000) allowing Enron's
> CFO Andrew Fastow to participate in the LJM SPEs that
> were buying Enron's assets.

> 343. As explained in the Senate Report, "with little
> debate or independent inquiry, the Enron Board approved
> three code of conduct waivers enabling Mr. Fastow to
> establish three private equity funds in 1999 and 2000,
> known as LJM1, LJM2, and LJM3.

> 344. Pursuant to these waivers, Fastow was allowed to
> engage in transactions that presented an inherent, and
> truly irreconcilable, conflict of interest between
> Fastow's duties as managing partner of the LJM special
> purpose entities and his duties as Enron's Chief
> Financial Officer.

> 345. [Ken] Harrison deemed this arrangement "unusual,"
> not something he had often encountered in his past
> experience. [Frank] Savage, during his deposition,
> confirmed that he had never before seen an arrangement
> similar to Fastow's LJM involvement on any other board
> on which he had served.

> 346. According to the Senate Report:

> The Enron Board approved code of conduct waivers for

-77-

> Mr. Fastow knowing that the LJM partnerships were
> designed to transact business primarily with Enron, and
> controls would be needed to ensure the LJM transactions
> and Mr. Fastow's compensation were fair to Enron.  The
> Board failed, however, to make sure the controls were
> effective, to monitor the fairness of the transactions,
> or to monitor Mr. Fastow's LJM-related compensation.
> The result was that the LJM partnerships realized
> hundreds of millions of dollars in profits at Enron's
> expense.

Not a single Director Defendant voted against the resolutions to waive the Code of Conduct relating to Fastow's dual roles.  #56, ¶ 465.  The Senate investigating committee found that the request for waivers of Enron's ethics code should have been a red flag to the Board, but the Board, despite clear notice, simply approved the LJM arrangement without any meaningful discussion.  #56, ¶¶ 347-51.

The complaint alleges that during his deposition, Frank Savage stated that Fastow had expressly told the Finance Committee Defendants that

> the proposed dual role as Enron Chief Financial Officer
> and LJM general partner posed a potential conflict of
> interest.  Fastow would be in a position to price
> assets or transactions in a manner not in the best
> interests of Enron, and, although he would be receiving
> an Enron salary, he would be spending time working as
> the general partner on LJM business.  Deposition
> testimony from other Board members confirms that the
> Director Defendants clearly understood that Fastow's
> proposed dual role as Enron Chief Financial Officer and
> LJM general partner constituted at least a potential
> conflict of interest given that Fastow would owe
> loyalty to both Enron and LJM.
>
> 353.  Savage and Wakeham both testified that the
> conflict of interest was "obvious."  For Mark-
> Jusbasche, the issue was whether "the conflict of

interest was manageable," not whether such a conflict existed.[35]

Moreover the complaint claims that the Board imprudently chose Arthur Andersen to perform both external and internal auditing work, thereby creating a potential conflict of interest for the auditor.[36]  #56 at ¶ 267.  According to Plaintiffs, lacking knowledge and refusing to institute controls, the Board also relied on what management told it.  #56, ¶ 269.

One of the Board's five committees, the Audit and Compliance Committee ("Audit Committee"), according to its own guidelines,

> serves as the overseer of Enron's financial reporting process, system of internal controls and corporate compliance process, and it provides reasonable assurance that Enron conducts its business in conformance with appropriate legal and regulatory standards and requirements.  Such Committee annually recommends independent auditors for appointment by the Board, reviews the service to be performed by the independent auditors, and exercises oversight of their duties.  The Audit and Compliance Committee is comprised solely of independent Directors.

#56 at ¶ 193.  Its charter lists as one of the Audit Committee's duties serving "as a channel of communications between the independent auditor and the Board of Directors and/or management of the Company."  #56, ¶ 194.

---

[35] For the complaint's allegations of the Board's and the Finance and Audit Committees' gross negligence and willful blindness in failing to institute controls and to monitor the LJM transactions, see ¶¶ 355-94.

[36] The complaint does not further develop this perceived problem with any details.

The complaint asserts, "In general, the Audit Committee's review of the adequacy of Enron's internal controls consisted of receiving a report from the auditors and hearing whether there was any disagreement between the auditor and the management." *Id.* at ¶ 271. Even after Sherron Watkins sent her letter to management warning that Enron was about to implode, testimony from several Director Defendants revealed that the Board never asked to see the letter nor Vinson & Elkins' investigative report on Enron. *Id.* at ¶ 272. It notes that the Board never pressed Lay to explain why hiring the firms allegedly involved in structuring the fraud-implementing related-party transactions also to investigate them was appropriate. *Id.* at 273. The complaint charges the Director Defendants with "willful ignorance" of and "gross indifference" toward their duties. *Id.* at ¶¶ 291-92.

With regard to Enron's SEC-filed financial statements, the complaint states that the Director Defendants lacked concern about the accuracy of Enron's publicly filed financial statements. #56, ¶ 276. According to the complaint, the Audit Committee did not receive drafts of Enron's 10-Qs, nor review the 10-Q filings, despite their duty to do so. #56, ¶ 278. The Audit Committee meetings were not timed for careful review of the Form 10-Ks before they were issued. Although the Director Defendants, who were "responsible for ensu[r]ing that the financial statements contained in Enron's public filings fairly represented Enron's

true financial condition," were obliged to review and question representations in the 10-Ks, no director remembered doing so. #56, ¶¶ 279, 281.  Investigation revealed that only some Board members received the final 10-Ks before they were filed, and of those that did receive them, some, e.g., Chan and Wakeham, did not review them and compare them to the draft 10-Ks, but instructed the corporate secretary Rebecca Carter to sign the final document for them anyway.  *Id.* at ¶ 280, 282 ("In signing the Form 10-Ks, the Director Defendants represented that the '10-K filing fully and fairly represents the financial condition of the company.' . . . As [Ken] Harrison conceded, Director Defendants had an obligation to use independent business judgment when arriving at the decisions that the 10-Ks were an accurate depiction of the company's financial conditions.").  Belfer and Blake admitted that it was "standard practice" at Enron to sign the 10-K filings without reading them, even though "a corporate official who, on behalf of the corporation, signs a false financial statement that is filed with the SEC, 'makes' a statement for potential liability."[37]  #56 at ¶¶ 283-84, 287.  The complaint names the Director Defendants who signed the SEC-filed Form 10-Ks for each year from 1998-2001 as well as registration statements and prospectuses containing false statements.  #56, ¶¶ 287-90.  Arthur

_____

[37] Specified Director Defendants also signed numerous false and misleading registration statements and prospectuses for many Enron securities offerings, listed in ¶ 290 of the complaint.

-81-

Andersen, LLP certified the 1998 Form 10-K as "unqualified,"[38] the

_____

[38] An "unqualified" opinion is with a "clean" opinion.  Under SAS No. 58, an unqualified report states, "In our opinion, the financial statement . . . present fairly, in all material respects, the financial position of X Company in conformity with generally accepted accounting principles."

Among various formal and informal guidelines applicable to auditors are Generally Accepted Auditing Standards ("GAAS"), which "require auditors to assess the overall level of risk associated with any engagement along with the risk for each individual account subject to the audit," and Generally Accepted Accounting Principles ("GAAP"), "an extremely loose set of practices" that are "continually growing and changing," Daniel Austin Green, *Whither and Whether Auditor Independence*, 44 Gonz. L. Rev. 365, 371, 373 (2008-09).

> Although GAAP is the "standard" of financial accounting, it has never been compiled into a single body of rules. In fact, GAAP is quite amorphous and actually encompasses an infinite universe of guidance operating at varying levels of specificity and authoritative value.  GAAS, on the other hand, refers to ten quite specific standards: three General Standards, three Standards of Field Work, and four Standards of Reporting.   These standards have remained virtually untouched since their adoption by the AICPA [American Institute of Certified Accountants] in 1947.  Many of the Statements on Auditing Standards ("SAS"), promulgated by the AICPA's  Auditing Standards Board ("ASB"), provide more specific guidance on the application of GAAS.

*Id.* at 371-72 (footnotes omitted).  GAAS is composed of

General Standards
1.  The auditor must have adequate technical training and proficiency to perform the audit.
2.   The auditor must maintain independence in mental attitude in all matters relating to the audit.
3.  The auditor must exercise due professional care in the performance of the audit and the preparation of the report.
Standards of Field Work
1.  The auditor must adequately plan the work and must properly supervise any assistants.
2.  The auditor must obtain a sufficient understanding of the entity and its environment, including its internal

1999 Form 10-K as "clean," and the 2000 10-K as "clean."[39]   #56,

control, to assess the risk of material misstatement of the financial statements whether due to error or fraud, and to design the nature, timing, and extent of further audit procedures.
3.  The auditor must obtain sufficient appropriate audit evidence by performing audit procedures to afford a reasonable basis for an opinion regarding the financial statements under audit.
Standards of Reporting
1.   The auditor must state in the auditor's report whether the financial statements are presented in accordance with generally accepted accounting principles (GAAP).
2.   The auditor must identify in the auditor's report those circumstances in which such principles have not been consistently observed in the current period in relation to the preceding period.
3.   When the auditor determines that informative disclosures are not reasonably adequate, the auditor must so state in the auditor's report.
4.  The auditor must either express an opinion regarding the financial statements, taken as a whole, or state that an opinion cannot be expressed, in the auditor's report. When the auditor cannot express an overall opinion, the auditor should state the reasons therefor in the auditor's report.  In all cases where an auditor's name is associated with financial statements, the auditor should clearly indicate the character of the auditor's work, if any, and the degree of responsibility the auditor is taking, in the auditor's report.

*Id.* at n. 43.

[39] Jay M. Feinman in *Liability of Accountants for Negligent Auditing:  Doctrine, Policy, and Ideology*, 31 Fla. St. U. L. Rev. 17, 21-22 (Fall 2003)(citations omitted), explains what an auditor does:

An audit is a systematic, objective examination of a company's financial statements.  As accountants frequently point out in debates about liability, the company, not the accountant, prepares the financial statements.  The purpose of an audit is to determine if the statements fairly present the financial condition of the company by determining that they have been prepared

-83-

¶ 287-89.

in accordance with Generally Accepted Accounting Principles (GAAP), applied on a consistent basis. The Auditing Standards Board of the American Institute of Certified Public Accountants (AICPA) promulgates Generally Accepted Auditing Standards (GAAS) and the interpretive Statements on Auditing Standards (SAS) that govern the conduct of audits.

After concluding the audit, the auditor issues its report. The report expresses the auditor's independent, professional opinion about the fairness of the financial statements and, depending on the result of the audit, may be one of several kinds:

An unqualified opinion states that the accountant followed GAAS and that the financial statements fairly present the financial condition of the company in accordance with GAAP. An unqualified opinion may sometimes contain explanatory language, as when the company has changed its accounting practice or when there is an unresolved uncertainty, such as significant pending litigation. As a practical matter, an unqualified opinion is almost a necessary result of an audit of large, publicly held companies, and of smaller companies when an audit is needed to satisfy lenders or investors. If the auditor discovers discrepancies that may require a qualified report, the auditor often will discuss, negotiate, and attempt to remedy the difficulties.

A qualified opinion states exceptions to the observance of GAAS, where the scope of the audit is limited or the auditor is unable to obtain necessary information, or to the fairness of the statements in accordance with GAAP, when the principles have not been observed or when not all necessary disclosures have been made.

An adverse opinion states that the financial statements are not fairly stated in conformity with GAAP.

A disclaimer of opinion is not an opinion at all; rather the accountant states that the scope of the audit was not sufficient to enable it to render an opinion.

-84-

On November 8, 2001, Enron issued a press release and filed an SEC Form 8-K revealing that Enron would "restate its financial statements for the years ended December 31, 1997 through 2000, and the quarters ended March 31 and June 30, 2001." #56, ¶ 62. Furthermore Enron admonished, "As a result, the previously-issued financial statements for these periods and the audit reports covering the year-end financial statements for 1997 to 2000 should not be relied upon." *Id.* The 2000 Form 10-Qs were also identified as unreliable. *Id.* The Form 8-K filing contained restatements of previously filed financial reports revealing (1) a previously announced $1.2 billion reduction to shareholder's equity reported by Enron in the third quarter of 2001, an overstatement of profits by more than $591,000,000, and an understatement of debt by approximately $711,000,000; and (2) a number of income statement and balance sheet adjustments after a review of related-party transactions indicated that LJM1, JEDI and Chewco should have been consolidated on Enron's balance sheets in accordance with GAAP. *Id.* at ¶¶ 62-64, 185. Enron's restatement also revealed (a) that Chewco had never satisfied SPE accounting rules, (b) that Chewco and JEDI should have been consolidated since 1997, and (c) that Enron had overstated profits by more than $591,000,000 and understated debt by approximately $711,000,000

and shareholders' equity by $1,208,000,000.  #56, ¶ 285.[40]  As noted, Arthur Andersen allegedly aided the fraud by providing "unqualified" audit reports and "clean" audit opinions for these various SEC filings.  *See, e.g.,* ¶¶ 287-89.  The complaint fails to explain where, when, how and why Arthur Andersen, Duncan, and Goddard realized that the financial statements failed to comply with GAAP.  Only after Enron filed for bankruptcy, and investigations and lawsuits began, was Enron's fraud, from at least as far back as 1997, exposed more fully.  *Id.*, ¶ 66.

The complaint does assert that even before the collapse, Arthur Andersen repeatedly but conclusorily warned Enron's Audit Committee of potential auditing problems.  As noted, on December 11, 2000, Arthur Andersen told the Audit Committee that Enron had a "control gap."  #56, ¶ 267.  The auditing firm regularly reported that Enron was using accounting practices which, because of their novel design and application in areas without established precedent, might attract scrutiny and pose a high degree of risk of noncompliance with GAAP.  #56, ¶¶ 298-99.  As examples it points, without details, to (1) an October 13, 1997 presentation by Arthur Andersen, LLP's David Duncan and Thomas Bauer to the Audit Committee regarding "high priority financial reporting risk

---

[40] Plaintiffs do not state where they got these figures and how they were calculated.

areas"[41]; (2) a February 7, 1999 briefing of the committee and several senior Enron officers, including Lay and Skilling, by four Arthur Andersen, LLP accountants concerning a number of unidentified transactions that Arthur Andersen, LLP considered to be at "high risk" for noncompliance with GAAP, during which the accountants told the committee that Enron's accounting practices "pushed the limits" or were "at the edge" of acceptable practice; (3) briefings to the Committee by Arthur Andersen on May 3, 1999, May 1, 2000, February 12, 2001, and April 20, 2001, during which particular "high risk" areas were identified[42]; and (4) packages of documents[43] emphasizing the risks and dangers of Enron's accounting practices which were given to the Audit Committee on May 3, 1999, February 7, 2000, May 1, 2000, December 11, 2000, February 12, 2001, and April 20, 2001.  #56, ¶¶ 298-303.  The complaint does not identify and provide facts about these "high risk areas," transactions "at high risk for noncompliance," novel accounting practices that "pushed the limits," briefings, and packages.  The complaint states that Defendant/Audit Committee Chair Robert Jaedicke was told by Arthur Andersen, LLP that "there was a high degree of risk associated with certain accounting

---

[41]  The complaint provides no more information about the presentation.

[42] The complaint does not identify them or explain why they are "high risk."

[43] The specific contents of these, too, are not described.

-87-

judgments that were being made" and that "the transactions could be complicated transactions that required special diligence and care in the choices that were made on how to account for them." #56, ¶ 307.  Defendant Goddard testified that Arthur Andersen informed the Audit Committee that the structured transactions[44] were one of the high priority financial reporting risk areas and agreed that Arthur Andersen provided "that information because Enron's audit committee had oversight responsibility for Enron's financial statements." *Id.*, ¶ 308.  Outside Director John Mendelsohn conceded, "I was aware there was risk"; during his deposition Mendelsohn admitted that he knew the structured transactions, merchant portfolio, commodities trading activities, project development activities, and intercompany and related party transactions[45] carried inherent risk.[46]  *Id.* at ¶ 309.  The Court observes that risk-taking is not necessarily equivalent to fraud. These comments by Board members do not establish that they thought, no less do they show, that the accounting was improper, "over the line," or fraudulent.

Nevertheless the alleged extraordinarily high degree of off-

---

[44] The complaint has not identified these transactions nor explained how and why they are risky.

[45] Again the complaint provides no examples and details required for pleading fraud.

[46] The complaint has not provided explanations or examples, no less detailed ones, of any of these categories.

balance sheet and risky accounting by Enron and Arthur Andersen, if more detailed, might help to support a claim for fraud, but by itself is insufficient.   The complaint alleges that the post-bankruptcy Senate Report on Enron revealed that Enron's Board of Directors was made aware of Enron's high-risk accounting practices, such as mark-to-market accounting, which required continuous reevaluation of assets and liabilities, but that the Board ignored the "red flags" (i.e., vaguely identified as "quirky accounting issues surrounding such transactions as Whitewing, LJM1, LJM2, the Raptors, and certain FASB 125 transactions" and "high risk activities by the company's outside auditor").   #56, ¶¶ 310-14.[47]   Experts [not identified] appearing before the Senate during the hearings indicated such a situation should have awakened the Board to careful scrutiny and review.   *Id.*, ¶¶ 315-17.   Unidentified experts also purportedly testified at Senate Subcommittee hearings that they did not know of any other public company with such a high percentage of its assets off-balance sheet as Enron; SEC chief accountant Sutton stated that "his

_____

[47] Again using generalities and abstractions, the complaint asserts, "The full Board was regularly briefed between 1999 and 2001 about accounting issues with Enron's 'merchant assets' classification."   #56, ¶ 314.   Without identifying concrete documents, accounting issues or transactions, it further asserts, "Numerous documents from both the Finance Committee and the Audit Committee were made available to all Director Defendants concerning quirky accounting issues surrounding such transactions as Whitewing, LJM1, LJM2, the Raptors, and certain FASB 125 transactions."   #56, ¶ 314.

experience is that Enron is at the top of the scale in terms of the extent" of its off-the-books activity. *Id.*, ¶ 320. The complaint names those Board members who attended the October 2000 Finance Committee, at which a presentation entitled "Private Equity Strategy" "made clear" (without any specific facts or examples) that Board action was required to sustain Enron's massive off-the-books activity by approving new special purpose entities ("SPEs"), issuing Enron preferred shares, and pledging Enron stock as collateral to allow the deals to go forward. #56, ¶ 321. In sum, Plaintiffs assert that the Board knowingly aided the moving off-balance sheet of at least $27 billion, or almost 50% of its assets. *Id.*

The complaint references meetings of the Finance and Audit Committees on February 9, 1998, October 6, 2000, and September 30, 2001, where detailed information, not specified in the complaint, about the amount of off-balance sheet assets was allegedly presented. On February 9, 1998 the Finance Committee had a presentation by management (individuals, including Buy, are not identified), indicating that about 45% of Enron debt was unconsolidated in its financial statements. #56, ¶ 324. On September 30, 2001, a presentation by Enron management revealed that 2/3 of Enron's debt was off-balance sheet. #56, ¶ 325.

The complaint charges that Director Defendants enabled and promoted the fraudulent manipulation of the balance sheets and the

resulting false SEC-filed financial statements, relied upon by Plaintiffs and other investors, by approving and overseeing major off-balance sheet transactions. #56, ¶¶ 326-27. For example, the Directors were informed that Whitewing would be used to enhance Enron's financial statements, and they then exercised oversight of Whitewing, which purchased over $2 billion in over-priced Enron assets. *Id.*, ¶ 328.[48] Board minutes in December 1997 reflect the Board's approval of the Whitewing structure to be 50% owned by Enron and 50% owned by Nighthawk (Citigroup). *Id.*, ¶ 329. The Board knew that this transaction was falsified on Enron's balance sheet because Enron characterized the $500 million it received from Nighthawk as an equity investment rather than what it was, a loan (debt).[49] *Id.* Board minutes of February 1, 1999 and September 17, 1999 and a Finance Committee presentation in August 2000 reflect that the Board continued monitoring Whitewing and the Osprey Trust offering, which raised money from uninformed investors for the purchase of distressed Enron assets by the Whitewing SPE. *Id.*, ¶ 330. The complaint conclusorily asserts that the full Board also knowingly approved the Raptor transactions, in spite of high risk accounting, lack of economic

---

[48] The complaint does not explain what the board understood "used to enhance Enron's financial statements" or how it learned that the purchased assets were overpriced.

[49] This allegation is unclear and does not explain how, when, and where they discovered this or how they knew it was fraudulent.

-91-

substance, and substantial potential threat of a claim to Enron stock, none of which is explained with any particularity.[50]  *Id.*, ¶ 331.  With explicit approval of the Board, Enron used the Raptor hedges to offset or, according to the Powers Report, "conceal from the market," losses of approximately $1 billion.  *Id.* at ¶ 333. No details are provided.  The Director Defendants did not adequately disclose to the public Enron's ongoing contingent liability for the Raptor transactions.[51]  *Id.*, ¶ 331.  The Powers Report viewed the Raptors as a wrongful attempt by Enron to use the value of its own stock to offset its losses in its investment portfolio and characterized the Raptors as "a highly complex accounting construct that was destine[d] to collapse" without indicating why.  *Id.*, ¶ 332.  The Powers Report also points out that the Board approved JEDI, Chewco, and Hawaii 125-0 Trust, unconsolidated affiliates that Enron created to artificially bolster Enron's reported financial condition.[52]  #56, ¶ 336.

The complaint charges that the Director Defendants knew or were grossly negligent for not knowing, that their off-balance sheet transactions were not properly disclosed.  The Senate Report

---

[50] Again the why, where, when and how are missing from the complaint.

[51] There is no explanation of the "ongoing contingency, nor why, where, when, and how the Board discovered these alleged generalities.

[52] The complaint again fails to state specific supporting facts.

states, "Enron's initial public disclosures regarding its dealings with its 'unconsolidated affiliates' such as JEDI, Whitewing, LJM, and the Raptor SPEs are nearly impossible to understand and difficult to reconcile with transactions known to have taken place." #56, ¶ 339.  The Powers Report describes the disclosures as "fundamentally inadequate" and criticizes Enron for proxy statements and financial statement disclosures that fail to "disclose facts that were important for an understanding of the substance of the transactions" in which Enron participated with related parties.  #56, ¶340.  The law and Enron's own policies mandate that Defendants must insure that Form 10-Ks filed with the SEC and relied upon by investors accurately disclosed transactions that would affect Enron's reported bottom line.  #56, ¶ 341.

Regarding the Arthur Andersen Defendants, the complaint represents that the accounting firm and Enron had an extensive relationship going back to the creation of Enron in 1985.  After providing accounting services to Enron for years, from 1997-2000, Arthur Andersen, LLP performed independent audits of Enron's financial statements, which Plaintiffs claim were false and misleading, and issued "unqualified" annual reports, certifying that the year-end statements fairly presented Enron's financial position, results of operations, and changes of financial position in conformity with GAAS.    Arthur Andersen, LLP was engaged not only to perform independent audits of Enron's financial statements

in accordance with GAAS, but also other internal audit-related services, to aid in the structuring and design of Enron and Enron-related transactions (no particular facts alleged), and to provide accounting services; thus, the complaint concludes, the accounting firm had continual access to and knowledge of Enron's financial and business information, including internal monthly financial statements, board minutes, and internal memoranda.  #56, ¶¶ 483-88.  Plaintiffs insist the audits of Enron's consolidated statements failed to comply with GAAS, without showing how or where.  They also claim that Arthur Andersen, LLP's consulting services for Enron grew and that an increasing, substantial portion of the accounting firm's revenues from Enron were for these non-audit services.  The firm's revenue from Enron tripled from 1996, when its fees approximated $15.9 million, to 2000 when its fees were approximately $47.9 million and when Enron became its largest client.  Nevertheless the portion of fees from consulting work, as opposed to auditing, increased over the years, creating what the complaint calls "an incentive to 'go along' with questionable or improper practices sought by Enron" or lack of independence.  #56, ¶¶ 489-92.  Plaintiffs charge that the accounting firm also failed to comply with its own guidance procedures but do not identify them.  #56, ¶ 481.  Arthur Andersen became too close with Enron, with the result that its "unqualified" audit reports filed with the SEC and relied upon by

Plaintiffs were false and misleading. *Id.,* ¶ 470-81. The complaint does not provide any specific examples or concrete numbers, no less explain where, how, and why the audit reports were false and misleading, nor demonstrate that Arthur Andersen had intent to defraud.

The complaint does list general failures to comply with GAAS and GAAP and accountant rules and standards and AICPA standards that Arthur Andersen violated in its preparing its Enron reports, but does not provide examples of where specifically they were disregarded. #56, ¶¶ 493-94. It argues that Enron's restatement on November 8, 2001 demonstrated and established that Enron's financial statements from 1997-2000 were not accurate, nor in compliance with GAAP, and unreliable.[53]   #56, ¶ 495.   Arthur Andersen, LLP admitted accounting errors, especially in the failure to consolidate the numerous improperly structured SPEs

---

[53] The Fifth Circuit has long held that "[t]he mere publication of inaccurate accounting figures, or the failure to follow GAAP, does not establish scienter.  The party must know that it is publishing materially false information, or the party must be severely reckless in publishing such information."  *Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1020 (5th Cir. 1996); *see also, e.g., Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527, 534 (5th Cir. 2008), *citing the following cases and comments*.  "[A]llegations of violations of GAAS or GAAP, standing alone, do not satisfy the particularity requirement of Rule 9(b)."  *Ziemba v. Cascade Int'l. Inc.*, 256 F.3d 1194, 1208 (11th Cir. 2001).  "Claims of accounting irregularities or violations of [GAAP] support a claim of scienter only when coupled with evidence that the violations or irregularities were the result of the defendant's fraudulent intent to mislead investors."  *Pirraglia v. Novell, Inc.*, 339 F.3d 1182, 1191 (10th Cir. 2002).

(LJM1 and its subsidiary Swap Sub, LJM2, the Raptors, Chewco/JEDI on Enron's balance sheet), causing the material misstatements in Enron's financial statements. The complaint fails to allege facts demonstrating that Arthur Andersen had the intent to mislead Plaintiffs and others in its erroneous accounting. Plaintiffs contend that Enron not only failed to consolidate the SPEs, but also failed to disclose adequately the existence of unspecified entities and relationships between Enron upper management and the controlling parties of the SPEs. #56, ¶¶ 496-97. *See* Accounting Research Bulletin ("ARB") No. 51, as amended ("there is a presumption that consolidated statements are more meaningful than separate statements and that they are usually necessary for a fair presentation when one of the companies in the group directly or indirectly has controlling financial interests in the other companies."). The complaint fails to distinguish clearly Enron's role from Arthur Andersen's in alleging who was responsible for what alleged accounting fraud and how either or both knew the underlying facts of the various transactions.

Under ARB No. 51, an SPE must be consolidated by Enron if less than 3% of the equity investment in it is made by a third party independent from Enron. For off-balance sheet accounting treatment, the minimum 3% investment by a third party must also remain at risk, with no guarantee of return on the investment. #56, ¶ 498. The complaint asserts that Arthur Andersen, LLP

ignored Enron's violation of these rules in structuring its SPEs.
Fully aware that LJM1 was a related party, with Fastow as LJM1's
manager while acting as Enron's CEO, according to the complaint
the accounting firm admitted that it improperly accounted for LJM1
transactions[54] with Swap Sub, in turn formed to hedge Enron's
investments in Rhythms NetConnections.   #56,  ¶¶ 497, 499-500.
They should have been consolidated because they never met GAAP
rules for nonconsolidation.   The complaint, filled with abstract
and conclusory sentences, fails to explain the concrete facts
regarding any of these transactions, how they operated, why they
were fraudulent, and specifically how the accounting was
fraudulent.

Similarly, in October 1999 Fastow owned the company that was
managing general partner of LJM2, which in turn, in violation of

---

[54]  The complaint recites that Arthur Andersen's Managing
Partner and Chief Executive Officer Joseph F. Bernardino discussed
causes of Enron's restatements before Congress and testified,

> Two SPEs were involved in Enron's recent restatement
> announcement.  One [LJM1], the smaller of them, we made
> a professional judgment about the appropriate accounting
> treatment that turned out to be wrong. . . .   In
> retrospect, we believe LJM1's subsidiary [Swap Sub]
> should have been consolidated.  I am here today to tell
> you candidly that this was the result of an error in
> judgment.

#56, ¶¶ 499, 500.  *But see, e.g., Melder v. Norris*, 27 F.3d 1097,
1101 n.8 (5th Cir. 1994)("These allegations boil down to plaintiffs'
attempt to chastise as fraud business practices that in, hindsight,
might have been more cautious.   Misjudgments are not, however,
fraud.").

GAAP, was used several times to attempt to establish an independent third-party's 3% equity at risk in other SPEs, including the Raptors. The complaint claims that a December 13, 1999 memorandum from Arthur Andersen, LLP's principals, David Duncan, Deb Cash, Patty Grutzmacher, and Jennifer Stevenson demonstrates that Arthur Andersen, LLP was aware that "a senior officer of Enron serves as the GP of LJM2 and is therefore in control of all the affairs of the partnership."  #56, ¶ 501. Nevertheless, the firm did not require Enron to consolidate the Raptors when LJM2 tried to act as their independent third-party investor, resulting in significant and material misstatements in Enron's financial statements.  *Id.*  The complaint asserts generally that the four Raptors, in turn, were designed to hedge profit and loss volatility in Enron's merchant portfolio.  In essence through LJM2, Enron was hedging against itself, and Arthur Andersen knew or should have known that its accounting and the nonconsolidation of these entities on the balance sheet were wrong and deceptive.  The complaint further asserts generally that in late 2000 and 2001 Arthur Andersen, LLP aided Enron in fraud and conspired with Enron to aggregate two of the Raptors, as many of the financial instruments in those Raptors had declined and diminished the Raptors' creditworthiness.  #56, ¶¶ 504-06.

Arthur Andersen, LLP also admitted that Chewco and JEDI should have been consolidated in Enron's SEC-filed financial

statements.   Chewco was created in 1997 by Enron to buy out
CALPERS's third-party investment in JEDI (with Enron owning the
other 97%) because CALPERS no longer wished to remain in the
investment.  By guaranteeing the loan, Enron got Barclays Bank to
lend Chewco $240 million to pay in part for CALPERS's interest
($383 million) in JEDI in November 1997.  The next month Chewco
used the $240 million loan from Barclays, guaranteed by Enron, to
buy out CALPERS's interest in JEDI.  In December it supplemented
that amount with a $132 million loan from JEDI (no longer a
legitimate SPE) to Chewco and a $11.5 million in contributions
from Chewco's general partner SONAR 1 (managed by Fastow's Enron
employee Michael Kopper)[55] and from a Barclays loan to Chewco's
limited partner, Big River.  Chewco clearly did not meet the
requirements of an independent third-party investor for an
nonconsolidated SPE, but was treated that way.  Plaintiffs contend
that the failure to consolidate JEDI caused material misstatements
in Enron's equity position between 1997 and 2001.  #56, ¶¶ 507-09.
The complaint does not specify when, where and how the Arthur
Andersen Defendants learned of the financing to know that

---

[55] The complaint states that Kopper, managing director of
Fastow's Enron Global Equity Markets Group, contributed $114,900
initially, but these funds were returned to him seven days later as
a "management fee."  Kopper's money was never at risk.  Barclays
simultaneously made a loan to Big River, Chewco's limited partner
and indirectly owned by Kopper, and JEDI distributed $16.6 million
to Chewco so that it could use the extra $6.6 million to establish
a bank account reserve, required by Barclays to protect its loan to
Big River.  #56, ¶ 508.

nonconsolidation was improper.

Financial Accounting Standard ("FAS") 57, Related Party Disclosures, provides,

> Information about transactions with related parties is useful to users of financial statements in attempting to compare an enterprise's results of operations and financial position with those of prior periods and those of other enterprises. It helps them to detect and explain possible differences. Therefore, information about transactions with related parties that would make a difference in decision making should be disclosed so that users of the financial statements can evaluate their significance.

> Examples of related party transactions include transactions between (a) parent company and its subsidiaries; (b) subsidiaries of a common parent; (c) an enterprise and trusts for the benefit of employees, such as pension and profit-sharing trusts that are managed by or under the trusteeship of the enterprise's management; (d) an enterprise and its principal owners, management, or members of their immediate families; and (e) affiliates.

#56, ¶ 511. FAS 57 required Enron to disclose specific information about the transactions between Enron and JEDI, Chewco, LJM1 and Swap Sub, and LJM2 and the Raptors because these parties fall within its definition of related parties. Enron's financial statements failed to disclose any of these connections until the restatement in the third quarter of 2001. Finally, and then only in Note 4 of Form 10-Q for the 3rd quarter of 2001 ("Related Party Transactions"), did Enron disclose specific details (including economic results, involvement of Fastow and other Enron employees in the creation and management of the entities) to the related party transactions involving Chewco/JEDI, LJM2, and the Raptors.

-100-

Under "Other Employee Transactions" Enron also disclosed the nature of the transactions with Chewco and JEDI and first named Kopper).  #56, ¶ 512.

Enron did not disclose Chewco as a related party nor its role as a 50% limited partner in JEDI since 1997.  Nor did it disclose Michael Kopper's role in the formation and management of Chewco or that Kopper received at least $12.7 million in distributions from Chewco and another $1.6 million in management fees.  #56, ¶513.  Nor did Arthur Andersen, LLP and Enron disclose the related parties in the Chewco/JEDI transaction in Enron's 1997 and 1998 financial statements.  The disclosures about LJM1 and LJM2 did not adequately describe Fastow's financial interests nor the amounts he invested.  The disclosures did not state the amounts paid to Fastow, who received at least $1.8 million in distributions and $2.6 million in management fees from LJM1, nor to Kopper.  When Enron terminated the Rhythms' hedges with Swap Sub, the Fastow Family Foundation received $4.5 million on an investment of $25,000.  From his involvement in LJM2 Fastow received approximately $9.3 million in distributions and $9.9 million in management fees; Fastow also received $15.5 million in cash and a house worth $850,000 from Kopper when he sold his LJM1 and LJM2 interests to Kopper.  Kopper received at least $7.2 million in management fees from LJM2.  Plaintiffs complain that disclosures failed to reveal the nature of the hedging activities and that the

hedging counterparties were also controlled by Enron and capitalized with Enron's own stock. #56, ¶ 514. The Court observes that the complaint also lacks details of such allegations.

In sum, the complaint claims that Arthur Andersen, LLP failed to disclose the related party transactions among Enron, JEDI, Chewco and Kopper in 1997 and 1998 and failed to make proper and meaningful disclosure of the related parties involved in JEDI/Chewco, LJM1 and LJM2 in transactions between 1999 and 2001. #56, ¶ 515. The Court notes that despite this accusation, there is no mention, no less specific facts related, in the complaint of how, when, and where the Arthur Andersen Defendants learned of these related party transactions.

The complaint also asserts that Arthur Andersen, LLP failed to exercise due care in Enron's financial statements, which should have conformed not only with GAAP, but also with recognized standards and procedures for proper presentation of a company's true financial condition. Statement on Auditing Standard ("SAS") 82 ("Consideration of Fraud in a Financial Statement") identifies risk factors that raise red flags of possible fraud. It states there is a heightened risk of fraud where a significant portion of management compensation is represented by bonuses, stock options, or other incentives, the value of which is contingent upon the entity's achieving unduly aggressive targets for

-102-

operating results, financial position, or cash flow.  It also
warns of excessive interest by management in maintaining or
increasing the entity's stock price or earnings trend through the
use of unusually aggressive accounting practices.  Other
identified risk factors include management's practice of
committing to analysts, creditors or third parties to achieve
seemingly unduly aggressive or clearly unrealistic forecasts;
significant pressure to obtain additional capital; where
valuations of assets, liabilities and the like are speculative
and/or highly subjective; where a company has significant related-
party transactions not in the ordinary course of business or with
related entities not audited or audited by another firm; the use
of significant, unusual or highly complex transactions, especially
near the end of an accounting period; and where a company is
reporting unusual growth or profitability compared with other
companies in the same industry.  #56, ¶¶ 516-26.  The complaint
asserts that all these factors were present at Enron, but cites
no specific examples or particular factual details.  #56, ¶ 527.
The complaint does point to a February 20, 2001 Andersen memo from
Julie Nickell and Selina Wilber, which the complaint vaguely
alleges demonstrates that Arthur Andersen was "aware" of these
high risk factors but does not explain what, how, where, and when
the firm learned of them.  The memo also purportedly admitted that
there could have been a "lack of management integrity" at Enron,

but the phrase is not defined and no supporting details are revealed.

Because of these factors, Plaintiffs insist that Andersen had a professional duty under GAAS, but failed to expand the scope of its work to assure that management representations were accurate and to "exercise professional skepticism," which "is an attitude that includes a questioning mind and a critical assessment of audit evidence."  #56, ¶¶ 528, 530.  For instance, Enron often refused to provide supporting documentation requested by the accounting firm, such as information about Delta and Mahonia, entities participating in approximately $8 billion prepay transactions.[56]  #56,¶ 529.  Nevertheless Arthur Andersen, LLP continued to issue "unqualified" approvals of Enron's SEC-filed financial statements.  #56, ¶¶ 528-29.  Enron Bankruptcy Examiner Neal Batson concluded from evidence (including testimony of Arthur Andersen, LLP partners and documents) that Arthur Andersen, although required by GAAS to exercise "professional skepticism," committed professional malpractice and was negligent in rendering services to Enron.[57]  #56, ¶¶ 529-31.

The complaint also asserts that Arthur Andersen failed to comply with its own internal guidance policies, which are not

_____

[56] The complaint does not explain what these transactions were, no less why they were fraudulent.

[57] The complaint does not detail what the evidence was nor explain how and why Batson reached his conclusions.

identified, even though its internal risk and materiality assessment tools showed increasing risks of non-compliance with GAAP and GAAS.  #56, ¶¶ 531-36.  No specific context or example is provided to "flesh out" the complaint's abstractions.

Contending that Arthur Andersen, LLP conspired with Enron and substantially aided Enron in committing fraud by disseminating materially misleading information, the complaint recites that Arthur Andersen, LLP purportedly assisted Enron in Enron's abuse of rule-based GAAP by helping Enron to design accounting models that Enron could use to report income, cash flow, and a financial status more positively than if the financial statements and related disclosures accurately represented the substance of Enron's transactions.  #56, ¶ 538.  Neal Batson's Third Interim Report describes Arthur Andersen's aid in designing the model for the prepay transactions and the "strained analysis of applicable GAAP used by the firm to justify the structure that misrepresented the nature of those loans to Enron.[58]  *Id.,* ¶ 540.  Relying on Batson, Plaintiffs charge that the accounting firm failed to use due care in auditing the SPEs used by Enron in its FAS 140 prepay transactions to determine whether they had the independent 3% equity investments and whether those investments were at risk.  *Id.,* ¶ 538.  Batson also found that Arthur Andersen, LLP also

_____

[58] The complaint does not provide essential details about the models or Arthur Andersen's purportedly strained interpretations of accounting rules.

failed in its duty as an auditor to insure that "the audit committee [was] informed about methods used to account for significant unusual transactions and the effect of significant accounting policies in controversial or emerging areas for which there is a lack of authoritative guidance or consensus."  #56, ¶ 539.  Again the complaint fails to provide specific facts and examples.

The complaint claims that internal Arthur Andersen emails and memoranda demonstrate that the firm knew that the prepay transactions would lead to deceptive reports about Enron's financial condition.  It lists a June 30, 1999 memorandum known as the "Chase/Mahonia Prepay Memo," by Arthur Andersen's Patricia Grutzmacher, who also sent an email to Arthur Andersen's Lisa Bomb on March 16, 2001 about the Yosemite II prepay transaction.  The complaint does not describe the contents of either memorandum. #56, ¶ 541.  Grutzmacher and Debra Cash authored a December 1999 "Yosemite Prepay Memo."  #56, ¶ 541.  The complaint fails to state what was in any of these documents or specifically how they reveal scienter.  The complaint maintains, without specific facts and examples, that the prepay loans, especially those with Citigroup and JP Morgan Chase, were characterized as "forward commodity swaps" and allowed Enron to raise billions of dollars of disguised debt, while distorting and making false the financial statements given an "unqualified" approval by Arthur Andersen but which are

not delineated.  #56, ¶¶ 541-42.   Two charts list the names of the prepays transacted with Citigroup and JP Morgan Chase, the amounts of money received from each by Enron, and the dates they were executed, but no specific facts are provided about any of them to demonstrate what they were, how they were fraudulent, nor which financial statements were affected and how they were impacted.  #56, ¶¶ 543-44.  The complaint states that Enron also entered into loan prepays with other banks, which were erroneously not characterized as debt in the financial statements, but the complaint fails to identify them or provide any supporting facts.

The complaint lists numerous other documents mainly prepared by Arthur Andersen employees, but does not provide specific facts demonstrating how they show fraud.  *See, e.g.*, references in an April 9, 2000 memorandum by Kimberly Scardino about the Hawaii 125-0 transaction; a September 9, 1998 memorandum by H. Ronald that "demonstrates how AA helped Enron design FAS transactions that obscured Enron's financial condition"; a December 7, 1999 "Nahanni Memo" by Debra Cash regarding "Non-Cash Activity" that "evidences AA's aid in designing and implementing fraudulent minority interest transactions"; and an agreement between CIBC and the Department of Justice in which CIBC admitted conclusorily that a number of (unidentified) FAS 140 and minority interest transactions with Enron were fraudulent.  #56, ¶¶ 546-48.

The complaint conclusorily asserts that Arthur Andersen

further aided Enron's fraud by helping in the design of unidentified tax transactions that had no legitimate business purpose, but served only to prop up Enron's reported financial condition.  Supposedly memoranda dated May 27, 1998 and July 7, 2000 by Ronald Weissman and others evidence Arthur Andersen's duplicity in creating these, but the complaint fails to explain the specific who, what, how, and why required of a fraud claim. #56, ¶ 549.

In sum, the complaint asserts that Arthur Andersen's auditing was not independent, contrary to AICPA Professional Standards. #56, ¶ 550.  It claims vaguely that in the auditors' reports in 1999 and 2000 to Enron's Audit Committee, Arthur Andersen Defendants would list problematic factors, but then states that Arthur Andersen considered itself to be independent.  #56, ¶¶ 551-53. It is almost entirely composed of conclusory accusations, without specific facts to explain and support them.

Carl Bass was Arthur Andersen's engagement partner for the Enron account through December, 1999, but allegedly after he became critical of some of Enron's desired accounting, in particular for the Raptors, in early 2001 Bass was replaced by David Duncan at Enron Chief Accounting Officer Richard Causey's request to Arthur Andersen senior executive Gary Goolsby. Nevertheless Bass continued to participate in Enron matters.  #56, ¶¶ 554-55, 558, 560. On February 1, 2000 Bass sent an email to

Arthur Andersen accounting expert John Steward, stating about the Raptors, "Going back to the Enron income effect, this whole deal looks like there is no substance."  #56, ¶¶ 554–56.  No reasons are provided.  The complaint maintains that the restatement notice of November 8, 2001 confirmed that Bass was right (even though it did not mention the Raptors), but, without supporting details, charges that Arthur Andersen had knowingly and purposely rejected Bass' opinion.  *Id.*, ¶ 557.  The complaint also mentions that accountant Jennifer Stevenson frequently received "push back" from Enron when Arthur Andersen, LLP was unwilling to account for a transaction the way Enron needed to in order to achieve its deceptive objectives.  The complaint further asserts that Stevenson and Grutzmacher pointed out to Tom Bauer regarding Merlin, which is not identified, that Enron's repurchase of an equity investment at the same price as the investment price might be an indication that the equity was never at risk, which would require changing the accounting; but Arthur Andersen chose not to change the accounting because it would be faced with the loss of large fees.  #56, ¶ 559.

The complaint further alleges that Duncan, who supervised the Enron engagement team, was aware that all was not right at Enron.  On February 9, 2001 David Duncan and other Arthur Andersen employees drafted a document entitled "LJM Areas for Improvement," consisting of a "long laundry list" of accounting problems with

-109-

the LJM partnerships, which are not identified in the complaint. The complaint also recites that sometime later, Duncan and Deborah Cash met with Enron's Andrew Fastow and CAO Rick Causey about (1) the sufficiency of the equity or risk in the LJM entities, (2) the inadequacies of Enron's policies and procedures for controlling conflicts and the failure of Enron personnel to timely sign deal approval sheets; and (3) inconsistencies with Arthur Andersen's understanding of the transactions entered into by Enron.  #56, ¶ 564.

According to the complaint, Arthur Andersen failed to act until David Duncan, learning of an impending SEC investigation, ordered the destruction of Enron-related documents by Goddard and his team in Houston in October 2001.  #56, ¶¶ 565-67.  The Arthur Andersen Defendants purportedly knew that destruction of documents was illegal when an SEC investigation was to occur.  #56, ¶ 569. Although at first Arthur Andersen employees claimed they did nothing wrong, email from Amy Walsh to Andersen partners dated March 13, 2002, the criminal trial testimony of Arthur Andersen's Patricia Grutzmacher, the deposition testimony of Arthur Andersen's Kate Agnew on October  31, 2005, and the deposition testimony of Roger Willard on July 20, 2004, together, describe "the frantic and massive effort to destroy documents."  #56, ¶ 568.  Accountant Jennifer Stevens stated that she had never seen such a coordinated effort to get rid of documents, and that at Tom

Bauer's instruction, she had destroyed documents, "including hand-written notes that may have shown how deals evolved." #56, ¶ 568. Arthur Andersen subsequently fired Duncan for violating the firm's policy after Arthur Andersen publicly admitted destroying a significant number of Enron-related documents and electronic files in the weeks before the firm received a subpoena from the SEC. #56, ¶ 570.  In a plea agreement with the Department of Justice, Duncan pleaded guilty to obstruction of justice in the mass destruction of documents.  Goddard was also fired by Arthur Andersen for his involvement in the destruction.  #56, ¶ 570-72.

In sum, the complaint charges in generalities that all the Arthur Andersen Defendants, who knowingly and purposefully disregarded professional accounting standards, are liable to Plaintiffs for conspiring with and aiding Enron to commit fraud by manipulated financial statements filed with the SEC and relied upon by Plaintiffs and other investors.  The Court observes that no specific allegations have been lodged against Goddard other than that he was fired for destroying documents.

### Plaintiffs' Summary of Causes of Action and Defendants

In closing, Plaintiffs' complaint summarizes their causes of action and the Defendants sued under each.

### 1.  Article 581-33 of the TSA

As Plaintiffs' first cause of action, violation of the TSA, the complaint alleges that Enron, as an issuer and offeror of

securities that made material misrepresentations and actionable omissions in its SEC filings, was a primary violator of article 581-33A.  In addition, Enron purportedly participated in numerous off-balance sheet structured financial transactions and other improper deals that purposely concealed the true nature of Enron's financial condition.  The complaint insists that guilty pleas, cooperation agreements, and criminal convictions of former Enron officers confirm that Enron was an intentional primary violator of the TSA.  #56, ¶ 579.

The complaint charges that Richard Buy, *inter alia,* is liable under article 581-33F(1) as a "controlling person" of a seller or of an issuer of a security and who, in the reasonable discharge of his duties, should have known of Enron's fraud.  #56, ¶¶ 581-82.

It also claims that, as alleged aiders and/or abettors, Arthur Andersen, LLP, Stephen Goddard, David Duncan, and Richard Buy violated article 581-33F(2) because each intended to deceive or defraud and/or acted with reckless disregard for the truth and/or acted with reckless disregard for the law in materially aiding Enron, a seller and issuer of securities, by knowingly failing to file accurate financial statements, as required by federal law, and by destroying documents to cover up its assistance to Enron.  #56, ¶¶ 583-93.

**2.  Statutory Fraud under § 27.01**

Under the second cause of action, statutory fraud, the complaint asserts that Richard Buy, Arthur Andersen, Duncan, and Goddard, *inter alia*, violated, conspired to violate, and aided and/or abetted violations of section 27.01 of the Texas Business & Commerce Code by making false representations of past or existing material facts or omitting to state past or existing material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, or by failing to disclose the falsity of Enron's and its management's representations. With Enron once again named the primary violator in making false representations to induce Plaintiffs to rely on them and to enter into contracts for the purchase of Enron's securities, the complaint asserts that Buy, Arthur Andersen, LLP, Duncan, and Goddard each violated section 27.01(d) with actual awareness of Enron's reported false SEC filings and other financial reports (accounting malfeasance and fraudulent misrepresentations) on which they knew that investors relied in making investment decisions. The complaint contends generally, without specific examples, that Andersen's experts headquartered in Chicago expressly warned Andersen Defendants about Enron's improper accounting for various transactions. These Defendants never revealed the falsity of Enron's representations, but instead actively participated in a cover-up of their wrongdoing in destroying truckloads of documents. Arthur Andersen Defendants

-113-

benefitted by more than $50 million in fees each of the last two years and by Duncan's and Goddard's unspecified high salaries and bonuses as lead accountants for the Enron engagement. $56, ¶¶ 595-604.

**3. and 4.   Common Law Fraud, Conspiracy to Defraud**

Under the next two causes of action, Buy and the Andersen Defendants are allegedly liable for common law fraud and/or conspiracy to defraud, under *Ernst & Young, LLP v. Pacific Mutual Life Ins. Co.,* contends the complaint. For common-law fraud, each allegedly had a duty to disclose, but breached it, because (1) each voluntarily disclosed some information but failed to disclose the whole truth; (2) each made a misrepresentation and failed to disclose new information that made the earlier representation misleading or untrue; and (3) each made a partial disclosure and conveyed a false impression. *Lesikar v. Rappeport*, 33 S.W. 3d 282, 299 (Tex. App.--Texarkana 2000, pet. denied)(duty to disclose may arise under these three circumstances).[59]  Plaintiffs assert that they justifiably relied on Enron's SEC-filed financial statements and suffered substantial losses as a result.  #56, ¶¶ 606-14.[60]

These same Defendants are also allegedly liable for

---

[59] The Court observes that there have been no allegations of disclosures, complete or partial, by Buy.

[60] The allegations in these paragraphs are very general and conclusory.

conspiring with Enron *inter alia* to defraud investors in order to keep Enron afloat and for personal pecuniary gain.   They all benefitted financially from the conspiracy.   They had a meeting of the minds with Enron on the course of action for perpetrating the fraud by allowing and approving Enron's improper transactions and accounting gimmickry, which enabled Enron to disseminate false financial information.   Overt acts by the three Andersen Defendants include producing false and misleading financial statements, giving them "unqualified" approvals, and destroying large volumes of documents to prevent the public from learning the truth about the conspiracy.   Buy is alleged to have "participated in numerous overt acts in furtherance of the conspiracy as described in numerous plea agreements."[61]   As a result of this wrongful conduct, the market price of Enron securities was artificially inflated when Plaintiffs purchased Enron securities or decided to hold rather than sell those already in their portfolios, and they suffered substantial damage when the price declined upon public disclosure of the fraud.   #56, ¶¶ 615-32.

## 5.   Negligent Misrepresentation

Plaintiffs' fifth cause of action for negligence and professional malpractice is charged against the three Arthur Andersen Defendants for failure to meet the standard of care of

---

[61]   The Court, however, observes that none of the quoted portions of the plea agreements or cooperation agreements names Buy.

certified public accountants as reflected by the General Standards of the American Institute of Certified Public Accountants, GAAS, and GAAP, with conscious indifference to the rights and welfare of persons affected by them, including Plaintiffs. #56, ¶¶ 63-36.

The cause of action based on the facts asserted in this section would require privity between Plaintiffs and Arthur Andersen, which everyone agrees did not exist here. Instead, as Defendants have observed, Plaintiffs' claim must be for a misrepresentation made through an intermediary intended to influence a third person's conduct, in accord with section 531 of the *Restatement (Second) Torts.*

### Andersen's Motion to Dismiss (#62)

The claims against Andersen[62] arise out of Andersen's issuance of audit opinions about Enron Corporation ("Enron"). With discovery now closed, Andersen contends that the allegations against Andersen fail to state a claim because they are naked legal conclusions, unsupported by facts. *Tuchman v. DSC Communications Corp.*, 14 F.3d 1061, 1067 (5th Cir. 1994)(conclusory allegations and unwarranted deductions of fact are insufficient to prevent a motion to dismiss). Furthermore, both fraud and negligent misrepresentations claims are subject to a heightened pleading standard under Rule (9(b)("In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be

---

[62] Arthur Andersen, LLP and D. Stephen Goddard, Jr.

stated with particularity."). Boilerplate statements that an accountant violated particular accounting standards are not, without more, sufficient to support an inference of fraud. *Melder v. Morris*, 27 F.3d 1097, 1103 (5th Cir. 2004).

Plaintiffs assert that Andersen violated the TSA by materially aiding Enron, a "seller" of securities, with the intent to deceive or defraud investors and with a reckless disregard for the truth. To allege that Andersen aided Enron for liability under Tex. Rev. Civ. Stat. § 581-33F(2), Andersen contends that Plaintiffs must first plead under Tex. Rev. Civ. Stat. art. 581-33A a primary violation by Enron, as the aided party and primary violator. *See also Frank v. Bear, Stearns & Co.*, 11 S.W. 3d 380, 384 (Tex. App.--Houston [14[th] Dist.] 2000). A primary violation under the TSA can only be committed by one who "offers or sells" a security by means of an untrue statement. § 581-33A(2). Texas courts have strictly construed this phrase to encompass only (1) a seller with whom the buyer-plaintiff was in privity or (2) the issuer if the plaintiff can allege that (a) it bought the securities *directly* from that issuer or (b) the issuer was sufficiently actively involved in the solicitation of the sale of its securities to that specific purchaser to be deemed the seller's agent. *Lone Star Ladies Inv. Club v. Schlotzky's, Inc.*, 238 F.3d 363, 370 (5th Cir. 2001)(decided under analogous statute, section 12 of the 1933 Securities Act); *In re Enron Corp.*

*Sec., Derivative and "ERISA" Litig.*, 258 F. Supp. 2d 576, 643-44
(S.D. Tex. 2003).  In the latter opinion this Court noted that in
1977 the "'Texas legislature substantially revised and modernized
section 33 (1) to limit plaintiffs under 33(A)(2) to whose who
bought securities from the defendant they are suing (a privity
requirement) . . . ."  *Id.*  Plaintiffs have not alleged who sold
them the Enron securities, that they were in privity with that
defendant, that they purchased securities directly from that
issuer, or that an issuer was sufficiently actively involved in
the solicitation of the sale of the securities to them so as to
be deemed an agent of the seller that allegedly sold them the
securities.   Thus they fail to state a claim for primary
violation, and of necessity, a secondary violation of § 581-
33A(2).  *In re WorldCom, Inc. Sec. Litig. (IQ Holdings, Inc. v.
Arthur Andersen, LLP)*, Nos. 02 Civ. 3288, 03 Civ. 1785, 2006 WL
1047130, *5 (S.D.N.Y. Apr. 21, 2006)(failure to identify seller
and plead a primary violation of the TSA against that seller
precludes aiding and abetting claim), *reconsideration granted in
part on other grounds*, 2006 WL 1880539 (S.D. N.Y. July 7, 2006).

The complaint also asserts that Andersen violated Texas
Business & Commerce Code § 27.01(d) by failing to disclose the
falsity of representations made by Enron to Plaintiffs.  Andersen
maintains that the claim fails as a matter of law because
Plaintiffs have not alleged how Andersen benefitted from the

-118-

alleged misrepresentations.    *WorldCom*, 2006 WL 1047130, at *6
(defendant must have received direct benefits, such as a
commission, from the transactions induced by the false
representations).[63]

Andersen further argues that Plaintiffs fail to state a claim
for common law fraud against Andersen because they fail to allege
with particularity that they each[64] directly relied upon Andersen's
alleged false statements/audit opinions.  Nor have they adequately
pleaded that Andersen intended to induce reliance under the
standard established in *Ernst & Young LLP v. Pacific Mutual Life
Ins. Co.*, 51 S.W. 3d 573, 581 (Tex. 2001)(to be liable for fraud,
the "maker of the misrepresentation *must have information* that
would lead a reasonable man to conclude that there is *an especial
likelihood*" that it will reach plaintiffs and influence their
conduct), *quoting Restatement (Second) of Torts* § 531, comment d
(1977).  "[E]ven an obvious risk that a third person will rely on

---

[63] This Court has taken a less restrictive view of "benefit"
under § 2701(d).  *See, e.g.*, *In re Enron Corp.*, 540 F. Supp. 2d at
799 ("The existing case law has not clearly defined what
'benefitting' from the sale of stock in which fraud occurred means
and has not restricted the 'benefit' to something immediate,
tangible and/or financial.  Indeed there is a dearth of case law
relating to the question, and what there is suggests that whether
the requisite benefit exists must be determined according to the
facts of the particular case before a court.").

[64] Andersen points out that Plaintiffs are a group of eight
insurance companies each presumably making independent decisions--a
conclusory allegation that they all justifiably relied on
Andersen's audits is a legal conclusion unsupported by a single
factual allegation.

a representation is not enough to impose liability." *Id.* at 581.

As for the conspiracy to commit fraud claim, Andersen insists Plaintiffs have failed to plead the underlying fraud claim against Andersen.   Nor have they alleged facts demonstrating a "meeting of the minds" between Andersen and the other defendants.

Finally, argues Arthur Andersen, because Plaintiffs' claim is based on their reliance on Andersen's audit opinions of Enron, their claim for negligence[65] is properly characterized as third party claim for negligent misrepresentation.   Andersen insists that the "actual knowledge" standard applies to accountants in Texas and that Andersen cannot be liable to Plaintiffs merely because Andersen should have known that they might rely on its statements. *Compass Bank*, 388 F.3d at 505 ("we are persuaded that the Restatement's actual knowledge standard applies to accountants in Texas").   Plaintiffs have also failed to plead that they were among a "limited group" of known persons to whom Andersen knowingly provided information.   In fact, the Second Amended

---

[65] Andersen points out that if the claim is construed as a negligence claim, it would fail because Plaintiffs were not in privity with Andersen. *See Barcelo v. Elliott*, 923 S.W. 2d 575, 577-79 (Tex. 1996)(persons who are not in privity with an attorney cannot sue the attorney for professional negligence); *Averitt v. PriceWaterhouse Coopers, LLC*, 89 S.W. 3d 330, 335 (Tex. App.--Fort Worth 2002)(citing *Barcelo* and applying the privity rule to a claim against an auditor; also concluding that in the absence of privity, an accountant may be liable to third persons for misrepresentations if the nonclients can demonstrate that they were within the class of persons the accountant knew or should have known would be relying on his work).

Complaint has no factual allegations establishing that Andersen had any knowledge, actual or otherwise, that these Plaintiffs would rely on Andersen's statements.   Instead Plaintiffs are generic "potential investor[s] with no previous connection to either the corporation or the accountant" and therefore not a member of a "limited group" under Texas law. *Scotland Heritable Trust,* 81 F.3d at 614.

### Plaintiffs' Response to Andersen

Plaintiffs argue that because they have alleged with specificity that Andersen intentionally, knowingly, and purposely destroyed documents relevant to the issues in this case to hide its wrongdoing upon learning that the SEC planned to initiate an investigation of Enron (#56, ¶¶ 566-69), Plaintiffs are entitled under the doctrine of spoliation to an adverse inference against Defendants where Plaintiffs are unable to specify documentary evidence. *See Smith v. American Founders Financial Corp.*, 365 B.R. 647, 681 (S.D. Tex. 2007)("The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known the evidence may be relevant to future litigation. [citations omitted]"). "A court may also assume facts against a party that destroys or loses evidence subject to a preservation obligation." *Id., citing FDIC v. Hurwitz*, 384 F. Supp. 2d 1039, 1099 (S.D. Tex.).

-121-

Adverse inferences may also be drawn against a party to a civil action when that party invokes his Fifth Amendment Rights. *FDIC v. Fidelity & Deposit Co. of Md.*, 45 F.3d 969, 977 (5th Cir. 1995), *citing Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976). Duncan, the primary Andersen partner with knowledge of the intent of Andersen's work and responsible for the spoliation of the evidence, has claimed his Fifth Amendment rights and refuses to testify, thereby creating a reasonable inference in favor of Plaintiffs.

Andersen urges dismissal of Plaintiffs' TSA claims for failure to allege a primary violation of the TSA under article 581-33A(2) because Plaintiffs have not shown that they purchased securities from a seller responsible for making actionable misrepresentations or omissions directly to Plaintiffs. In response, Plaintiffs point to the aider provision of article 581-33F(2), imposing secondary liability on anyone who materially aids an "issuer." They argue that Enron, as an issuer of securities pursuant to Texas securities law, was a primary violator under the strict liability provision, article 581-33C, and that, as reflected in judicial admissions by former Enron directors, Enron made material false statements and omissions in order to hoodwink and defraud the investing public. #56, ¶¶ 83-85 (quoting Richard Causey's Plea Agreement), 95-99 (quoting and discussing portions of Andrew Fastow's Plea Agreement), 110-14 (quoting and discussing

-122-

Michael Kopper's Cooperation Agreement)).   Thus Enron was a primary violator under 581-33C.  They assert that Defendants cite no authority requiring privity or some similar relationship between a section 33C issuer (as opposed to a section 33A(2) seller) and the party alleging violation of section 33F(2).

Plaintiffs alternatively point out that the exact relationship between a seller and a securities purchaser under 581-33A(2) remains unsettled.  *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 258 F. Supp. 2d 576, 603 (S.D. Tex. 2003)(the statute requires "some kind of undefined privity relationship between the defendant and the purchaser in the process of offering to sell or in the sale of securities.").[66]  Other courts have concluded that a plaintiff does not have to purchase directly from the party responsible for disseminating the false and misleading representations or omissions under 581-33(A)(2).  The 1963 amendment to article 581-33 states, "The manifest purposes of a civil liability provision are to indemnify victimized purchasers and to encourage private enforcement of the Act."  According to Houston's First Court of Appeals,

> We are to construe the Texas Securities Act "to protect investors."  Given the definitions the legislature gave the relevant terms, the purposes of the Texas Securities Act, and the language of article 581-

---

[66] This Court notes that it concluded that a plaintiff must be in privity with, i.e., have purchased his securities from, the named defendant to impose seller liability under article 581-33(A)(2).  258 F. Supp. 2d at 603.

33(A)(2), we conclude article 581-33(A)(2) applies to private, secondary securities transactions.

*Texas Capital Secs., Inc. v. Sandefer*, 58 S.W. 3d 760, 776 (Tex. App.--Houston [1st Dist.] 2001, pet. denied).[67]  Plaintiffs insist that under *Sandefer*, Enron committed a primary violation of 33(A)(2), supporting Plaintiffs' section 33F(2) claims against Andersen.

As for statutory fraud under section 27.01(d) against Andersen, Plaintiffs insist they have alleged how Andersen benefitted from Enron's alleged false statements: Plaintiffs have pleaded that for helping Enron to cook its books, devising opaque transactions for Enron to defraud investors, and issuing "unqualified" approvals of Enron's SEC-filed financial reports when Andersen knew they were false, Andersen received high fees and additional business, and Goddard received a high salary and bonuses for agreeing with Enron not to disclose the truth at the time Plaintiffs were purchasing Enron securities in reliance upon Enron's false and deceptive financial reports.  The complaint at ¶ 489 alleges that Andersen's revenues increased threefold from 1996, when they were approximately $15.9 million, to 2000, when Andersen received fees of approximately $47.9 million from Enron.

Defendants charge that Plaintiffs fail to state common-law

---

[67] *In accord Anheuser-Busch Companies, Inc. v. Summit Coffee, Inc.*, 934 S.W. 2d 705, 708 (Tex. App.--Dallas 1996); *Grotjohn Precise v. JEM Financial, Inc.*, 12 S.W. 3d 859, 869 (Tex. App.-Texarkana 2000).

fraud and conspiracy to defraud claims because they fail to specify an underlying tort. Plaintiffs respond that the underlying fraud torts were the falsification of Enron's financial records and the purposeful illegal filing of false financial statements with the SEC, repeatedly alleged throughout the complaint. They assert that Andersen's and Enron's objective was to help each other make large amounts of money by allowing and approving improper transactions and disseminating false financial information in filings with the SEC in violation of securities laws. #56, ¶¶ 68, 69, 478, 493-95, 538-50,[68] 624. Investors reasonably relied upon such SEC-filed financial statements. *Id.* at ¶¶ 74, 75, 83-85. Plaintiffs maintain they have alleged with particularity substantial evidence that demonstrates, directly or by reasonable inference, an agreement to conspire between Enron and Andersen, numerous overt acts by each Defendant and by Enron

---

[68] The complaint alleges that Enron Bankruptcy Examiner Neal Batson produced evidence and concluded that Arthur Andersen assisted Enron in abusing GAAP by helping Enron design accounting techniques or "models" that Enron could use to report income, cash flow and a financial position more favorable than its actual results. Andersen failed to attend to whether the intermediaries used by Enron in Prepay Transactions were legitimate SPEs and whether the 3% equity investments in Enron's SPEs in FAS Transactions were at risk. It references by date and author memoranda and emails purportedly showing Arthur Andersen's knowledge that the prepay transactions would lead to deceptive reports about Enron's true financial conditions, but does not summarize the contents. In particular the complaint singles out disguised prepay loans from Citigroup and JP Morgan Chase and details amounts involved in what it characterizes as the falsification of the financial statements that were given "unqualified" approval by Arthur Andersen Defendants.

in furtherance of the conspiracy, Duncan's refusal to testify, and Defendants' destruction of documents that would evidence the object of the conspiracy and a meeting of the minds.  In addition to the blatant conflict of interest evidenced by Fastow's two hats in running the affairs of LJM2 while acting as Chief Financial Officer of Enron (#56 at ¶ 501),[69] approved by the Board of Directors, the complaint refers to emails dated December 28, 2000 and Oct. 15, 2001 from David Duncan, Arthur Andersen LLP's partner in charge of the Enron account, to other Andersen accountants that demonstrate a meeting of the minds and overt acts in furtherance of the conspiracy in the concealing of the impropriety of aggregating the Raptor SPEs when the financial instruments in Raptors I and III severely declined.  #56 at ¶¶ 501, 504-06.  It also discusses AA's conspiracy with Enron to insure there were no disclosures of the related parties involved in the Chewco/JEDI transaction (¶¶ 507,[70] 510-15), and Goddard's agreement to conspire

---

[69] Paragraph 501 states that Fastow used LJM2 several times in the Raptor transactions to attempt to establish independent 3% equity as risk, but because it was a related party, that effort "was a farce and a violation of GAAP."  A memorandum dated December 13, 1999 from Andersen principals David Duncan, Deb Cash and others to the file stated that Andersen was aware that "a senior officer of Enron serves as the GP of LJM2 and is therefore in control of all the affairs of the partnership," but nevertheless did not require Enron to consolidate the Raptors, resulting in significant, material misstatements of Enron's financial statements.

[70] As an instance of a well pleaded allegation of related party fraud through use of improper SPEs, ¶ 507 describes how Chewco, created by Enron in 1997 to buy out third-party CALPER's truly independent interest in JEDI, was paid for by using proceeds from

with Enron as evidenced by his purposeful disregard for Arthur
Andersen LLP's internal guidance policies to further the goals of
the conspiracy (¶¶ 532-36).   *See also* ¶¶ 69-170 (conduct by
Enron); 532-64, 627 (conduct by Arthur Andersen and Goddard, who
were aware that Arthur Andersen's internal computerized risk
assessment tool, known as SMART, showed Enron's increasing risk
of noncompliance with GAAP and GAAS, but continued to aid Enron
in accounting fraud).

Plaintiffs maintain that their allegations about Defendants'
conduct also support Plaintiffs' fraud claims against Arthur
Andersen and Goddard, argue Plaintiffs.   #56, ¶¶ 532-64.
Plaintiffs have generally alleged reliance on Enron's financial
statements by all Plaintiffs (¶ 52), by American Insurance Company
and its wholly owned subsidiaries (¶ 53), by Farm Family Life
Insurance Company and Farm Family Casualty Insurance Co. (¶ 54).
They claim that they have alleged facts about Andersen's
unqualified approval of SEC-filed financial statements and
Andersen's audits and certification of the financial statements

---

a loan from Barclays that was guaranteed by Enron.  In December
1997, Chewco repaid the bridge loan using a $240 million loan from
Barclays, again guaranteed by Enron, a $132 million loan from JEDI,
and $11.5 million in contributions (comprised of $114,900 from
Chewco's general partner, SONR #1, and $11.4 million from a
Barclays loan to Chewco's limited partner, Big River.  Thus the
equity did not come from an independent third party that satisfied
the 3% equity as risk rule.  Moreover ¶ 508 identifies Michel
Kopper, Enron's director of its Global Equity Markets Group, was
the owner of SONR #1 and indirectly of Big River, while Enron owned
the vast majority of JEDI from the beginning.

as in compliance with GAAS, while identifying the ways in which Defendants in actuality failed to comply with GAAS and GAAP standards.  #56, ¶¶ 473 and 493-94; *see also* ¶¶ 608-12, alleging fraud against each Defendant; ¶¶ 74, 75, and 83-85, establishing Defendants' intent and reason to expect reliance by Plaintiffs[71]; and ¶¶ 56, 613, and 628, Plaintiffs' damages.[72]   Even when Defendants were forced to restate Enron's financial statements, in particular falsified by the deconsolidation of SPEs, Andersen still did not reveal the whole truth.   #56, ¶¶ 496-515. Plaintiffs emphasize that they have alleged Defendants' knowledge of, but decision to ignore, Enron's "lack of management integrity" (¶¶ 516-25); concealment of the true nature of the Citigroup and JPMorgan Chase prepay transactions (¶¶ 529, 541-45); the removal of accountant Carl Bass from the Enron audit team at the request of Richard Causey in 2001 because Bass was critical of the accounting tricks Enron sought to employ (¶¶ 554-56, 558); Arthur Andersen's concealment of the nature of the Raptor SPEs and disregard of Bass's assessment that the "whole deal looks like there is no substance" (¶¶ 504-06, 556); and the invocation of the Fifth Amendment and temporary plea of guilty by David Duncan, who

---

[71] While these paragraphs reflect the officials' general awareness of misrepresentations about Enron, they do not establish or suggest reliance by Plaintiffs.

[72] The assertions in these paragraphs are too general to show fraud.

probably had the greatest knowledge about the conspiracy and the fraud claims, giving rise to a reasonable inference that Plaintiffs satisfy the elements of fraud and conspiracy to defraud.

Finally, with respect to Plaintiffs' claim of negligent misrepresentation, Arthur Andersen and Goddard contend that Plaintiffs are not among the "limited group" of known persons to whom Arthur Andersen knowingly provided information.  Plaintiffs respond that David Duncan, the Arthur Andersen partner with the most knowledge about what was going on and why Arthur Andersen had reason to expect that Plaintiffs would rely on the misrepresentations in the SEC-filed financial statements, has refused to testify.  Andersen argues that this Court wrote, "Texas courts have expanded the parameters of the tort of negligent misrepresentation in section 552 to include not only those that the defendant actually knows will receive the misrepresentations, but to those the accountant should know will receive it."  *In re Enron Corp. Sec., Derivative, and "ERISA" Litig.*, 284 F. Supp. 2d 511, 646 (S.D. Tex. 2003), *citing Blue Bell v. Peat Marwick, Mitchell & Co.*, 715 S.W. 2d at 411-13.[73]

---

[73] This Court has indicated *supra* (see footnote 22), that *Blue Bell's* expansive "should have," foreseeability standard was implicitly overruled by the Texas Supreme Court in *McCamish* with its actual knowledge standard.  991 S.W. 2d at 791, 793-94.  Under *McCamish*, an attorney/auditor's liability to third parties for negligent misrepresentation under § 552 would be limited to (1) plaintiffs specifically identified as recipients of the

### David B. Duncan's Motion to Dismiss

As with Andersen, Plaintiffs have alleged against Duncan claims for (1) violation of the TSA, article 581-33; (2) statutory fraud under Texas Business & Commerce Code § 27.01; (3) common law fraud and conspiracy to defraud; and (3) gross negligence and professional malpractice for making fraudulent misrepresentations and breaching the duty of care imposed upon accountants.

Duncan also moves for dismissal of all claims under Federal Rules of Civil Procedure 12(b) and 9(b).

With regard to the TSA claim, Duncan moves for dismissal because he is not, under article 581-33F, an "aider" of a "seller" who has violated article 581-33A by selling securities directly to the plaintiff nor was he sufficiently involved in the solicitation of the sale to plaintiff to be deemed the seller's agent. Plaintiffs have not identified the purported seller of the Enron securities that they purchased from nor shown that they were in privity with a defendant, nor have they alleged that they purchased securities directly from an issuer or that an issuer was sufficiently actively involved in the solicitation of the sale of its securities to them so as to be deemed an agent of the seller. Thus because Plaintiffs have failed to allege a primary violation

---

representations and (2) plaintiffs who, although not specifically named, belong to a group or class the auditor knew would receive the information.

of the TSA, their "aider" claims against him fail as a matter of law. *IQ Holdings, Inc. v. Arthur Andersen LLP (In re WorldCom, Inc. Sec. Litig.)*, Nos. 02 Civ. 3288, 03 Civ. 1785, 2006 WL 1047130, at *5 (S.D.N.Y. Apr. 21, 2006)(failure to identify seller and plead a primary violation of the TSA precludes aiding and abetting claim).

Duncan contends that Plaintiffs' claim for statutory fraud under Texas Business and Commerce Code § 27.01(d) fails because they have not pleaded with particularity how Duncan "benefitted" from the alleged false representations. Duncan claims that Texas courts have only sustained such claims where the defendant allegedly received direct benefits, such as a commission, from the transactions induced by false representations. *WorldCom,* 2006 WL 1047130, at *6 (statute's "'benefits from the false representation' . . . applies to those who have benefitted in the specific sale . . . of stock in which the fraud occurred, for instance a company who receives fees . . . ."), *citing Belton v. Dover Prop. Sales, Inc*., No. 3-85-0557-H, 1985 WL 8797, at *3 (N.D. Tex. July 16, 1985)(applies even to those who receive customary fees from a sale that would not have occurred but for the misrepresentation).

As for Plaintiffs' common-law fraud claims, Duncan argues that Plaintiffs have failed to allege that Plaintiffs directly relied upon Andersen's and/or Duncan's audit opinions. Instead,

eight independent insurance companies making independent decisions
state conclusorily that they all justifiably relied on unspecified
false representations by Duncan, without a single fact in support.
Such a general statement is not sufficient to sustain their fraud
claim.  #56, ¶ 607.

Furthermore, Duncan maintains that Plaintiffs have failed to
plead adequately, with particular facts, that Duncan intended to
induce their reliance.  *Pacific Mutual*, 51 S.W. 3d at 581 (the
"maker of the misrepresentation must have information that would
lead a reasonable man to conclude that there is an especial
likelihood" that it will reach plaintiffs and influence their
conduct)(*quoting Restatement (Second) of Torts* § 531, comment d
(1977)).

Plaintiffs' conspiracy claim fails because the allegations
are insufficient to state an underlying fraud claim against
Duncan, and they fail to allege any facts demonstrating that there
was a "meeting of the minds" between Duncan and any other
defendants.

Plaintiffs' negligence claim is properly characterized as one
for negligent misrepresentation under the *Restatement (Second) of
Torts* § 552.  Section 552 restricts an accountant's liability to
a "limited group of persons for whose benefit and guidance he
intends to supply the information or knows the recipient intends
to supply it" and does not allow recovery for every foreseeable

consumer of financial information. *Scotland Heritable Trust*, 81 F,3d at 612; *see also McCamish*, 991 S.W. 2d at 794 ("a section 552 cause of action is available only when information is transferred by [a professional] to a known party for a known purpose."). An allegation that an accountant should have known that a third party might rely on the statements is insufficient; "the *Restatement's* actual knowledge standard applies to accountants in Texas." *Compass Bank*, 388 F.3d at 505. Duncan argues that plaintiffs are generic "potential investors with no previous connection to either the corporation or the accountant," and thus not members of a "limited group" to which Duncan might be liable for negligent misrepresentation. *Scotland Heritable Trust*, 81 F.3d at 614.

### Plaintiffs' Response to Duncan

Plaintiffs highlight Duncan's repeated assertion of his Fifth Amendment rights whenever he was asked questions on key issues earlier in this litigation. "As Arthur Andersen [LLP]'s lead engagement partner on the Enron account, and the person largely responsible for the destruction of massive amounts of Enron-related documents, Duncan is uniquely qualified to provide critical information pertaining to the issues presented in Plaintiffs' action--but he has refused to do so." #72 at 3; #56 at ¶¶ 566-69. He was "the primary Arthur Andersen partner with knowledge of the 'intent' of Arthur Andersen's work." *Id.* at 4. Therefore, insist Plaintiffs, adverse inferences may be drawn

against him and in favor of Plaintiffs in this civil action.  *FDIC v. Fidelity & Deposit Co. of Md.*, 45 F.3d 969, 977 (5th Cir. 1995)(*citing Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976)).

Plaintiffs further claim under the spoliation doctrine that they are entitled to an adverse inference against Duncan, which arises because in bad faith and bad conduct, Duncan purposefully and wrongly destroyed documents relevant to the issues, resulting in Plaintiffs' inability to specify documentary evidence to support their claims.

With respect to the TSA article 581-33F(2) claim against Duncan for aiding and abetting primary violator Enron, as an issuer of securities, which made material false statements and omissions to defraud the investing public into purchasing Enron securities, Plaintiffs insist they have stated a primary violator claim against Enron under articles 581-33C and 581-033F(2).  *See* quoted portions of Richard Causey's plea agreement, ¶¶ 83-85[74]; of Andrew Fastow's plea agreement, ¶¶ 95-99; and of Michael Kopper's

---

[74] As indicated elsewhere, the statements quoted in these plea agreements are too general to state a claim of fraud.  For example Causey admitted "While CAO, I and other members of Enron's senior management fraudulently misled investors and others about the true financial position of Enron in order to inflate artificially the price of Enron stock.  More specifically, I conspired with members of Enron's senior management to make false and misleading statements, in Enron's filings with the [SEC] and in analyst calls, about the financial condition of Enron, which did not fairly and accurately reflect Enron's actual financial conditions and performance as I knew it."  ¶ 83.  The same generality characterizes Fastow s and Kopper's statements.

cooperation agreement, ¶¶ 11–14.  The Andersen Defendants have not cited any authority requiring privity or a similar relationship between a section 33C issuer, as opposed to a section 33A(2) seller, and the party alleging a violation of section 33F(2).

Moreover Plaintiffs observe that this Court has noted judicial uncertainty regarding the relationship between the two provisions, while other well-reasoned decisions expressly hold that a plaintiff does not have to purchase directly from the party responsible for disseminating the false and misleading misrepresentations or actionable omissions.  *In re Enron Corp.*, 258 F. Supp. 2d at 603; *Sandefer*, 58 S.W. 3d at 776.

In sum, should the Court decide a primary violation fails under section 33A(2), Plaintiffs insist they state a cognizable aiding and abetting claim under article 581-33F(2), based upon Enron's primary violation as an issuer of securities under article 581-33C.

As for Duncan's benefitting from his silence while Enron issued false and deceptive financial reports for purposes of Plaintiffs' statutory fraud claim under section 27.01(d), Plaintiffs point to the threefold increase in Arthur Andersen's business with Enron between 1996 and 2000 and Duncan's high salary and bonuses as lead engagement party.  In 1996 Arthur Andersen had revenues of $15.9 million; in 2002, it received fees of approximately $47.9 million from Enron.  Duncan and his firm also

-135-

benefitted from obtaining additional consulting business.  #56, ¶¶ 489-92, 603 ("Enron was Arthur Andersen's biggest account, generating over $50 million per year during the last two years of Enron's existence.   David Duncan and Stephen Goddard both benefitted by being lead accountants for the Enron engagement, both earning high salaries and bonuses.").  Plaintiffs relied upon Arthur Andersen's "unqualified" approvals of the SEC-filed Enron financial reports that Duncan knew were false.  They insist there is no authority to support Duncan's contention that a plaintiff must somehow trace a particular dollar that was used to purchase the security to the pocket of the section 27.01(d) violator.

Defendants' only challenge to Plaintiffs' common-law fraud and conspiracy to defraud claims is a failure to state a claim of fraud (i.e., Duncan and Andersen's knowing illegal filing of false financial statements with the SEC), which is the underlying tort of the conspiracy claim.  Plaintiffs object that they describe the collusion between Duncan and Enron to falsify Enron's SEC-filed financial statements.  They maintain that they have alleged that because Duncan was responsible for supervising the Enron audit team and the final review of the financial data published by Enron, he was aware of the wrongful conduct of his underlings.  #56, ¶¶ 470, 501-06 (discussing Duncan's involvement with fraud perpetrated by LJM2 and the Raptors).

Duncan and Enron purportedly conspired to help each other

make large amounts of money by allowing and approving improper transactions and disseminating false information in filings with the SEC in violation of securities laws.   #56, ¶ 624 ("Each Management, and AA Defendant, had a meeting of the minds with Enron on the course of action for perpetrating the fraud: allowing and approving Enron's improper transactions and accounting gimmickry.").  All involved understood that investors reasonably relied upon the SEC-filed financial statements.  #56, ¶¶ 74, 75, 83-85.  Plaintiffs claim that they have alleged with particularity circumstantial evidence giving rise to an inference of an agreement among Enron, Arthur Andersen, LLP, and Duncan to conspire to prepare and illegally file the SEC financial statements and have described numerous overt acts by Duncan and Enron in furtherance of the conspiracy.  Specifically they point to Duncan's knowledge of the inherent conflict of interest in Fastow's duties as Enron's CFO and his role in governing LJM2. #56, ¶ 501.  Emails dated December 28, 2000 and October 15, 2001 from Duncan to other Andersen accountants show a meeting of the minds and constitute overt acts in furtherance of the conspiracy by concealing the impropriety of aggregating the Raptors, but that they did so to conceal the severe decline in value of Raptors I and III's assets.  #56, ¶¶ 504-06.   They have also alleged that Arthur Andersen and Duncan conspired with Enron to conceal the related parties in the Chewco/JEDI transaction.   #56, ¶¶ 514-15.

*See also* ¶¶ 69-170 (conduct by Enron); ¶¶ 532-64 (conduct by Duncan).

The fraud claims against Duncan and Arthur Andersen are based on the material misrepresentations[75] made in Enron's financial statements and Duncan and Andersen's "unqualified" approval of Enron's financial statements, which Duncan and Arthur Andersen knew were false when made and would be illegally filed with the SEC. #56, ¶¶ 51, 473, 494, 510-15, 608-12, 627. Plaintiffs claim they relied on these SEC filings and suffered damages as a result. #56, ¶¶ 56; 613; 628; 470; 493 (Duncan's failure to comply with GAAS and GAAP); 494 (how the issuance of unqualified approval of Enron's SEC-filed financial statements violated AICPA standards and constitutes simple fraud); 495-525 (even when forced to restate Enron's financial statements, Duncan did not reveal the whole truth); 501; 504 (Duncan conspired with Enron improperly to report the financial condition of the Raptors and to aggregate two of them when the financial instruments in them substantially declined); 527 (internal Andersen memo showing Duncan's knowledge of, but decision to ignore, Enron's "lack of management integrity"); 529; 532-36; 541-45 (concealing the true nature of the Citigroup and JPMC prepay transactions); 554-56 (Carl Bass was replaced as an Enron engagement partner at Enron's request because

---

[75] The Court observes that Plaintiffs have failed to provide any specific examples.

of his criticism of Enron's proposed accounting tricks and Duncan's disregard to Bass' assessment of the Raptors as this "whole deal looks like there is no substance"); 547-50 (CIBC's agreement with DOJ[76] and numerous Andersen emails confirming Duncan's fraudulent conduct); 560; 564.  The financial statements were filed with the SEC and disseminated to the public to paint a false picture of Enron that would induce Plaintiffs and others to purchase Enron securities.  #56, ¶¶ 69, 492-95, 504-06, 514, 527, 530-42, 549, 554-56, 565-71.  Plaintiffs claim the Duncan had "reason to expect" that Plaintiffs would rely upon "unqualified" SEC-filed financial statements.  #56, ¶¶ 83-85 (Causey judicially admitted that he "participated along with others in Enron's senior management in efforts to mislead the investing public about the true nature of Enron's financial performance by making false and misleading statements, and omitting facts necessary to make certain statements not misleading."), 95-99 (Fastow admitted that Enron's senior management "manipulated Enron's publicly reported financial results.  Our purpose was to mislead investors and others about the true financial position of Enron and, consequently, to inflate artificially the price of Enron's stock and to maintain fraudulently Enron's credit rating.").  Finally,

---

[76] Paragraph 548 states conclusorily that CIBC admitted to and listed a number of FAS 140 and minority interest transactions with Enron that were fraudulent, some of which were given unqualified approval by Andersen, but fails to identify them or explain how they were fraudulent.

as a result Plaintiffs suffered injury.  #56, ¶¶ 55, 478, 594, 604, 613, 631-32, 637-46.

Given Duncan's assertion of his Fifth Amendment rights and his ordering of the Enron-related document destruction, i.e., spoliation, Plaintiffs insist they are entitled to inferences that Duncan withheld relevant information and destroyed evidence that would bolster their claims.

Finally, the Andersen Defendants challenge Plaintiffs' negligent misrepresentation claim solely on the grounds that they are not among the "limited group" of persons to whom Arthur Andersen knowingly provided information under *Ernst & Young, LLP v. Pacific Mutual Ins. Co.*, 51 S.W. 3d at 577-78.  Plaintiffs respond that Duncan, as the lead Enron engagement partner, probably had the most knowledge about Arthur Andersen LLP's intent and reasonable expectations.  Duncan's refusal to testify by invoking his Fifth Amendment rights, in combination with his role in destroying documents that likely would yield probative information, creates a strong inference that Plaintiffs have met their burden on stating a negligent misrepresentation claim.

## Richard B. Buy's Motion to Dismiss

## or For More Definite Statement (#67)

Buy argues that Plaintiffs' complaint is conclusory, i.e., lacking specific facts as to Buy that could support the four causes of action against him.  The complaint fails to allege that

Buy made any specific misrepresentations or took any actions, no less fraudulent ones.  Mentioned substantively in fewer than fifteen paragraphs, Buy is included numerous times only as a member of the "Management Defendants":  these group allegations are quintessential conclusory allegations that do not meet the heightened pleading requirements of Rule 9(b).  Plaintiffs' allegation that Buy conspired to allow Enron to report its financial condition falsely (¶ 131) has no facts alleged to support it or to satisfy the who, what, when and where required under Rule 9(b).

Buy maintains that there are no allegations as to what decisions he made, or what false transactions he engaged in, or where he committed any fraudulent acts.  He insists that he had no involvement in the preparation of publications of Enron's financial statements during his employment at the company and no responsibility while at the company for the preparation and issuance of press releases.  He was not an Enron board member and was not present at any of the meetings mentioned in the complaint. Thus the complaint fails to state a claim and should be dismissed with prejudice as to him.

Alternatively, Buy urges that the Court set a deadline for amendment by Plaintiffs to assert specific allegations of actionable conduct by Buy that would satisfy Rule 9(b).

**Plaintiffs' Request for Acknowledgment that**

-141-

**Admissions of Defendant Buy are Deemed Admitted and**

**Response to Buy's Motion to Dismiss (#76)**

Plaintiffs urge the Court to deny Buy's motion in its entirety in light of his repeated assertion of his Fifth Amendment rights in the face of their discovery requests and the resulting adverse inference to which they claim entitlement.  If the Court chooses not to do so, Plaintiffs ask the Court to grant Buy's alternative request to provide a more definite statement by way of an amended complaint.

First Plaintiffs attach as Exhibit A unanswered Requests for Admission,[77] served on Buy on October 26, 2005 and posted on the Enron 3sl website, and ask the Court to acknowledge that these requests are deemed admitted under Federal Rule of Civil Procedure 36(a).[78]

As for Plaintiffs' failure to plead adequate facts supporting their claims against Buy as a control person under the TSA's article 581-33F(1), statutory fraud under Texas Business and

---

[77] While the requests generally ask if Enron's publicly filed financial statements, Form 10-Ks, and Form 10-Qs for specified periods were materially false or misleading and whether Buy had actual awareness that each one was, as requested admissions they are not any more specific and do not have any more particularity than the allegations in the complaint.

[78] Plaintiffs point out that the Court did not direct a longer or shorter time for responding and that Rule 29 is inapplicable because the parties made no stipulations concerning responses to requests for admission.

Commerce Code § 27.01, and common law fraud, Plaintiffs point to Buy's repeated assertion of his Fifth Amendment rights in depositions taken during the *Newby* fact discovery to avoid providing information relevant to Plaintiffs' claims. Exs. D and E.[79] Since Buy's knowledge of LJM2's "quirky and fraudulent transactions" was probably second only to Fastow's among Enron employees, Buy's refusal to testify creates a reasonable inference against Buy and in favor of Plaintiffs.

Regarding their claim against Buy as a control person liable under 581-33F(1) of the TSA, Plaintiffs have alleged that the Management Directors Rick Causey, Andrew Fastow, Michael Kopper, Richard Buy, Jeff Skilling and Kenneth Lay, together, exercised control over Enron generally. #56, ¶¶ 79-81, 128-29. *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 258 F. Supp. 2d 576, 608 (S.D. Tex. 2003)(plaintiffs must show that the controlling person (1) exercised control over the operations of the corporation generally and (2) had the power to control the specific transaction or activity constituting the primary violation, *citing Frank v, Bear Stearns*, 11 S.W. 3d 380, 383 (Tex. App.--Houston [14th Dist.] 2000, pet. denied). Plaintiffs are not required to show scienter. *Id. See also id., citing* comment to

---

[79] The Rule 12(b)(6) and 9(b) motions to dismiss must be resolved on the pleadings, not on additional evidence, which Plaintiffs have attached to their response. They state in a footnote that if allowed to amend, they would incorporate their evidence into the new complaint.

33F(1)("Depending on the circumstances, a control person might include an employee, an officer or director, a large shareholder, a parent company, and a management company.").

Plaintiffs urge that the facts demonstrate that Buy was a "control person" at Enron. Buy was Executive Vice President and Chief Risk Officer of Enron from June 1999 through Enron's bankruptcy and served on Enron's Management Committee. #56, ¶ 128. Buy's power to influence the operations of the corporation is evidenced by Enron's internal requirement that Buy sign off on certain transactions before the transactions could be executed. #56, ¶ 136 (Buy "failed to use the power vested in him by the Board of Directors to prevent Fastow from engaging in numerous fraudulent transactions."). Andrew Fastow's testimony confirms that Buy was an important member of the management team running the affairs of Enron. Ex. F at 1337:20-1338:3; 1571:20-1572:3; 1579:25-1581:6; 1599:1-15; 1764:21-1765:3. *See also* Ex. D at 5, questions 38, 74-77. As for the alleged TSA violation in the falsification of Enron's financial records and purposeful illegal filing of false financial statements with the SEC, the requests for admission, deemed admitted, assert Buy's knowledge, long before the restatements were issued in the fall of 2001, that Enron's 10-K financial statements filed with the SEC were materially false and/or misleading. Ex. A at 6-9, requests for admission 12-42. LJM2, set up by Enron and Fastow, was

-144-

instrumental in Enron's accounting fraud.   #56, ¶¶ 92-99, 129, 132-34, 501-06.  Plaintiffs have alleged that Buy and Causey were charged by the Board of Directors with the monitoring and approval of all LJM2 transactions.   356, ¶ 129.  Given his accounting background, Buy allegedly knew that many of LJM2's transactions were shams and were accorded improper accounting treatment on Enron's financial statements, but he approved them anyway.   #56, ¶¶ 129-36.   Plaintiffs maintain they have adequately alleged control person liability against Buy under 581-33F(1) of the TSA.

As for imposing Buy's liability as an aider and abettor under subdivision 33F(2), a primary violation by Enron is established because "Enron was publicly traded on the New York Stock Exchange under the symbol ENE and was an 'issuer' and/or 'seller' of securities for the purposes of the Texas securities laws," and made material false statements and omissions to defraud the investing public. #56, ¶¶ 42, 69-72, 93, 95-99, 72-74, 75, 83-85.

Under subsection 33F(2), Buy was an aider of Enron's fraud because he had more than a "general awareness" of his role in the fraud:  he approved fraudulent LJM2 transactions and was aware of the Nigerian Barge Transaction.  *See also* Exhibit D at 5, questions 38-42, Buy knew of his obligation to ensure "DASH" form approvals were proper, but approved the fraudulent transactions anyway.   Plaintiffs assert that Buy's "assistance" was "substantial" "because LJM2 was critical for effectuation of the

fraud and Buy had the ability to control LJM2's transactions." #76 at 8, citing #56, ¶¶ 95-99 (describing how LJM2 was used to help Enron cook its books); 129-34 (discussing Buy's responsibilities for approving LJM2's transactions and explaining that Buy did not assure that the transaction were proper); 501-06 (describing LJM2's role in falsifying the financial condition of Enron's Raptors). They argue that Buy's conduct creates the strong inference that he either intended to deceive investors or acted with reckless disregard for the truth or law when he approved the fraud-enabling LJM2 transactions. #56, ¶¶ 129-31; Ex. A at 609, requests for admission 12-42 (Buy admits he knew, long before Enron issued restatements, that 10-K financial statements filed by Enron were materially false and/or misleading).

For purposes of statutory fraud under section 27.01(d) against Buy, Plaintiffs claim they have adequately asserted the three elements: (1) Buy not only had actual awareness of the falsity of the financial statements that resulted from LJM2 and Enron's accounting shenanigans (#56, ¶¶ 132-35), but he admits actual knowledge of the falsity of Enron's 10-K filings with the SEC (Ex. A at 6-9, requests for admission 12-42; Ex. E at 6, question 15); (2) there is no evidence that Buy disclosed, nor does Buy claim that he disclosed, the falsity of Enron's SEC-filed financial reports; and (3) Buy benefitted from the false

representations by selling 140,000 shares of Enron stock for $10,656,000 and was rewarded with bonus payments of about $1,600,000 for his aid in falsification of the financial statements, which allowed Enron to meet certain performance targets (#56, ¶ 137).

Regarding the conspiracy claim, Plaintiffs contend that Buy, Fastow, and Enron engaged in a conspiracy to falsify Enron's financial records and knowingly and illegally to file false financial statements with the SEC (underlying tort), while Buy and Fastow made lots of money and kept Enron afloat, an objective to be achieved by executing improper fraudulent transactions and disseminating false financial information in filings with the SEC in violation of securities laws.  #56, ¶¶ 45-47, 68, 131.  They claim all involved understood that investors reasonably relied upon such SEC-filed financial statements.  #56, ¶ 70, 75, 85. They maintain their complaint alleges circumstantial evidence from which one can infer an agreement to conspire among Enron, Fastow, and Buy.  #56, ¶¶ 128-39.  They assert that Fastow's testimony confirms the agreement and Buy's role in the conspiracy.  Ex. F at 1337:20-1338:3; 1571:20-1572:3; 1579:25-1581:6; 1599:1-15; and 1764:21-1765:3.

## Court's Decision

## 1.  Inferences and Privileges

As a threshold matter, the Court looks first to Plaintiffs'

claim that they are entitled to an adverse inference against the Arthur Andersen Defendants based on Duncan's invocation of the Fifth Amendment privilege against self incrimination and on the Andersen Defendants' alleged spoliation of crucial evidence.

**a.  Fifth Amendment**

While an adverse inference may be drawn in a civil case when a party asserts his Fifth Amendment privilege, the trier of fact is not required to draw a negative inference. *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976)("[T]he Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them."); *Daniels v. Pipefitters' Ass'n Local Union No. 597*, 938 F.2d 800, 802 (7th Cir. 1992)("The inference is permissible, but not required."); 8 Wright, Miller and Marcus, *Federal Practice & Procedure* § 2018 n.63 (3d ed. 2004).

David Duncan, who was fired by Arthur Andersen on January 15, 2002, initially invoked his Fifth Amendment privilege against self incrimination on February 4, 2002 when he was called to testify before the House Commission on Energy and Commerce.  On April 9, 2002 he entered into a cooperation agreement with the government (H-02-CR-209, instrument #6) and pled guilty to one count of obstruction of justice for ordering his staff to shred thousands of Enron-related documents during late October and early November 2001 in the face of an imminent SEC inquiry.  He

-148-

subsequently testified for five days as the key government witness at the criminal trial of Arthur Andersen, LLP (H-02-CR-121, #101, 102, 110, 111, and 112), from May 13-17, 2002.  Arthur Andersen was convicted on June 15, 2002 and sentenced on October 16, 2002. After the conviction of the accounting firm was reversed by the United States Supreme Court,[80] Duncan, with the Court's permission, withdrew his plea of guilty, and his case was dismissed by the government  H-02-CR-209, #36.

Under Federal Rule of Evidence 410, evidence of a plea of guilty, which was later withdrawn, or of any statement made by the defendant during plea negotiations with the prosecutor or statements made in court during proceedings under Rule 11, are not admissible in any civil or criminal proceeding against the defendant who withdrew the plea.  Thus neither Duncan's guilty plea nor any of his statements at the time of his plea in court may be used against him here.

Therefore Plaintiffs cannot use the fact of Duncan's guilty plea to support their claims but the Court observes that there are

_____

[80] *Arthur Andersen, LLP v. United States*, 544 U.S. 696, 125 S. Ct. 2129 (2005)(reversing and remanding because the jury instruction failed to convey properly the *mens rea* element of "knowingly . . . corruptly persuades" another person to destroy records to be used in an official proceeding under 18 U.S.C.A. § 1512(b)(2)(A,B) because it did not require the jury to find the requisite consciousness of wrongdoing in order to convict and because the instruction did not require the jury to find a nexus between the persuasion to destroy documents and a particular proceeding).  The government did not pursue a retrial.

other sources of information that are readily available to provide Plaintiffs with a basis to discover and plead specific facts in support of claims against Duncan. Under the circumstances here, making an adverse inference against Duncan for invoking his Fifth Amendment Rights to satisfy Plaintiffs' pleading requirement would seem moot.

With regard to Richard Buy, the only document that he has filed in this action is his motion to dismiss, and that motion does not invoke his Fifth Amendment privilege against self incrimination as to the Second Amended Complaint. Plaintiffs state that Buy claimed the privilege before government investigative bodies, but Plaintiffs have not provided sufficient information for the Court to determine whether Buy invoked his Fifth Amendment rights anywhere before or after responses to Plaintiffs' requests for admission were due.[81] Nor in this case has Buy addressed the effect of his default admissions nor responded to Plaintiffs' request to the Court for acknowledgment that admissions are deemed admitted by default. The Court observes that Buy was never indicted for his role at Enron.

A proper and timely invocation of the Fifth Amendment privilege may impact Rule 36's mandate that admissions, whether

---

[81] Not only did he not respond to the request for admissions, but he has never moved to withdraw or amend once they became automatically admitted after thirty days of service. Fed. R. Civ. P. 36(a) and (b).

express or by default, are conclusive to the matters admitted. Nevertheless, as noted, "An individual may not make a 'blanket refusal' to answer questions, but instead must affirmatively assert the privilege 'with sufficient particularity to allow an informed ruling on the claim.' . . . 'He is obliged to answer those allegations that he can and to make a specific claim of the privilege to the rest.'" *Toyota Motor Credit Corp. v. Palma*, No. 3:07-CV-1248-B, 2007 WL 4165706, *2 (N.D. Tex. Nov. 26, 2007), *quoting North River Ins. Co. v. Stefanou*, 831 F.2d 484, 486-87 (4th Cir. 1987("[T]o invoke this [Fifth Amendment] privilege the party claiming it must not only affirmatively assert it, he must do so with sufficient particularity to allow an informed ruling on the claim."), *cert. denied*, 486 U.S. 1007 (1988), and 5 C. Wright & A. Miller *Federal Practice and Procedure* § 1280, at 360 (1969). A "blanket refusal to answer questions does not suffice to raise constitutional questions." *United States v. Carroll*, 567 F.2d 955, 957 (10th Cir. 1977), *citing United States v. Malnik*, 489 F.2d 682, 685 (5th Cir.), *cert. denied*, 419 U.S. 825 (1974). *See* also Dish *Network, LLC v. SatFTA*, No. C 08-1561 JF (PVT), 2009 WL 2057916, *2 (N.D. Cal. July 13, 2009)(A blanket assertion of one's Fifth Amendment privilege in the face of requests for admissions is improper; the defendant must respond to each question individually). Therefore even if Buy had expressly asserted his Fifth Amendment rights in this action, a blanket invocation of the

-151-

Fifth Amendment is an insufficient response under Rule 36.

Buy has not even made that, so the Court concludes that Rule 36 applies and the admissions are deemed admitted. Therefore Plaintiffs' request that the Court acknowledge that the admissions are deemed admitted under Rule 36 is granted.

Nevertheless the Court finds that the deemed admissions do not provide the kind of detail necessary to plead, no less prove, a fraud claim under Rule 9(b). They speak in generalities and fail to identify specific examples that answer the who, what, where, how and why required by the Rule and by Fifth Circuit case law. Moreover, many of them undermine the allegations against the Arthur Andersen Defendants by stating that Enron officials, including Buy, concealed from Arthur Andersen many of the facts of their wrongdoing that Arthur Andersen would need for accurate accounting for Enron.

**b. Spoliation**

As for spoliation, there are substantial sources of information available to Plaintiffs to draw on for a plausible factual pleading of the document destruction at Enron in the fall of 2001. Material issues include whether Arthur Andersen LLP and Duncan had notice and knew or should have known that the documents were relevant to future litigation so as to trigger a duty to preserve the Enron records and whether Duncan breached that duty. *Smith v. American Founders Financial Corp.*, 365 B.R. at 681. Did

Arthur Andersen's retention policy excuse the destruction of documents? Did David Duncan act in bad faith in destroying the Enron-related documents and did he destroy them "because the contents of those documents were unfavorable to that party.'" *Whit v. Stephens County*, 529 F.3d at 284-85. Were Plaintiffs prejudiced or was there other evidence available to take the place of the destroyed documents? These issues could and should have been addressed and pleaded with factual specificity by Plaintiffs in the instant case before they resorted to asking for a blanket negative inference based on spoliation.[82] Ultimately even if Plaintiffs provide evidence establishing spoliation, the Court has discretion in deciding what kind of sanctions should be imposed if the party seeking the adverse inference demonstrates spoliation. Even if the evidence at that stage warrants a special instruction, such an instruction allows, but does not mandate an inference that the evidence did not favor the spoliator. Plaintiffs would still have the burden of proof on their causes of action; while a spoliation instruction may allow the party seeking it "to survive a legal sufficiency challenge, it will not by itself, prevent a successful factual sufficiency challenge," because in a factual sufficiency challenge the spoliation

---

[82] The government argued that mentioning the document retention policy was a code to trigger shredding at a time when it was not permissible, and it produced evidence of tons of shredded documents being trucked away at this precarious time for Enron.

presumption is merely one factor that we must consider in reviewing the evidence for factual sufficiency." *Wackenhut Corrections Corp. v. de la Rosa,* No. 13-06-00692-CV, 2009 WL 866791, *24 (Tex. App.--Corpus Christi Apr. 2, 2009), *citing Trevino*, 969 S.W. 2d at 960-61 (Baker, J. concurring).  The Court finds that, standing alone at the pleading stage of the litigation, Plaintiffs' conclusory claim of spoliation is insufficient to satisfy the heightened pleading standards.

**c.  Restatement**

The Court agrees with those courts who have determined that a restatement of previous financial reports filed with the SEC demonstrates that those financial statements which it covers were erroneous when made, but a restatement alone does not prove scienter or fraudulent intent on the part of those who prepared them.  Additional factual allegations giving rise to an inference of, or demonstrating intent or severe recklessness, depending on the cause of action, are necessary to satisfy Rule 9(b) for fraud-based claims, with the exception of a primary violation of the TSA and Texas Business and Commerce Code § 27.01,.

**1.  Sufficiency of Pleading Against Buy and Arthur Andersen Defendants:  Motions to Dismiss Under Rule 9(b) and 12(b)(6)**

The Court's summation of the allegations reflects its conclusion that much of the complaint is composed of generalities or legal conclusions inadequately supported by specific factual

allegations, and thus fails to satisfy the heightened pleading standards of Rule 9(b) for the fraud-based claims.

Nevertheless, the Enron collapse severely victimized numerous people and entities.  In the interests of justice this Court believes that if Plaintiffs are able to plead and prove intentional fraud by Defendants, they should not be denied relief. Plaintiffs have constructed a skeletal framework of at least some claims, and the Court is confident that there are numerous sources of information available sufficient to flesh it out with specific details to meet the requirements of Rule 12(b), *Twombly*, *Iqbal*, and Rule 9(b). For example, they have identified a number of emails and memoranda by date and by the individuals involved, but fail to describe the contents.  The numerous fraudulent transactions referenced need to be described--where, when, why, and how fraudulent and who was involved. Therefore, having herein highlighted the weaknesses in the current controlling pleading, the Court will give Plaintiffs one more opportunity to attempt to replead those of their claims that it concludes may be viable, as indicated below, while dismissing those for which they are unable to plead essential elements.

**a. TSA**

**1. Enron as a Primary Violator**

Plaintiffs have not, and apparently cannot, allege that they purchased their securities from Enron nor an agent of Enron as

their immediate "seller," nor were they in privity with Enron for purposes of liability under article 581-33A(2).  *See generally In re Enron Sec.*, 258 F. Supp. 2d at 603-08.

Plaintiffs argue alternatively that because Enron was an "issuer" of securities, it could be strictly liable as a primary violator under article 581-33C of the TSA.  Article 581-33C imposes strict primary liability on issuers of registered securities purchased on a secondary market for misleading statements in the prospectus under which those securities were issued.

The complaint satisfies the first element under article 581-33C in stating in ¶ 42 that "Enron  was publicly traded on the New York Stock Exchange under the symbol ENE and was an 'issuer' and/or 'seller' of securities for purposes of Texas securities laws."  In ¶ 290 of the complaint, Plaintiffs identify the relevant prospectuses under which the securities purchased by Plaintiffs were issued and name the Enron Directors who signed them and therefore "made" a statement for which they and Enron may be liable under article 581-33C.  Nevertheless Plaintiffs fail to point to specific misleading statements or identify material omissions in the prospectuses named, no less explain how such material misrepresentations or omissions were deceptive.  In the interests of justice, the Court will allow Plaintiffs a final opportunity to attempt to replead with the requisite detail this

claim, identifying specific material misrepresentations and omissions in prospectuses. As noted earlier, there is no requirement of privity or reliance for a claim under article 581-33C. *Bateman*, 15 Houston L. Rev. at 849.

If Plaintiffs succeed in adequately pleading a primary violation by Enron as an issuer under either article 581-33A(2) or 581-33C, the derivative claims against Buy as a "controlling person" of Enron under article 581-33F(1), and against Buy as well as against the Andersen Defendants under article 581-33F(2), for materially aiding Enron "with reckless disregard for the truth or the law," by giving "unqualified" or "clean" opinions to the relevant SEC-filed financial statements that were incorporated into the prospectuses, will stand. *Sterling Trust*, 168 S.W. 3d at 845 ("[A] secondary violator's liability depends on the primary violator's culpability . . . .[A] secondary violator may only be liable 'to the same extent' as the primary violator.").

**b.   Statutory Fraud Under Tex. Bus. & Comm. Code § 27.01(d)**

Enron's restatements establish generally that it had made a broad array of false misrepresentations of past or existing material fact. The quoted portions of the plea agreements and cooperation agreements of former Enron officials sufficiently evidence Enron's intent to fraudulently induce investors into buying Enron securities, *inter alia*.

As indicated above, the Court grants Plaintiffs leave to

-157-

attempt to plead with requisite specificity required by Rule 9(b) the justifiable reliance of each Plaintiff, individually, on one or more misrepresentations, which must also be specified (what, when, by whom, how fraudulent).  *Martin*, 947 F.2d at 1280 ("Texas courts . . . demand proof that the 'party acted in reliance upon the false representation.'").  As opined in *Grant Thornton, LLP v. Suntrust Bank*, 133 S.W. 3d 342, 355 (Tex. App.--Dallas 2004),

> Reliance, or the lack thereof, can be shown only by demonstrating the person's thought processes in reaching the decision.  Proof of reliance or lack of reliance necessarily requires an individualized determination because, under all the same facts and circumstances, one person may have relied on the misrepresentation in reaching a decision, while another did not rely on it in reaching the same decision. . . . "[P]roof of reliance . . . necessarily requires an individual determination for each person . . . .

If on repleading Plaintiffs succeed in stating a primary violation of § 27.01 against Enron, the Court agrees with Plaintiffs that they have satisfied the elements of a claim for secondary liability under § 27.01(d) against Buy and Arthur Andersen Defendants by stating facts making a plausible claim that they was were actually aware of the falsity in Enron's representations to investors and benefitted from them.

**c.  Common Law Fraud**

As noted, Texas law is in accord with the *Restatement (Second) of Torts* § 531 in requiring for affirmative misrepresentations intended to induce a third party to act that an "alleged fraudfeasor must 'have information that would lead a

-158-

reasonable man to conclude that there is *an especial likelihood* that it will reach those persons and *will influence their conduct*." *Pacific Mutual*, 51 S.W. 3d at 580. "[E]ven an obvious risk that a third person will rely on a representation is not enough to impose liability. . . . General industry practice or knowledge may establish a basis for foreseeability to show negligence, but it is not probative of fraudulent intent." *Id.* at 581.

Plaintiffs have failed and do not appear able to plead information that demonstrates an especial likelihood that each of them was intended to receive and rely on any representations in financial statements by Enron or by the Arthur Andersen Defendants. As noted, there are no allegations that Buy made any representations.

If their claim is for fraudulent concealment, Plaintiffs have not alleged facts showing that the Arthur Andersen Defendants and/or Buy had a duty to these third parties to disclose any such facts about Enron to them, or that Plaintiffs each relied on the fact that these Defendants were silent.

Accordingly the common-law fraud claims are dismissed.

**d.  Civil Conspiracy to Defraud**

As discussed, Plaintiffs' common law fraud claims fail. The Court is granting Plaintiffs a final opportunity to replead their statutory fraud claims under the TSA and § 27.01 against Enron as

-159-

a primary violator and against Buy and the Andersen Defenders as secondary violators.  If they succeed, these claims may sustain their conspiracy cause of action.  For conspiracy they must also allege with particularity facts that make plausible their contention that there existed a common purpose or object, a "meeting of the minds," among Enron, Arthur Andersen Defendants and Buy, to defraud Plaintiffs.  The Court will then determine whether they have succeeded in stating both statutory fraud and conspiracy claims.

**e. Negligent Misrepresentation against Arthur Andersen Defendants**

Plaintiffs' negligent misrepresentation claim against the Arthur Andersen Defendants also fails because Plaintiffs have not alleged and do not appear able to allege facts showing that Plaintiffs were members of a limited group known to and for whose benefit and guidance these Defendants supplied information and which they intended or knew Plaintiffs would rely upon, distinct from the much larger group or class of persons who might reasonably be expected sooner or later to have access to it and foreseeably take action in reliance upon it. *Restatement (Second) of Torts*, § 552; *McCamish*, 991 S.W. 2d at 793-94.  Thus this claim is dismissed.

**ORDER**

Accordingly, for the reasons indicated above, the Court ORDERS that Plaintiffs' request that the Court acknowledge

-160-

that the admissions served on Buy are deemed admitted under Rule 36 (#76) is GRANTED and the admissions are deemed admitted.  The Court further

ORDERS that Arthur Andersen and D. Stephen Goddard, Jr.'s motion to dismiss (#62),  Richard B. Buy's motion to dismiss (#67), and David B. Duncan's motion to dismiss (#69) are GRANTED as to Plaintiffs' common law fraud and negligent misrepresentation claims, but are otherwise DENIED.  Plaintiffs are granted leave to replead within thirty days those claims which the Court has identified as possibly viable.  Defendants may thereafter file timely responsive pleadings.

Finally, because the remaining claims are against some Enron Defendants in prison or unavailable,[83] the Court

ORDERS that Plaintiffs' motion for status conference (#111) is currently DENIED.  Plaintiffs shall inform the Court within twenty days whether they wish to proceed against these Defendants through their attorneys, stay the case, or dismiss the case against all or any of them.

**SIGNED** at Houston, Texas, this 8th day of December , 2010.


_____
MELINDA HARMON
UNITED STATES DISTRICT JUDGE

_____

[83] Claims remain pending against Jeffrey Skilling, Andrew Fastow, Richard Causey, Michael Kopper, and Kenneth Lay, now deceased.

-161-